IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KONA GRILL, INC., et al.,[1] | ) | Case No.: 19-10953 (___) |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN INTERIM AND FINAL ORDER
AUTHORIZING THE DEBTORS TO (I) PAY AND/OR HONOR PREPETITION
WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION AND
PAY THIRD PARTY AND CONTRACT WORKERS; (II) REMIT WITHHOLDING
OBLIGATIONS AND DEDUCTIONS; (III) MAINTAIN EMPLOYEE COMPENSATION
AND BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE
OBLIGATIONS; AND (IV) HAVE APPLICABLE BANKS AND OTHER FINANCIAL
INSTITUTIONS RECEIVE, PROCESS, HONOR, AND PAY CERTAIN CHECKS
PRESENTED FOR PAYMENT AND HONOR FUND TRANSFER REQUESTS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Company") hereby file this motion (the "Motion") for the entry of an interim and final order (the "Order") authorizing, but not directing, the Debtors to (i) pay and/or honor prepetition wages, salaries, employee benefits, and other employee compensation and reimbursements; and pay third party and contract labor expenses; (ii) remit withholding obligations and employee deductions; (iii) maintain employee compensation and benefits programs and pay related administrative obligations, including workers' compensation insurance amounts; and (iv) have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include:  Kona Grill, Inc. (6690); Kona Restaurant Holdings, Inc. (6703); Kona Sushi, Inc. (4253); Kona Macadamia, Inc. (2438); Kona Texas Restaurants, Inc. (4089); Kona Grill International Holdings, Inc. (1841); Kona Baltimore, Inc. (9163); Kona Grill International, Inc. (7911); and Kona Grill Puerto Rico, Inc. (7641).  The headquarters and service address for the above-captioned Debtors is 15059 North Scottsdale Road, Suite 300, Scottsdale, Arizona 85254.

payment and honor certain fund transfer requests.  In support of this Motion, the Debtors state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003, 6004, and 9013 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and Local Rule 9013-1(f).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.      The Chapter 11 Cases

3.      On the date hereof (the "Petition Date"), the Debtors commenced these chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy

2

Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in these chapter 11 cases.

4.     The factual background regarding the Debtors, including their current and historical business operations and the events leading up to the commencement of these chapter 11 cases, is set forth in detail in the *Declaration of Christopher J. Wells in Support of First Day Pleadings* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference.

**B.     General Employee Overview**

5.     As of the Petition Date, the Debtors employ approximately 2,400 Employees.  Except as otherwise noted, the employee benefits described in this Motion are generally applicable to all Employees unless otherwise noted. The Employees are not unionized.

6.     The Debtors represent that they will have sufficient funds available postpetition, through the use of cash collateral and postpetition financing, to pay or honor all Wages and Benefits and other amounts detailed in this Motion, to the extent described herein, on an ongoing basis and in the ordinary course of business and subject to the applicable limits under section 507(a) of the Bankruptcy Code.  Consequently, there is no reason for the regular payment of Wages and Benefits to be disrupted, which would directly harm the Debtors and their Employees.

DOCS_LA:321273.9

C.    **Payroll**

7.    The Employees are paid in arrears.  Salaried Employees and hourly Employees are each paid bi-weekly (*i.e.*, once every two weeks) (each, a "Bi-Weekly Pay Date").  However, the Debtors process a payroll every week because approximately half of the work-force is paid on even weeks and the other half on odd weeks.  The Debtors use a third party to process payroll and fund payroll prior to the Bi-Weekly Pay Date. All payroll-related automatic deposits and checks are drawn against third party accounts (*i.e.*, Paycom, the Company's third party payroll processor).

8.    The next Bi-Weekly Pay Date will occur on May 8, 2019, which relates to wages earned during the period of April 17, 2019 through and including April 30, 2019.  As of the Petition Date, the Debtors estimate they owe approximately $850,000 on account of accrued, but unpaid wages, for all Employees, which is scheduled to be paid on May 8, 2019. The last and final Bi-Weekly Pay Date that relates to the prepetition period is May 15, 2019, which relates to April 24, 2019 through and including May 7, 2019, of which only 7 days relate to the prepetition period.  As of the Petition Date, the Debtors estimate they owe approximately $425,000 on account of accrued, but unpaid wages, for all Employees being paid on May 15, 2019 (together with the May 8, 2019 Bi-Weekly Pay Date, the "Unpaid Wages").

