IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KONA GRILL, INC., et al.,[1] | ) | Case No.: 19-10953 (___) |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MOTON FOR INTERIM AND FINAL ORDER UNDER SECTIONS 105, 345, 363, 364, 503, 1107 AND 1108 OF THE BANKRUPTCY CODE AUTHORIZING (I) MAINTENANCE OF EXISTING BANK ACCOUNTS; (II) CONTINUANCE OF EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, CHECKS AND RELATED FORMS; (III) CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS; (IV) LIMITED WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors" or "Company") hereby file this motion (the "Motion") for the entry of an interim and final order, pursuant to sections 105, 345, 364, 363, 503, 1107, and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"), authorizing: (i) the maintenance of existing bank accounts, including the authority to pay routine prepetition banking fees owed to financial institutions; (ii) the continued use of the Company's existing cash management system, bank accounts, and checks (the "Cash Management System"); (iii) the continued performance of intercompany transactions ("Intercompany Transactions"); (iv) a limited waiver of the deposit and investment requirements

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include:  Kona Grill, Inc. (6690); Kona Restaurant Holdings, Inc. (6703); Kona Sushi, Inc. (4253); Kona Macadamia, Inc. (2438); Kona Texas Restaurants, Inc. (4089); Kona Grill International Holdings, Inc. (1841); Kona Baltimore, Inc. (9163); Kona Grill International, Inc. (7911); and Kona Grill Puerto Rico, Inc. (7641).  The headquarters and service address for the above-captioned Debtors is 15059 North Scottsdale Road, Suite 300, Scottsdale, Arizona 85254.

imposed under section 345(b) of the Bankruptcy; and (v) granting related relief.  In support of the

Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

      1.      The United States Bankruptcy Court for the District of Delaware (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference from the United States District Court for the District of Delaware*,

dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules

of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot

enter final orders or judgments in connection herewith consistent with Article III of the United

States Constitution.

      2.      The statutory bases for the relief sought in this Motion are sections 105,

345, 363, 364, 503, 1107, and 1108 of the Bankruptcy Code; Rules 6003, 6004, and 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Local Rule 9013-1(f).

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.**      **The Chapter 11 Cases**

      3.      On the date hereof (the "Petition Date"), the Debtors commenced these

chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

The Debtors have continued in the possession of their property and have continued to operate and

2

manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the
Bankruptcy Code. No trustee, examiner, or committee has been appointed in the these chapter 11
cases.

4.     The factual background regarding the Debtors, including their current and
historical business operations and the events leading up to the commencement of these chapter 11
cases, is set forth in detail in the *Declaration of Christopher J. Wells in Support of First Day
Pleadings* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein
by reference.

**B.     The Cash Management System and Bank Accounts**

5.     The Company's Cash Management System facilitates the timely and
efficient collection, management, and disbursement of funds used in the Debtors' business. The
Cash Management System currently consists of, as more fully outlined below, three primary bank
accounts and 38 linked depository sub-accounts, all located at Wells Fargo Bank, N.A. ("Wells
Fargo").[2] A list of the Company's bank accounts (collectively, the "Bank Accounts") is set forth
on Exhibit A annexed hereto. A schematic diagram of the Cash Management System is annexed
hereto as Exhibit B.

6.     As more fully explained below, the Cash Management System is designed
to effectuate the collection of revenue from customers, pay operating expenses, and maintain
payroll obligations. Any disruption to the Cash Management System would jeopardize the
Company's ability to timely satisfy postpetition obligations.

---

[2] The Company is in the process of closing certain restaurant locations. To the extent sub-accounts relating to these
restaurants are no longer necessary, the Debtors request authority to close such sub-accounts without further order
of the Court.

i. The Operating Account

7. The Debtors maintain an operating account (Account No. 9811, the "Operating Account") at Wells Fargo. The Operating Account is utilized for both receipts and disbursements. The approximate balance in the Operating Account as of the Petition Date is $1.2 million.