9.    The Debtors seek authority to pay Employees any Unpaid Wages up to $1,275,000 and to continue to pay Wages that are due after the Petition Date in the ordinary course of business.

10.     As part of the relief requested in this Motion, the Debtors seek authority to permit Paycom to continue processing the Company's payroll obligations in the ordinary course of business.  On each Bi-Weekly Pay Date, the Debtors pay Paycom fees to process their payroll.  The fees vary depending upon the number of employees and the timing of the payroll processing. Historically, the fee for each Bi-Weekly Pay Date is approximately $6,000 to $9,000. The Debtors believe that they are current in fees owing to Paycom but will owe Paycom processing fees for the May 8 and May 15, 2019 Bi-Weekly Pay Dates.  Although the forecasted Paycom processing fees arise from postpetition services, the Debtors seek, out of an abundance of caution, authority to pay such fees because they relate to the payment of prepetition claims of Employees.  The Debtors request authority, in their discretion, to remit such amounts to Paycom, in an aggregate amount not to exceed $18,000.

D.     **Gross Pay Deductions and Payroll Taxes**

11.     For each applicable Bi-Weekly Pay Date, the Debtors routinely deduct certain amounts from each Employee's gross payroll, including, without limitation, garnishments, child support, spousal support, and similar deductions and other pre-tax and post-tax deductions payable pursuant the employee benefit plans discussed herein (including, for example, the Employee's share of health care benefits) (collectively, the "Deductions"). As set forth below, the Deductions are not property of the Debtors or their estates and are withheld from Employees' gross payroll and remitted to the appropriate third parties.  As of the Petition Date, certain of the Deductions may not yet have been transmitted to the appropriate third party recipients and the Debtors request authority to transfer any Deductions

5

to the appropriate third party recipients or as may be required under applicable non-bankruptcy law.

12.    In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Withholding Obligations"). The Debtors must also pay, from their own funds, for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "Employer Payroll Taxes," and, together with the Withholding Obligations, the "Payroll Taxes"). On average, the Payroll Taxes for each Bi-Weekly Pay Date, including both the Employee and employer portions, total approximately $360,000. The Debtors are seeking to pay the Debtor's portion of such taxes that is estimated to be $170,000. To the extent any of the prepetition Deductions or Payroll Taxes have not yet been forwarded to the appropriate third-party recipients, the Debtors seek authority to forward such amounts (and to continue to forward Deductions and Payroll Taxes on a postpetition basis whether or not related to the prepetition period) to the applicable third party recipients in the ordinary course of business and consistent with past practice.

E.    **Reimbursable Expenses**

13.    Employees customarily incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses may include, but are not limited to, cell phone expenses, office supply purchases, and business-related travel expenses,

6

including air travel, car rental, lodging, meal charges, ground transportation, and miscellaneous other approved travel expenses (collectively, the "Reimbursable Expenses").

14.    Generally, Employees pay for the Reimbursable Expenses personally and submit expense report forms to the Debtors for reimbursement.  In some cases, Employees may not have submitted reimbursement requests in time to have been processed prior to the Petition Date.  In addition, certain Employees have corporate-issued American Express credit cards upon which Reimbursable Expenses are charged and for which the Employees are personally responsible, but which invoices are paid by the Debtors to the extent the charges are authorized.  In the aggregate, the Employees incur, on average, approximately $30,000 per month in Reimbursable Expenses, including corporate credit card expenses, although these amounts can vary from month to month depending on the amount of expenses incurred at any given time.  The Debtors seek authority to pay unpaid prepetition Reimbursable Expenses owed as of the Petition Date, not to exceed $45,000, and to continue to honor, reimburse, and pay postpetition Reimbursable Expenses in the ordinary course of business in their discretion.

F.    **Employee Bonus Payments**

15.    The Debtors administer two bonus programs to non-insider Employees. The first relates to salaried restaurant Employees: 29 General Managers; 29 Executive Chefs, 8 Assistant General Managers, 56 Assistant Managers, and 1 Sushi Chef.  These salaried restaurant Employees are eligible for a monthly bonus based upon targeted goals of a specific restaurant's cash flow and same-store sales growth year over year (the "Monthly Restaurant Bonus") and such Employees must be employed on the day the payment is made. The total

7

amount of a Monthly Restaurant Bonus is determined in the aggregate by location. Once the total is determined, 45% is allocated to that restaurant's General Manager, 20% to the restaurant's Executive Chef, and 20% is allocated evenly among the other eligible Employees. The remaining 15% of the Monthly Restaurant Bonus is paid to Directors of Operations as discussed further below.