8. The Company typically makes the following deposits to the Operating Account:

- **Restaurant Cash Deposits**: Each sub-account is maintained for a separate restaurant location. Cash deposits from the restaurants are transported on a weekly basis to and deposited into the applicable sub-account at a Wells Fargo branch by armored car. Deposits are automatically swept from the sub-accounts to the Operating Account such that the end of day balance of the sub-accounts is always $0.

- **Credit Card Deposits**: Credit card deposits (collectively the "Credit Card Deposits") in the United States are received from (a) American Express and (b) Total Systems Services, Inc. ("TSYS"). Credit card deposits in Puerto Rico are received from Global Payments Inc. ("Global Payments"). The Credit Card Deposits are made by the applicable credit card processor directly into the Operating Account.

- **Other Deposits**: Checks may be received at the Company's corporate office for vendor rebates, refunds, and for other miscellaneous reasons. These checks are logged by the Senior Accountant into a summary journal entry when received. The physical checks are stored in a locked drawer until deposited. The checks are deposited into the Operating Account either electronically or at a physical Wells Fargo branch location. In addition, the Debtors receive Automated Clearing House ("ACH") deposits from other vendors or consumers that are deposited into the Operating Account.

9. As discussed above, the Company also utilizes the Operating Account as a centralized disbursement account. Specifically, the Company uses the Operating Account to fund the zero-balance payroll and accounts payable accounts, as described more fully below. The Debtors also utilize the Operating Account to (i) fund certain credit card processing fees, (ii) send

4

wires to third parties when ACH is not available, and (iii) fund the on premise cash requirements of individual restaurants.

ii.    Accounts Payable Account

10.    The Debtors make the majority of accounts payable disbursements and some minor payroll-related disbursements (e.g., *de minimis* prepaid payroll debit cards) from a zero balance account (Account No. 0072, the "Accounts Payable Account") maintained at Wells Fargo. Disbursements from the Accounts Payable Account are made via automated and manual checks and ACH transfers. Check runs typically occur on a weekly basis while ACH transfers occur on a daily basis or as needed. The Accounts Payable Account is funded on an as-needed and zero balance basis from the Operating Account.

iii.    Payroll Account

11.    The Debtors make the majority of payroll disbursements from a zero balance account (Account No. 9829, the "Payroll Account") maintained at Wells Fargo. To meet their weekly payroll obligations, the Debtors utilize the services of Paycom, a third party payroll processor. Payments to fund payroll disbursements are made to Paycom from the Payroll Account. The Payroll Account is funded on an as-needed and zero balance basis from the Operating Account. The Debtors do not make any non-payroll-related disbursements from the Payroll Account.

**RELIEF REQUESTED**

12.    By this Motion, the Debtors seek (a) authority to (i) maintain their existing bank accounts and to pay any prepetition routine banking fees imposed by the financial institutions where the Debtors' bank accounts are maintained and to continue to use their existing business

forms and check stock; (ii) continue to use their existing Cash Management System, as provided herein; (iii) continue to perform intercompany transactions among the Debtors; (iv) obtain a limited waiver of the requirements pursuant to section 345(b) of the Bankruptcy Code to the extent required; and (b) the related relief set forth herein.

A.      **The Court Should Authorize the**
        **Debtors to Maintain Existing Bank Accounts**

13.     The United States Trustee for the District of Delaware has established certain operating guidelines for debtors in possession.  One such provision requires chapter 11 debtors in possession to close all existing bank accounts and open new bank accounts.  The guidelines also require that debtors maintain new bank accounts in certain financial institutions designated as authorized depositories by the United States Trustee.  This requirement, designed to provide a clear line of demarcation between prepetition and post-petition claims and payments, helps protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

14.     The Debtors seek a waiver of the United States Trustee's requirement for the closure of the Bank Accounts and opening of new post-petition bank accounts at depositories authorized by the United States Trustee.  If strictly enforced in these cases, the requirement to close and open new accounts would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under chapter 11.  Maintenance of the Bank Accounts and the Cash Management System will greatly facilitate the Debtors' operations in chapter 11.  The continued maintenance of the Bank Accounts is of paramount importance because the accounts are used to collect revenues and effectuate payments to employees and vendors.