16.     Given the Debtors' projected restaurant cash flows, the Company estimates that the Monthly Restaurant Bonus for April 2019 for all locations will total approximately $70,000, which will be allocated among the applicable locations and allocated among the applicable eligible Employees.  No Employee will receive more than $13,650 inclusive of any other wages or benefits described in this Motion.  If the applicable bonus targets are not achieved, or if the Employee is not employed by the Company on the bonus payment date, the Debtors will not issue a Monthly Restaurant Bonus.

17.     The Debtors also administer a bonus program for approximately four (4) Directors of Operations, who oversee multiple restaurant locations in a region ("Quarterly Director Bonus" and, together with the Monthly Restaurant Bonus, the "Employee Bonuses"). After the conclusion of each quarter, Directors are paid 15% of the total Monthly Restaurant Bonuses for those restaurants they direct.

18.     Given the Debtors' projected restaurant cash flows, they estimate that the Quarterly Director Bonuses for the second quarter of 2019 for all locations will total approximately $31,500 and is scheduled to be paid in July 2019.  The Company projects that no single bonus will exceed $7,875.  No Employee will receive more than $13,650 inclusive

8

of any other wages or benefits described in this Motion.  If the applicable bonus targets are not achieved, or if the Employee is not employed by the Company on the bonus payment date, the Debtors will not issue a Quarterly Director Bonus.

## G.    <u>Third Party Labor Providers</u>

19.    The Debtors utilize the services of VincentBenjamin (the "<u>Third Party Labor Provider</u>"), a staffing firm that provides labor service for the Debtors' corporate office. The Debtors derive the benefit of services provided by the Third Party Labor Provider without having to incur the expenses associated with Benefits and payroll tax obligations that would otherwise be incurred if these workers were employed by the Debtors.  Moreover, the Third Party Labor Provider provides critical labor services to the Debtors.  Without the Third Party Labor Provider, the Debtors' corporate office would be short-staffed and they would not be able to operate without having to hire additional personnel without having to incur the associated costs of having permanent employees.  Due to the financial distress of the Debtors' business, the Debtors need the flexibility to hire and downsize such labor depending upon the Debtors' needs, which can change quickly.  As of the Petition Date, the Debtors estimate that they may owe up to $6,000 to the Third Party Labor Provider.  Accordingly, the Debtors seek authority, in their discretion, to pay up to $6,000 in prepetition Third Party Labor Provider costs, and to continue to use the services of the Third Party Labor Provider and pay postpetition Third Party Labor Provider costs in the ordinary course of business and in their discretion.

**H.    Health Benefits**

20.    The Debtors provide health insurance to all salaried Employees and eligible hourly Employees. An hourly Employee is eligible to receive health insurance if the Employee has been employed for 12 continuous months at an average of 30 or more hours per week. Approximately 350 Employees are eligible to receive health insurance. The Company's health benefits include, *inter alia*, medical, dental, vision, disability, health savings accounts, and dependent care benefits (collectively, the "Health Plans"), as described in more detail below. Each pay period, Employees make contributions toward the Health Plan premiums for medical, dental, and vision coverage, and the Debtors deduct an Employee's portions of the premiums, if applicable, owing under the Health Plans from the Employee's Wages as Deductions.

**i.    Medical Plans**

21.    The Debtors offer all regular full-time Employees and legal dependents subsidized medical insurance. The Debtors are partially self-insured for their medical and use Blue Cross Blue Shield of Arizona ("Blue Cross") for Employees except for those Employees located in Hawaii. Employees in Hawaii are provided insurance through Kaiser Permanente ("Kaiser") under a first dollar plan.

22.    Under the Blue Cross medical plan, the Debtors have a specific stop-loss program whereby any individual medical claim exceeding $110,000 (and $1,545,000 in the aggregate) is fully covered by the insurance carrier. To administer their plan, the Debtors pay Blue Cross monthly premiums at the end of each month for that month plus actual claims

10

incurred in the prior month, subject to any applicable stop-loss cap.  For example, in May 2019, the Company will pay Blue Cross the monthly premium for May 2019 and the actual claims incurred in April 2019.