DOCS_LA:320608.7

15.     The Bank Accounts are maintained by a financial institution that is on the United States Trustee's approved depository list for the District of Delaware. If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments into and out of the Debtors' accounts, which would disrupt the flow of post-petition receipts and disbursements. In addition, closing the Bank Accounts would require the Debtors to cancel and reinstitute wire transfer instructions which would be difficult to modify under exigent circumstances. This disruption would severely impact and could irreparably harm the Debtors' ability to operate at this critical juncture. The Debtors should be permitted to maintain their existing Bank Accounts and, if necessary, open new accounts as debtors-in-possession accounts, and/or close any unneeded existing Bank Accounts.

16.     To guard against improper transfers resulting from the post-petition honoring of prepetition checks, the Debtors will promptly notify Wells Fargo not to honor checks drawn on the Debtors' accounts before the Petition Date, except upon limited Court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of their Bank Accounts in the same manner and with the same account numbers, styles, and document forms as those employed prepetition.

17.     If the relief requested herein is granted, the Debtors will not pay, and Wells Fargo will be required not to pay, any debts incurred before the Petition Date, other than as specifically authorized through this Motion or otherwise ordered by the Court.

**B.    The Court Should Authorize the Debtors to
Continue Their Existing Cash Management System**

18.    The Debtors hereby seek authority to continue to use their Cash Management System as such system may be modified by the Debtors.  For the reasons set forth above, the Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The Cash Management System provides numerous benefits including the ability to (a) receive customer payments; (b) allow a mechanism for deposits; (c) pay employee wages and benefits; and (d) pay vendors.  In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System.  Moreover, the Debtors submit that the relief requested is consistent with the relief provided to debtors in a number of other cases pending in this district, as explained below.

**C.    The Court Should Authorize the Payment
of Outstanding Routine Prepetition Expenses
Relating to the Operation of the Cash Management System**

19.    In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System, which also includes fees relating to the processing of credit cards.  While it is difficult to readily determine the aggregate amount of unpaid prepetition banking fees as of the Petition Date (given, for example, the applicable bank's and third party payment processors' varying timing of charging/deducting such fees from a given account), on average, the Debtors pay approximately $250,000 to $300,000 per month.[3]  The Debtors seek

---

[3]    This amount is inclusive of monthly Credit Card Processor fees discussed below.

authority, in their discretion, to pay any such routine and ordinary course prepetition banking fees and charges owed to any affected bank and to continue the post-petition payment of such fees and charges in the ordinary course of business, subject to the terms of any order authorizing the Debtors to obtain debtor in possession financing (a "Financing Order").

**D.     The Court Should Authorize Debtors to
Continue Processing Credit Card Transactions**

20.     The Debtors are party to a Merchant Processing Agreement (the "MPA") with TSYS Merchant Solutions, LLC, as agent for First National Bank of Omaha (the "Credit Card Processor"). The Company's customers are able to pay for their meals and other services with credit cards.  For purchases with American Express, the Credit Card Processor remits customer payments to the Debtors after it withholds the related transaction fees associated with the purchase. For all others, the Debtors are paid in full for each credit card transaction and the Credit Card Processor debits the Company's account in the amount of its fee on the second business day of the following month; *provided*, *however*, for credit card transactions in Puerto Rico, the Company is paid in full for each credit card transaction and pays American Express and Global Payments the related credit card processing fees at the end of each month.