23.     The premiums payable to Blue Cross for April 2019 were paid as of the Petition Date.  However, the claims associated with April 2019 are not yet known and remain unpaid.  Accordingly, by this Motion, the Debtors seek authority to pay Blue Cross the valid claims as and when they come due.  While no two months are the same, the claim for March 2019 were approximately $90,000.

24.     Approximately 34 Employees that reside in Hawaii are covered by a separate medical plan provided by Kaiser.  Under the Kaiser medical plan, the Company only pays a monthly premium of approximately $11,000. The Debtors seek authority to pay Kaiser approximately $11,000, which includes the April 2019 premium and continue making premium payments in the ordinary course as and when they come due.

25.     As discussed above, it is unknown at any given time what is outstanding on account of claims under the Company's medical plans.  Accordingly, the Debtors seek authority to continue to pay postpetition amounts under each medical plan in the ordinary course of business and in the Debtors' discretion.

ii.    **Dental Plan**

26.     The Debtors offer all eligible Employees and legal dependents dental insurance (the "Dental Plan"), which is 100% funded by Employees through withholdings from payroll, and averages approximately $12,000 per month.  The Debtors are current with the

11

Dental Plan and seek authorization to continue making payments in the ordinary course of business.

### iii.   **Vision Plan**

27.     The Debtors also provide eligible Employees with vision insurance through a premium-based policy issued by Eyemed (the "Vision Plan"). The Vision Plan provides several types of services, including eyeglass lenses, frames, and contact lenses. The Vision Plan provides both in-network and out-of-network services. The Vision Plan is 100% funded by Employees through withholdings from payroll, and averages approximately $2,000 per month. The Debtors seek authority to pay the $2,000 prepetition premium and continue to offer the Vision Plan, administer Employee withholdings, and pay Eyemed amounts owed under the Vision Plan postpetition in the ordinary course of business.

### iv.   **Life Insurance, Accidental Death & Dismemberment, and Disability Plans**

28.     The Debtors provide basic life and accidental death and dismemberment coverage to all salaried Employees (the "Basic Life and AD&D Insurance Plan") through Metlife at no cost to such Employees. The Debtors pay all premiums and administrative fees in connection with the Basic Life and AD&D Insurance Plan. The Debtors estimate that they remit approximately $500 per month on account of premiums and administrative fees under the Basic Life and AD&D Insurance Plan.

29.     The Company also provides, for locations within the states of Hawaii, New Jersey, and Puerto Rico, Temporary Disability Income ("TDI") and Short-Term Disability Income ("SDI") to the Employees based in these locations.

12

30.    TDI and SDI in Hawaii are provided by The Hartford for approximately $600 per month.  TDI and SDI in in New Jersey and Puerto Rico are administered by the respective government authorities and is approximately $250 and $200, per month, respectively.

31.    The Company also provides a short-term disability plan to all salaried Employees (except in Hawaii, New Jersey, and Puerto Rico), which the Company self-funds and administers through their weekly payroll runs.

32.    The Debtors also offer all salaried Employees (a) supplemental life and accidental, death and dismemberment insurance (the "Voluntary Life and AD&D Plan") and (b) voluntary long-term disability insurance (the "Voluntary Long-Term Disability Plan" and together with the Voluntary Life and AD&D Plan, the "Voluntary Plans").  Eligible Employees pay 100% of the premiums under the Voluntary Plans out of payroll deductions.  The Debtors estimate that they remit approximately $1,000 per month on account of premiums and administrative fees under the Voluntary Life and AD&D Plan.  The Debtors estimate that they remit approximately $3,500 per month on account of premiums and administrative fees under the Voluntary Long-Term Disability Plan.

33.    The Debtors seek authority to pay unpaid prepetition amounts on account of the Basic Life and AD&D Insurance Plan, as well as TDI and SDI in Hawaii, New Jersey, and Puerto Rico, up to $4,000, and to continue to pay postpetition premium amounts on account of the Basic Life and AD&D Insurance Plan, as well as TDI and SDI in Hawaii, New Jersey, and Puerto Rico, in the ordinary course of business and in the Debtors' discretion.