21.     It is routine for the Company's customers to pay using a credit card.  As a result, it is essential that the Debtors maintain the MPA with the Credit Card Processor in the ordinary course of business.  Accordingly, the Debtors request authority to pay any outstanding fees owed to the Credit Card Processer to ensure that the Debtors continue to receive all of the benefits and services associated under the MPA.

22.     The Debtors further request that the Court authorize the Banks and, to the extent applicable, the Company's credit card processors, to process payments in the ordinary course of business, including the netting out of any fees and/or chargebacks arising before, on, or after the Petition Date.

**E.      The Court Should Grant a Limited Waiver
Pursuant to Section 345(b) of the Bankruptcy Code**

23.     The Debtors seek a waiver of section 345(b) of the Bankruptcy Code to the extent required.  The waiver would permit the Debtors to maintain the Bank Accounts without posting a bond or other security, as would otherwise be required under section 345(b) whenever the funds on deposit exceed the amount permitted under section 345(b).  As explained above, all of the Bank Accounts are maintained at Wells Fargo, which is a federally insured institution and approved depository with the United States Trustee.

### BASIS FOR RELIEF REQUESTED

**A.      The Continued Use of the Cash Management System
and Bank Accounts Is Essential and Approval to Maintain the Status
Quo Is Routinely Granted Under Bankruptcy Code Sections 363 and 105**

24.     Bankruptcy courts routinely grant chapter 11 debtors authority to continue utilizing existing cash management systems, and treat requests for such authority as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  This is particularly true where, as here, the chapter 11 case involves affiliated entities with complex financial affairs.  In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the bankruptcy court entered an order authorizing the debtors and forty-three (43) of their subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to

10

transfer monies from affiliated entity to entity, including operating entities that are not debtors." *Id.* at 620. The Eleventh Circuit Court of Appeals then affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id.* at 621.

25.     Likewise, in another context, the bankruptcy court in the *Columbia Gas* chapter 11 case explained that a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticability of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1993), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 114 S. Ct. 1050 (1994). The Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061. *See also In re Southmark Corp.*, 49 F.3d 111, 114 (5th Cir. 1995) (cash management system allows debtors "to administer more efficiently and effectively their financial operations and assets"); *In re UNR Indus., Inc.*, 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984).

26.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtors in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtors in possession with the flexibility to engage in the ordinary transactions required to operate their business without undue oversight by creditors or the court. *Medical Malpractice Ins. Ass'n. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997). Included within the

11

purview of section 363(c) is a debtors' ability to continue the "routine transactions" necessitated by a debtors' cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection and disbursement of cash pursuant to their existing Cash Management System. Additionally the Court may exercise their equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the Cash Management System without interruption is vital to the success of their chapter 11 cases.

27.     In other cases in the District of Delaware, this Court has granted relief substantially similar to that requested in this Motion. *See, e.g., In re The Walking Company Holdings, Inc.*, Case No. 18-10474 (LSS) (Bankr. D. Del. Mar. 8, 2018); *In re Aquion Energy, Inc.*, Case No. 17-10500 (KJC) (Bankr. D. Del. Mar. 10, 2017); *In re Basic Energy Services, Inc., et al.*, Case No. 16-12320 (KJC) (Bankr. D. Del. October 26, 2016); *In re Key Energy Services, Inc., et al.*, Case 16-12306 (BLS) (Bankr. D. Del. October 25, 2016)*; In re Malibu Lighting Corporation, et al.*, Case No. 15-12082 (KG) (Bankr. D. Del. Oct. 9, 2015); *In re Caché, Inc.*, Case No. 15-10172 (MFW) (Bankr. D. Del. Feb. 5, 2015). Accordingly, the Debtors request that the Court approve the continued use of the Cash Management System and Bank Accounts.

**B.      The Debtors' Bank Accounts Are In**
**<u>Compliance With Section 345(b) of the Bankruptcy Code</u>**

28.     Section 345(a) authorizes deposits or investments of money "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit

or investment." Section 345(b) requires a depository to provide a bond, unless deposits with such depository are, "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States."