13

34.    The Debtors are also requesting authority to remit all funds withheld from Employees for the Voluntary Life and AD&D Plan, as well as the Voluntary Long-Term Disability Plan.

35.    The Debtors also offer additional benefits to Employees on a voluntary basis, which include, Critical Illness, Hospital Indemnity, and Legal, each through MetLife, and a health savings account through Optum Bank (collectively, the "Voluntary Benefits"). As voluntary benefits, the Debtors remit Employee funds that are withheld from paychecks. The Debtors are requesting authority to remit all funds withheld from Employees for Voluntary Benefits.

**I.    Vacation and Sick Time**

36.    The Debtors provide vacation pay for salaried Employees upon hire. An hourly Employee is eligible to receive vacation pay if the Employee has been employed for 12 continuous months at an average of 30 or more hours per week. Sick leave is permitted in the states that require this benefit (together with vacation time, "PTO"). Vacation time may not be rolled over from year to year.

37.    By this Motion, the Debtors seek authority to continue to honor their PTO program in the ordinary course of business by allowing Employees to use accrued prepetition PTO postpetition in the Debtors' discretion. The Debtors also seek authority, but not the obligation, in their sole discretion and to the extent required by applicable non-bankruptcy law, to pay out any accrued and prepetition PTO amounts that are owed to Employees solely to the extent their employment with the Debtors is terminated postpetition,

provided that no Employee shall be paid more than $13,650 on account of all payments of accrued and prepetition amounts owing to such Employee for wages and benefits, including such PTO.

**J.    <u>401(k) Plan</u>**

38.    The Debtors provide Employees with a 401(k) retirement plan (the "<u>401(k) Plan</u>"). The Debtors also match 100% of the first 3% of Employee contributions and 50% of the next 2% of Employee contributions, for a total Employee contribution match of 4%. Employee contributions are withheld from paychecks as Deductions and transferred to the 401(k) account approximately one week after each Bi-Weekly Pay Date. The Company's matching contributions are made to the 401(k) Plan within one week after each Bi-Weekly Pay Date and deposited to the participating Employee's respective 401(k) account. Historically, the Debtors matched approximately $30,000 of Employee contributions to the 401(k) Plan on a monthly basis. The Debtors estimate that as of the Petition Date that approximately $20,000 will need to be transferred to Employees' 401(k) accounts and seeking authority to complete such transfers as and when they become due. The Debtors also seek authority, in their discretion, to continue their 401(k) Plan postpetition in the ordinary course of business, including continuing to match Employee contributions to the 401(k) Plan consistent with their 401(k) Plan policy.

39.    ADP is the record keeper and is paid approximately $1,000 per month for administering the 401(k) Plan. The Debtors seek authorization to pay any other prepetition

15

amounts to ADP up to $2,000 and continue paying postpetition amounts in the ordinary course of business to avoid any disruption to the administration of the 401(k) Plan.

**K.    Workers' Compensation Insurance**

40.    Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide Employees with coverage for injury claims arising from or related to their employment with the Debtors (the "WC Claims"). The Company's workers' compensation program is fully insured ("WC Program") with Liberty Mutual for all locations, except Ohio and San Juan, Puerto Rico, which are each insured through the local municipality.

41.    For the current coverage year, the Debtors pay an initial premium and estimated monthly premiums to its broker for the benefit of Liberty Mutual ("Liberty") in the amount of $140,000 and $55,000, respectively. The initial premium of $140,000 was paid prior to the Petition Date and the Debtors are seeking authorization to continue paying premiums as they become due in the ordinary course of business.

42.    For the Employees employed in Ohio, the Debtors have state-mandated compensation insurance fund coverage (the "Ohio Program"). Under the Ohio Program, the Debtors' premiums are generally based on the number of Employees insured during each policy year. Every two months the Debtors make payments in the approximate amount of $3,000 to the Ohio Bureau of Workers' Compensation ("BWC"), and then true-up annually based on actual wages. The last prepetition premium payable to BWC was paid and the

Debtors seek authorization to pay any other prepetition amounts to BWC up to $6,000 and continue paying postpetition amounts in the ordinary course of business.