29.     As noted above, the Debtors' depository accounts are with Wells Fargo Bank, a bank that has been approved as a depository for funds of debtors in possession by the United States Trustee for Region 3.  Therefore, the Bank Accounts are in compliance with the security or bonding requirements prescribed by section 345(b) of the Bankruptcy Code and no security or bonds are necessary to secure the funds in such accounts.

C.     **The Court Should Grant the Debtors Authority to Use Existing Checks and Related Forms**

30.     To minimize expense to their estates, the Debtors request authority to continue using their respective existing pre-printed check stock, deposit slips, and related forms without reference to their "debtors in possession" status until the existing stock has been exhausted, provided that the Debtors shall add the "debtor in possession" designation to any new checks ordered after the depletion of the existing stock.  The Debtors' business forms are primarily electronically generated, but certain forms used by the Debtors' accounts payable department are preprinted.  Parties doing business with the Debtors undoubtedly will be aware, as a result of the notice that will be sent of the filing of the Debtors' chapter 11 cases and the publicity of the filing, of the Debtors' status as a chapter 11 debtors in possession.  For this reason, the Debtors request that they be authorized to use existing checks and deposit slips without placing the label "debtor in possession" on each such form until such a time as their existing stocks are depleted.  In addition, the Debtors request a reasonable amount of time to alter their software to provide for the insertion

of "debtor in possession" on postpetition purchase orders and invoices, which the Debtors estimate may take up to three weeks to implement.

       31.    Similar relief has been granted in this district. *See, e.g., In re The Walking Company Holdings, Inc.*, Case No. 18-10474 (LSS) (Bankr. D. Del. Mar. 8, 2018); *In re Aquion Energy, Inc.*, Case No. 17-10500 (KJC) (Bankr. D. Del. Mar. 10, 2017); *In re Malibu Lighting Corporation, et al.*, Case No. 15-12082 (KG) (Bankr. D. Del. Oct. 9, 2015).

**F.**    **The Debtors Should Be Allowed to Continue the Intercompany
Transactions and Preserve Intercompany Setoff Rights**

       32.    The Intercompany Transactions allow the Debtors, among other things, to meet the needs of their customers and suppliers efficiently and in a cost-effective manner, through centralization of key administrative functions. Accordingly, the Debtors believe that the continuation of the Intercompany Transactions is beneficial to their estates, their creditors and other parties in interest and, therefore, should be authorized by the Court.

       33.    To ensure each individual entity will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims between and among affiliated Debtors arising after the Petition Date as a result of Intercompany Transactions (collectively, "Intercompany Claims"), be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

14

34. The Debtors also seek authorization to preserve and exercise intercompany

setoff rights. Section 553(a) of the Bankruptcy Code provides that:

> Except as otherwise provided in this section and in sections 362 and
> 363 of this title, this title does not affect any right of a creditor to
> offset a mutual debt owing by such creditor to the Debtors that arose
> before the commencement of the case under this title against a claim
> of such creditor against the Debtors that arose before the
> commencement of the case. . . .

11 U.S.C. § 553(a). A creditor need only establish two elements before a setoff may be asserted:

mutuality and timing. *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In*

*re The Bennett Funding Group, Inc.)*, 212 B.R. 206, 212 (2d Cir. B.A.P. 1997); *see also In re*

*Verco Industries*, 704 F.2d 1134, 1139 (9th Cir. 1983); *In re Lundell Farms*, 86 B.R. 582, 584

(Bankr. W.D. Wis. 1988). Although courts have not uniformly defined the elements of mutuality,

most courts require the following elements: that the debts be (i) owed between the same parties

and (ii) in the same right or capacity. *See 5 Collier on Bankruptcy* ¶ 553.03[3][a] at 553-28-29

(15th rev. ed. 2004) (citing *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1537 (10th

Cir. 1990); *Lubman v. Sovran Bank, N.A. (In re A & B Homes, Ltd.)*, 98 B.R. 243, 248 (Bankr.