43.     For the Employees employed in Puerto Rico, the Debtors have workers' compensation insurance fund coverage similar to that of Ohio that is paid through a local municipality (the "Puerto Rico Agency"). The Debtors make payments calculated on the amount of hours worked by the Employees located in Puerto Rico. The Debtors are seeking authority to pay up to $65,000 for claims and/or premiums for the period between July 1, 2015 through the Petition Date. It should be noted that the Debtors have filed an amended workers' compensation return with the Puerto Rico Agency for the period of July 1, 2015 through June 30, 2016. If the return is accepted, the Debtors expect the total liability to the Puerto Rico Agency to be reduced to $25,000. However, out of an abundance of caution, the Debtors are seeking authority to pay up to $65,000.

44.     In addition, for the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate WC Claims during these chapter 11 cases. Thus, the Debtors request that the automatic stay be modified to allow them to continue to assess, determine and adjudicate unpaid WC Claims in the ordinary course of the Debtors' business. In addition, to the extent any employees assert claims under the WC Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the employees to proceed with their claims under the WC Program and to allow the insurers to administer, handle, defend, settle, and pay a claim covered

17

by the WC Program and the costs related thereto in accordance with the WC Program. For avoidance of doubt, this requested modification of the automatic stay pertains solely to claims under the WC Program, and not to other claims made under different insurance policies.

### RELIEF REQUESTED

45.     By this Motion, the Debtors seek to minimize the personal hardship to their employees (collectively, the "Employees") as a result of the filing of these chapter 11 cases and to minimize the disruption to the Debtors' operations. To accomplish this, the Debtors request, in their sole discretion, the authority (a) to pay and honor, *inter alia*, certain prepetition claims of their Employees for wages, salaries, and compensation (the "Wages"), (b) pay and honor employee benefits and expense reimbursements and honor and pay ordinary course bonuses owed to certain non-insider Employees (collectively, the "Benefits" and, together with Wages, the "Wages and Benefits"); (c) remit withholding obligations and employee deductions and withholdings, and (d) to continue to pay and honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business.

46.     Pursuant to sections 105(a) and 363(b)(1) and (c)(1) of the Bankruptcy Code, and the "necessity of payment" doctrine, the Debtors seek authority to pay or honor, in their sole discretion, the following, subject to the limits noted in the chart below:

| Wages or Benefits | Total |
|---|---|
| Unpaid Wages | $1,275,000 |
| Employer Payroll Taxes | $170,000 |
| Paycom Fees | $18,000 |
| Reimbursable Expenses | $45,000 |

18

| Wages or Benefits | Total |
|---|---|
| Employee Bonus Payments | $101,500 |
| Third Party Labor Providers | $6,000 |
| Blue Cross Medical Plan Benefit Expenses | Valid April claims under the Blue Cross Medical Plan as and when they come due. |
| Kaiser Medical Plan | $11,000 |
| Dental Plan | $0.00 |
| Vision Plan | $2,000 |
| Life and Disability Insurance Plans | $4,000 |
| Workers' Compensation Claims | $71,000 |
| 401(k) Plan Contributions | $20,000 |
| 401(k) Plan Administrator Expenses | $2,000 |

47.     The Debtors represent that (a) they will not distribute any amounts over $13,650 directly to any individual Employee on account of the sum of unpaid: (i) prepetition Wages or (ii) any other compensation due to an Employee; (b) they will not make contributions to any employee benefit plan on account of unpaid prepetition amounts in excess of (i) the number of Employees covered by such plan multiplied by $13,650, less (ii) the aggregate amount of prepetition Wages and ordinary course bonus payments, plus the aggregate amount paid by the Debtor on behalf of such Employees to any other employee benefit plan, as provided under section 507(a)(5) of the Bankruptcy Code; and (c) they will not pay any amounts in excess of the estimated outstanding prepetition cap amounts for each category of prepetition claims identified in the chart above and in the proposed interim order without further order from this Court, except to the extent required under state law.

48.    To enable the Debtors to accomplish the foregoing, the Debtors request that the Court authorize and direct the Debtors' banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

49.    Notwithstanding the authority requested in this Motion, the Debtors, in the ordinary course of business, may modify, change, and discontinue employee programs and implement new employee programs, may continue to do so during these chapter 11 cases, and will provide notice thereof to the extent required by applicable rules and law.