E.D. Va. 1989); *see also Cohen v. Savs. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman*

*Asset Mgmt. Corp.)*, 896 F.2d 54, 57 (3d Cir. 1990) (explaining that the right of setoff depends on

the existence of mutual debts and claims between the creditor and debtor). Timing requires that

both claims arose prepetition. *See Cooper Jarrett, Inc. v. Cent. Transp., Inc.*, 726 F.2d 93, 96 (3d

Cir. 1984) (noting that a creditor may not [setoff] its prepetition claims against a debt owed to a

Debtors which came into existence after filing the bankruptcy petition); *see also In re Sentinel*

*Prods. Corp.*, 192 B.R. 41, 45 (S.D.N.Y. 1996) ("Section 553(a) of the bankruptcy code preserves

15

a creditor's right to set off . . . between the Debtors and creditor as long as both debts arose before

the commencement of the [bankruptcy] case"); *In re Westchester Structures*, 181 B.R. 730, 739

(Bankr. S.D.N.Y. 1995) (same); Arnold M. Quittner, *Setoff and Recoupment*, 715 PLI/Comm 633,

661 (1995) (same).  As a result, "a creditor may not set off a prepetition claim against a post-

petition debt it owes the debtor, and likewise it may not set off a post-petition claim that it has

against a pre-petition debt it owes to a debtor." *In re Metco Mining and Minerals, Inc.*, 171 B.R.

210 (Bankr. W.D. Pa. 1994); *see also In re Westchester Structures*, 181 B.R. at 739.

35.    The Cash Management System and other processes allow the Debtors to

track all obligations owing between related entities and thereby ensure that all setoffs of

Intercompany Transactions will meet both the mutuality and timing requirements of section 553

of the Bankruptcy Code.  The Debtors seek the authority to continue their Intercompany

Transactions in the ordinary course of business, in a manner consistent with the budget attached

to any Financing Order.  The Debtors also respectfully request, therefore, that the Debtors

expressly be authorized, subject to any Financing Order to set off obligations arising on account

of Intercompany Transactions between the Debtors.  For the avoidance of doubt, the Debtors are

not seeking authority by this Motion to satisfy prepetition claims arising out of Intercompany

Transactions by offsetting such prepetition Intercompany Transactions against post-petition

Intercompany Transactions.

## WAIVER OF BANKRUPTCY RULES 6003 AND 6004

36.    Pursuant to Bankruptcy Rule 6003(b), "a motion to pay all or part of a claim

that arose before the filing of the petition" shall not be granted by the Court within 21 days of the

Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable

16

harm . . . ." Fed. R. Bankr. P. 6003(b).  For the reasons described more fully above, and as supported by the First Day Declaration, and to the extent that the relief requested herein implicates Bankruptcy Rule 6003(b), the Debtors submit that the requirements of Bankruptcy Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

37.    Finally, to implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

## **NOTICE**

38.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) Key Bank National Association and Zions Bank, (c) parties asserting liens against the Debtors' assets, and (d) the Debtors' thirty largest unsecured creditors on a consolidated basis.  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

39.    No prior motion for the relief requested herein has been made to this Court or any other Court.

17

WHEREFORE, the Debtors respectfully request that the Court enter an interim order substantially in the form attached hereto as <u>Exhibit C</u> and a final order granting the relief requested herein and granting such other relief as is just and proper.

Dated:    April 30, 2019

PACHULSKI STANG ZIEHL & JONES LLP

Jeremy V. Richards (CA Bar No. 102300)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No. 271038)
919 N. Market Street, 17th Floor
Wilmington, DE 91899
Tel:  (302) 652-4100
Fax: (302) 652-4400
E-mail:  jrichards@pszjlaw.com
         joneill@pszjlaw.com
         jlucas@pszjlaw.com

Proposed Attorneys for Debtors
and Debtors in Possession

18