## BASIS FOR RELIEF

50.    Statutory support for the requested relief exists pursuant to sections 105(a), 362(d), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*).  Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.  Section 363(c) of the Bankruptcy Code authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing.  Section 105(a) of the Bankruptcy Code further provides, in pertinent part, that the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

51.    The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.  The "necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior

20

to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under section 105(a) of the Bankruptcy Code and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive employee morale—two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing* H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the "necessity of payment" doctrine applies to the payment of prepetition employee compensation and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the Debtors' business judgment in permitting payment of certain workers' compensation claims).

52.    This Court similarly has approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re GST AutoLeather, Inc.*, Case No. 17-12100 (LSS) (Bankr. D. Del. Oct. 27, 2017) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re True Religion Apparel, Inc.*, Case No. 17-11460 (CSS) (Bank. D. Del. Jul. 31, 2017) (same); *In re TK Holdings Inc.,* Case No. 17-11375 (BLS) (Bankr. D. Del. June 27, 2017) (same); *In re Aquion Energy Inc.,* Case No. 17-10500 (KJC) (Bankr. D. Del Mar. 10, 2017) (same); *In re Basic Energy Services, Inc., Ca*se No. 16-12320 (KJC) (Bankr. D. Del. Oct. 26, 2016) (same)*; In re Key Energy Services, Inc.,* Case No. 16-12306 (BLS) (Bankr. D. Del. Oct. 25, 2016).

53.    The "necessity of payment" doctrine authorizes the Debtors to pay the amounts they seek authority to pay pursuant to this Motion because the Debtors' Employees are critical assets necessary to the successful administration of the chapter 11 case.  Pursuant to section 507(a)(4) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, or commissions, including vacation and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $13,650 per Employee. The Debtors believe that all of the Wages relating to the period prior to the Petition Date (to the extent not already paid) would constitute priority claims under sections 507(a)(4) of the Bankruptcy Code.  As priority claims, the Wages must be paid in full before any general unsecured obligations of the Debtors may be satisfied.  Accordingly, the relief requested may

22

affect only the timing of the payment of these priority obligations, and will not prejudice the rights of general unsecured creditors or other parties in interest.

54.    As explained earlier in the Motion, the Debtors believe that all prepetition Wages for Employees have been paid.    However, solely to the extent any prepetition Wages may not have been paid for any reason, the Debtors request authority only to pay up to the $13,650 statutory cap under section 507(a)(4) of the Bankruptcy Code to each Employee on account of any unpaid prepetition Wages owing to such Employee.[2]

55.    Many Employees may live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses.    These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business.    Moreover, the Debtors believe that if they are unable to honor accrued Wages and the Benefits described above, including honoring prepetition PTO and Sick Time by allowing Employees to use accrued prepetition PTO and Sick Time on a postpetition basis, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. The Debtors believe that any uncertainty with regard to continuation of Wages and Benefits will cause significant anxiety at precisely the time the Debtors need their Employees to perform their jobs at peak efficiency.

---

[2]    In the event any unpaid amounts owing to any Employee on account of unpaid Wages exceed the $13,650 statutory cap, the Debtor reserves the right to petition the Court for authority to pay such excess amounts.

DOCS_LA:321273.9

56.    Additionally, the Debtors submit that the Deductions (including, for example, any 401(k) Plan contributions held by the Debtors) do not constitute property of the Debtors' estates and principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Deductions), and judicial authorities (in the case of involuntary Deductions), have designated for deduction from Employee paychecks.  The failure to transfer these withheld funds could result in hardship to certain Employees. Moreover, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit these payments.

57.    The Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estates given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations.  Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, such as withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estates. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the Debtors' estates).

58.    Courts have also authorized debtors to pay employee-related taxes under section 363(b)(1) of the Bankruptcy Code, which provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11. U.S.C. § 363(b)(1).  Under such section, a court may authorize a debtor to pay certain prepetition claims. *See In re FV Steel & Wire Co.*, Case No. 04-22421 (Bankr.

24

E.D. Wis. Feb. 26, 2004) (authorizing the continuation of customer programs and the payment of prepetition claims under section 363 of the Bankruptcy Code); *In re UAL Corp.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code).

59.     To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175.  As discussed herein, the Debtors' failure to pay employee-related taxes could have a material adverse impact on their ability to operate in the ordinary course of business.

60.     Indeed, in numerous chapter 11 cases, this Court has exercised its equitable powers under section 105 of the Bankruptcy Code to authorize debtors to pay a variety of prepetition claims of creditors, including claims similar to the prepetition taxes. *See, e.g., In re Aquion Energy Inc.*, Case No. 17-10500 (KJC) (Bankr. D. Del March 10, 2017); *In re Basic Energy Services, Inc., et al.*, Case No. 16-12320 (KJC) (Bankr. D. Del. October 26, 2016); *In re Key Energy Services, Inc., et al.*, Case 16-12306 (BLS) (Bankr. D. Del. October 25, 2016); *In re Malibu Lighting Corporation, et al.*, Case No. 15-12082 (KG) (Bankr. D Del. October 9, 2015); *In re Savient Pharmaceuticals, Inc.*, Case No. 13-12680, ECF No. 44 (MFW) (Bankr. D. Del. Oct. 16, 2013); *In re Furniture Brands Int'l, Inc.*, Case No. 13-12329, ECF No. 71 (CSS) (Sept. 11, 2013); *In re Exide Technologies*, Case No. 13-11482, ECF No. 71 (KJC) (Bankr. D. Del. June 11, 2013); *In re Synagro Technologies, Inc.*, Case No. 13-11041

25

(BLS), ECF No. 43 (Bankr. D. Del. Apr. 25, 2013).  The Debtors submit that the present circumstances warrant similar relief in these chapter 11 cases to preserve the Debtors' assets and avoid business interruption.

61.     Finally, the Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the successful sale of the Debtors' business.  Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets.  Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

## WAIVER OF BANKRUPTCY RULES 6003 AND 6004

62.     Pursuant to Rule 6003(b) of the Bankruptcy Rules, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 21 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b).  For the reasons described herein and as supported by the First Day Declaration, the Debtors submit that the requirements of Bankruptcy Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  To implement the foregoing successfully, the Debtors seek a waiver of the requirements under Bankruptcy Rule 6004, including the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

DOCS_LA:321273.9

## NO ASSUMPTION OR ASSIGNMENT OF EMPLOYEE BENEFITS

63.     To the extent any Benefits or related agreement is deemed an executory

contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this

time, seek to assume any such contract.  Accordingly, if the Court authorizes the payments

described above, such payments should not be deemed to constitute a postpetition assumption

or adoption of the programs, policies, or agreements as executory contracts pursuant to section

365 of the Bankruptcy Code.  Moreover, authorization to pay all amounts on account of Wages

and Benefits shall not affect the Debtors' rights to contest the amount or validity of these

obligations.

## REQUEST FOR FINANCIAL INSTITUTIONS TO HONOR CHECKS

64.     The Debtors request that all applicable banks and other financial

institutions be authorized to receive, process, honor, and pay all checks presented for payment

and to honor all fund transfer requests made by the Debtors to Employees (and other third

parties described herein), whether such checks were presented or fund transfer requests were

submitted prior to, on, or after the Petition Date.  The Debtors represent that they have

sufficient postpetition funding to pay promptly all Wages and Benefits, to the extent described

herein, on an ongoing basis and in the ordinary course of business.  Nothing contained in this

Motion, however, shall constitute a request for authority to assume any agreements, policies,

or procedures relating to Wages and Benefits.  Further, the Debtors seek to retain the discretion

to decide which Wages and Benefits it will pay and honor, and nothing in this Motion shall be

27

deemed an admission by the Debtors that any Wages and Benefits will in fact be paid or honored.

65.     Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Wages and Benefits including, but not limited to, any fees owed to any third party administrators of Benefits as described in the Motion.

## **NOTICE**

66.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) Key Bank National Association and Zions Bank, (c) parties asserting liens against the Debtors' assets, and (d) the Debtors' thirty largest unsecured creditors on a consolidated basis.  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

67.     No prior motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an interim order, substantially in the form attached hereto as **Exhibit A**, and ultimately a final order granting the relief requested herein and granting such other relief as is just and proper.

Dated:    April 30, 2019

PACHULSKI STANG ZIEHL & JONES LLP

Jeremy V. Richards (CA Bar No. 102300)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No. 271038)
919 N. Market Street, 17th Floor
Wilmington, DE 91899
Tel:         (302) 652-4100
Fax:        (302) 652-4400
E-mail:    jrichards@pszjlaw.com
              joneill@pszjlaw.com
              jlucas@pszjlaw.com

Proposed Attorneys for Debtors
and Debtors in Possession