## EXHIBIT C

**Stalking Horse Purchase Agreement**

## ASSET PURCHASE AGREEMENT

by and among

**Williston Holding Company, Inc.,**
**a Nevada corporation,**

**as Purchaser,**

**and**

**Kona Grill, Inc., a Delaware corporation, Kona Restaurant Holdings, Inc., a Delaware corporation, Kona Sushi, Inc., an Arizona corporation, Kona Macadamia, Inc., a Delaware corporation, Kona Texas Restaurants, Inc., a Texas corporation, Kona Baltimore, Inc., a Delaware corporation, Kona Grill International Holdings, Inc., a Delaware corporation, Kona Grill International, Inc., an Arizona corporation, and Kona Grill Puerto Rico, Inc., an Arizona corporation,**

**as Sellers**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "***Agreement***") is made and entered into as of May 13, 2019 (the "***Effective Date***") by and among Kona Grill, Inc., a Delaware corporation, Kona Restaurant Holdings, Inc., a Delaware corporation, Kona Sushi, Inc., an Arizona corporation, Kona Macadamia, Inc., a Delaware corporation, Kona Texas Restaurants, Inc., a Texas corporation, Kona Baltimore, Inc., a Delaware corporation, Kona Grill International Holdings, Inc., a Delaware corporation, Kona Grill International, Inc., an Arizona corporation, and Kona Grill Puerto Rico, Inc., an Arizona corporation (each of the foregoing a "***Seller***" and collectively, the "***Sellers***") and Williston Holding Company, Inc., a Nevada corporation (the "***Purchaser***"). Sellers and Purchaser are sometimes collectively referred to as the "***Parties***."

## RECITALS

The Parties hereby acknowledge that:

A.      Sellers are engaged in the business of owning and operating 27 restaurants in 17 states and Puerto Rico (such restaurants located in such states, the "***Restaurants***" and such business as conducted in such states, the "***Business***").

B.      Each of Sellers has filed Petitions initiating Chapter 11 bankruptcy cases which are being jointly administered under Case No. 19-10953 (the "***Chapter 11 Cases***") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 *et seq.* (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").

C.      On the terms and conditions of this Agreement, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, certain of the assets and properties of Sellers relating to the Business, and the assumption and assignment of certain executory contracts and unexpired leases pursuant to the terms hereof, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (such transactions, the "***Contemplated Transactions***").

## AGREEMENT

In consideration of their respective covenants set forth herein, the Parties agree as follows:

1.      <u>Transfer of Assets</u>.

1.1      <u>Purchase and Sale of Assets</u>. On the Closing Date and on the terms and conditions hereinafter set forth in this Agreement and pursuant to sections 363 and 365 of the Bankruptcy Code and the Sale Order, Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire, accept and receive from Sellers, free and clear of all Encumbrances to the extent provided in the Sale Order, all of each Seller's respective right, title and interest as of the Closing Date in and to the following assets and properties used primarily by Sellers in connection with the operation of the Acquired Restaurants, including the

Schedules referenced herein, other than any Excluded Assets (such assets and properties described below, other than the Excluded Assets, are collectively referred to herein as the "*Purchased Assets*"):

      (a)     all Furniture and Equipment;

      (b)     all Inventory that is located at (or in transit to) any of the Acquired Restaurants as of the Closing Date, other than alcoholic beverage inventories in jurisdictions where the Law does not permit Purchaser to take title to such inventories in general or does not permit Purchaser to take title to such inventories until Purchaser obtains the requisite Liquor License Approvals from the relevant Governmental Body; provided, however, Sellers shall transfer, assign, convey and deliver to Purchaser such alcoholic beverage inventories in each instance upon issuance of the relevant Liquor License Approval or other authorization from the relevant Governmental Body (whichever occurs first), and all rights of Sellers to take delivery of any Inventory ordered by Sellers before the Closing Date for delivery to any of the Acquired Restaurants, which Inventory has not been delivered as of the Closing Date;

      (c)     all Restaurant Petty Cash;

      (d)     all Large Party Deposits;

      (e)     all Intangible Property Assets, including, but not limited to, those identified on Schedule 1.1(e) hereto;

      (f)     any interest of Sellers under the Restaurant Leases and the Other Contracts that are described on Schedule 1.1(f) hereto (collectively, the "*Purchased Contracts*"), including, without limitation, credits, deposits and prepaid amounts of Sellers with respect to the Purchased Contracts as of the Closing Date subject to the provisions of Section 2.8 hereof;

      (g)     to the extent transferable and assignable, all of Sellers' interest in those Business Permits and all Liquor Licenses held by Sellers that are described on Schedule 1.1(g) hereto, in each case to the extent transferable, other than alcohol Business Permits (including Liquor Licenses) in jurisdictions where the law does not permit Purchaser to take title to such Business Permits until it obtains the requisite approvals from the pertinent Governmental Body; Sellers shall transfer, assign convey and deliver to Purchaser such Business Permits in each instance only upon issuance of the requisite approvals from the relevant Governmental Body;

      (h)     all Receivables;

      (i)     all books, records, files and papers of Sellers relating to the Business or the Purchased Assets, including equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, Tax records and other similar documents and records (all in the state in which such records and information currently exist) and all computers and other storage devices, wherever located, upon which such

information resides (collectively, "**Documents**") provided, however, for the avoidance of all doubt, the following items shall not be deemed "Documents," but rather as Excluded Assets for all purposes hereof: (x) any such records that are prohibited for being transferred to Purchaser due to federal or state privacy laws and (y) any other of the foregoing which are subject to attorney-client or any other privilege;

(j)       to the extent transferable, all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold or services provided to any of Sellers with respect to the Acquired Restaurants or to the extent affecting any Purchased Assets or Purchased Contracts, other than any warranties, representations and guarantees pertaining to any Excluded Asset;

(k)       all rights, to the extent assignable, under any agreements in favor of any of Sellers or for the benefit of any of Sellers with current or former employees, contractors or third parties, with respect to confidentiality, non-disclosure, non-competition, non-solicitation, or other restrictive covenants, regardless of whether any such Person accepts an offer of employment from Purchaser, continues to perform services for Purchaser, or submits a bid for all or any portion of the Purchased Assets; and

(l)       Subject to the provisions of Section 2.8 below, all Claims for deposits and other prepaid amounts under any of the Purchased Contracts or held by any Utilities or trade vendors relating to any of the Acquired Restaurants; provided, however, any adequate assurance deposits paid to the provider of any Utilities or held by Sellers shall be Excluded Assets for purposes of this Agreement.

1.2       Excluded Assets. The Purchased Assets shall include only those assets and interests specifically listed in Section 1.1 above and shall in all events exclude all right, title or interest of any of Sellers in or to any of the following (collectively, the "**Excluded Assets**"):

(a)       all cash and cash equivalents of Sellers, other than Restaurant Petty Cash and Large Party Deposits;

(b)       any bank accounts of Sellers;

(c)       the Purchase Price and Sellers' rights under this Agreement;

(d)       any Excluded Contracts, including any refund, rebate, credit or payment due to Sellers thereunder;

(e)       any Claims, other than as set forth in Section 1.1(j) and Section 1.1(l), and those arising post-Closing with respect to or in connection with any Purchased Asset;

(f)       all securities, whether capital stock or debt, and other ownership interests issued by any of Sellers;

3

(g)    all assets of any Section 401(k) or other Seller benefit plan;

(h)    all intercompany claims by any Seller against any other Seller or any Subsidiary or other Affiliate of any Seller;

(i)    any item expressly excluded pursuant to the provisions of Section 1.1 above;

(j)    all Avoidance Actions;

(k)    any premium refunds (including, without limitation, for any prepaid premiums) of Sellers arising from their insurance policies on account of reduction in workforce, liability coverage, and the like; and

(l)    except only as provided in Sections 1.1(f) and 1.1(l), all rights and Claims to deposits (including, without limitation, any cash collateral for any obligation of Sellers and all Post-Petition deposits made by Sellers), credits, prepaid amounts (including, without limitation, as to Taxes), refunds, reimbursements, vendor and other rebates, set-offs and similar rights and claims of Sellers, including, without limitation, any of the foregoing relating to any Contract other than the Purchased Contracts.

1.3    Executory Contracts

(a)    All Purchased Contracts (which, shall for the avoidance of doubt, include the Keen-Summit Agreement) shall be assumed by Sellers and assigned to Purchaser at the Closing. Any Contract of any Seller that is an Excluded Contract may be assumed or rejected by Sellers in Sellers' sole discretion and shall be deemed an Excluded Asset.

(b)    As part of the Sale Motion, Sellers shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by Sellers to Purchaser of all Purchased Contracts. Sellers shall serve the Sale Motion on all counterparties to all such Purchased Contracts along with a notice specifically stating that Sellers are or may be seeking the sale, assumption and assignment of such Purchased Contracts and shall notify such parties of the deadline for objecting to the Cure Costs. As part of the Sale Motion, Sellers shall seek authority to file with the Bankruptcy Court the list identifying the Purchased Contracts and the amounts necessary to cure defaults under each as determined by Sellers in accordance with Schedule 1.3(b) hereto, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible. Purchaser may delete any Purchased Contract from Schedule 1.1(f) and Schedule 1.3(b) or add any Contract to Schedule 1.1(f) and Schedule 1.3(b) at any time no later than seven (7) days prior to the Closing Date, in each case by written notice to Sellers, but any such deletion or addition will not affect the Purchase Price. Notwithstanding anything herein to the contrary, if a Contract is added to Schedule 1.1(f) and/or Schedule 1.3(b) after the Sale Motion is filed, the assumption and assignment of any such Contract(s) shall not be a condition to Closing and may be effected on a post-Closing basis.

4

2.    Consideration.

2.1    Purchase Price. In consideration of the transfer of the Purchased Assets to Purchaser and the other undertakings set forth herein, the purchase price shall be Twenty Million Three Hundred Thousand and 00/100 Dollars ($20,300,000.00) (the "**Purchase Price**") and shall be payable, as follows:

(b)    on the Effective Date, Purchaser shall deposit into an escrow (the "**Escrow**") with counsel of the Sellers, which shall be held in a trust account (the "**Escrow Holder**"), an amount equal to Two Million Thirty Thousand and 00/100 Dollars ($2,030,000.00) (the "**Deposit**") in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "**Good Funds**"), pursuant to joint escrow instructions to be delivered to the Escrow Holder on or before the Effective Date; and

(c)    on the Closing Date, Purchaser shall deliver the Cash Purchase Price, as forth in Section 3.3(c).

2.2    Disposition of Deposit at Closing, Etc.

(a)    At Closing, the Deposit shall be credited and applied toward payment of the Purchase Price.

(b)    Except as set forth in Section 2.2(c) hereof, if this Agreement terminates without a Closing, Purchaser shall be entitled to the return of the Deposit.

(c)    If this Agreement is terminated without a Closing by Sellers pursuant to Section 14.3(a) or by Purchaser other than in accordance with this Agreement, Sellers shall be entitled to the Deposit as liquidated damages. The Parties acknowledge and agree that if this Agreement is terminated as contemplated by Section 14.3(a) or by Purchaser other than in accordance with this Agreement, the actual damages incurred by Sellers will be difficult, if not impossible, to ascertain and accordingly, the Parties have provided for the liquidated damages provided above. This provision shall not be construed as a penalty, but as a bona fide attempt to establish an agreed upon measure of damages which Sellers will suffer as a result of such termination of this Agreement.

2.3    Assumed Liabilities. As additional consideration for the transfer of the Purchased Assets to Purchaser over and above the Purchase Price, effective as of the Closing Date, Purchaser shall assume only the following Liabilities of Sellers (collectively, the "**Assumed Liabilities**"):

(a)    any obligation of Sellers to honor Gift Certificates that remain outstanding as of the Closing Date, whether or not such Gift Certificates were issued prior to or after the commencement of the Chapter 11 Cases of Sellers. A historical summary of all Sellers' Liabilities relating to Gift Certificates is listed on Schedule 2.3(a); provided, however, the Purchaser's assumption of the Liabilities arising from the Gift Certificates shall include all such Liabilities even if they are greater than the historical amounts on Schedule 2.3(a);

5

(b)    all Liabilities arising out of the ownership or operation of the Purchased Assets after the Closing Date;

(c)    all Liabilities of Sellers under any of the Purchased Contracts (which shall include, without limitation, all Cure Costs);

(d)    all Liabilities of Sellers under any Large Party Reservation relating to any Acquired Restaurant made with the payment of a Large Party Deposit at any time before the Closing Date and scheduled to be honored after the Closing Date;

(e)    all Liabilities of Sellers as of the Closing Date under Sellers' "Konavores" customer loyalty program;

(f)    all environmental Liabilities arising after the Closing Date under federal, state and local law relating to or arising out of or in connection with the Purchased Assets;

(g)    accrued vacation, sick pay, and other paid time off of the Transferred Employees and all other restaurant level Business Employees that are not Transferred Employees as provided in Section 13.3, as such amounts may change (increase or decrease) in the ordinary course of the Business pending the Closing Date;

(h)    ordinary course payroll of Transferred Employees (i.e. paid in the ordinary course of the Sellers' current payroll practices) coming due and payable after the Closing, which may be attributable in whole or in part to payroll periods preceding the Closing Date;

(i)    all Liabilities of Sellers for accrued sales, use and similar taxes as of the Closing; and

(j)    ~~all post-Petition trade payables of the Business that come due after the Closing, including all credit card merchant fees, and post-Petition obligations to customers of Sellers for refunds, rebates, returns, discounts and the like as of the Closing Date, but in each of the foregoing cases described in this clause only to the extent the same were incurred by Sellers in the ordinary course of the Business from and after the~~ commencement of the Chapter 11 Cases.

2.4    Excluded Liabilities.    Notwithstanding anything to the contrary contained in this Agreement, other than the Assumed Liabilities, Purchaser shall not be obligated to assume or to perform or discharge any Liability of Sellers (such Liabilities not assumed by Purchaser, the "**Excluded Liabilities**"), which Excluded Liabilities, for the avoidance of doubt, shall include, but are not limited to, those listed on Schedule 2.4 and the following:

(a)    Claims arising under Section 503(b)(9) of the Bankruptcy Code;

(b)    Claims or Liabilities arising on or before the Petition Date under the Perishable Agricultural Commodities Act, 7 U.S.C. §499a *et seq.*, the Packers and Stockyards Act, 7 U.S.C. §181 *et seq.*, or their state law correlates;

(c)    any costs or expenses incurred in connection with, or related to, the administration of the Chapter 11 Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Chapter 11 Cases;

(d)    all Liabilities and obligations under Sellers' key employee retention plan; and

(e)    all Liabilities for the provision of notice or payment in lieu of notice and any applicable penalties under the WARN Act arising prior to the Closing Date or arising as a result of the Contemplated Transactions.

2.5    <u>Payment of Cure Costs</u>.  All Cure Costs shall be the responsibility of Purchaser.

2.6    <u>Transitional Matters</u>.  From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(a)    From and after the Closing, Purchaser will retain and make available to Sellers or any trustee or other bankruptcy estate representative and their respective representatives acting on behalf of Sellers' estates, during normal business hours and upon reasonable advance notice to Purchaser and for a period of one (1) year following the Closing Date, the Documents delivered by Sellers to Purchaser, if reasonably needed by Sellers for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents, and the Parties otherwise will reasonably cooperate to minimize inconvenience to Purchaser.  Further, during the same period, Purchaser shall promptly provide such reports as Sellers may reasonably request to facilitate Sellers' post-Closing activities for the purposes described above in this <u>Section 2.6(a)</u> at Sellers' cost.

(b)    <u>Previously Omitted Contracts</u>.

(i)    If, prior to or following Closing, it is discovered that a Contract should have been listed on <u>Schedule 1.1(f)</u> but was not listed on <u>Schedule 1.1(f)</u> (any such Contract, a "***Previously Omitted Contract***"), Sellers shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract.  Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "***Previously Omitted Contract Designation***").  A Previously Omitted Contract designated in accordance with this <u>Section 2.6(b)(i)</u> as "Rejected," or with respect to which Purchaser fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)    If Purchaser designates a Previously Omitted Contract as "Assumed" in accordance with <u>Section 2.6(b)(i)</u>, (A) <u>Schedule 1.1(f)</u> shall be amended to include such Previously Omitted Contract and (ii) Sellers shall serve a notice (the "***Previously Omitted Contract Notice***") on the counterparties to such Previously Omitted Contract notifying such

7

counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.6(b) with no adjustment to the Purchase Price. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with [seven (7)] days to object, in writing to Sellers and Purchaser, to the Cure Costs and the assumption, assignment and sale of the Previously Omitted Contract. If the counterparties, Sellers and Purchaser are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption, assignment and sale. If no objection is timely served on Sellers and Purchaser, Sellers shall seek an Order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract.

(c)    To the extent that the assignment to Purchaser of any Purchased Contract pursuant to this Agreement is not permitted without the consent of a third party, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, the Parties will use commercially reasonable efforts to obtain consent prior to the Closing. If such consent is not obtained by the Closing, each Seller will, with respect to each such Purchased Contract, from and after the Closing and until the earlier to occur of (x) the date on which such applicable consent is obtained and (y) the date on which such Seller liquidates and ceases to exist, use commercially reasonable efforts (subject to restrictions under law) during the term of such Purchased Contract to (i) provide to Purchaser the benefits under such Purchased Contract, (ii) cooperate in any reasonable and lawful arrangement (including holding such Purchased Contract in trust for Purchaser, pending receipt of the required consent) designed to provide such benefits to Purchaser, and (iii) enforce for the account of Purchaser any rights of such Seller under such Purchased Contract (including the right to elect to terminate such Purchased Contract in accordance with the terms thereof upon the direction of Purchaser). Purchaser will cooperate with the applicable Sellers in order to enable Sellers to provide to Purchaser the benefits contemplated by this Section 2.6(c). Sellers will pay any amount they would have been required to pay under any such Purchased Contract had the Purchased Contract been assigned (after obtaining the requisite consent) to Purchaser at the Closing in accordance with this Agreement; provided, however, in no event shall Sellers be required to bear or pay any fee or the like payable for any third party consent.

2.7    Purchase Price Allocation.    Not later than sixty (60) days following the Closing Date, Purchaser shall prepare and deliver to Sellers for their review and consideration a schedule (the "*Allocation Schedule*") allocating the Purchase Price among the various assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local Tax law) or any successor provision. If Sellers disagree with or raise objections to the Allocation Schedule, Purchaser and Sellers will negotiate in good faith to resolve such objections. If the Parties are able to agree upon the allocation of the Purchase Price, Purchaser and Sellers shall report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Taxing authority or any other proceedings). Purchaser and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, the Parties are unable mutually to agree upon

the manner in which the Purchase Price should be allocated, Purchaser and Sellers shall be free to make their own respective allocations of the Purchase Price for Tax purposes. Notwithstanding any other provisions of this Agreement, in the event the Parties mutually agree upon the allocation of the Purchase Price, the provisions of this <u>Section 2.7</u> shall survive the Closing.

2.8    <u>Apportionment</u>.    Before the Closing Date, Sellers and Purchaser shall make mutually satisfactory arrangements with respect to, or take readings or other measurements of, gas, water, electricity and other utilities at the Acquired Restaurants (the **"Utilities"**); *provided, however*, that to the extent any post-petition claims for Utilities services come due after the Closing, such claims shall be the responsibility of the Purchaser.  On and as of the Closing, Sellers and Purchaser shall mutually determine (or, to the extent impractical, using the Parties' best estimates as of the Closing Date), and Purchaser shall pay promptly to Sellers, the amount of any rebates under beverage and other supplier contracts relating to the Acquired Restaurants, and all amounts for Utilities, rent, common area expense, and real estate taxes arising out of or relating to the Acquired Restaurants therefor which were paid by Sellers in respect of any period following the Closing.

3.    <u>Closing Transactions</u>

3.1    <u>Closing</u>. The closing of the Contemplated Transactions (the **"Closing"**) shall take place at 10:00 a.m. on or before the third (3rd) Business Day following the satisfaction or waiver by the appropriate Party of all the conditions contained in <u>Section 4</u>, or on such other date (no later than the Outside Date) as may be agreed to by the Parties hereto (the date on which the Closing occurs, hereinafter the **"Closing Date"**).

3.2    <u>Sellers' Deliveries to Purchaser at Closing</u>.    On the Closing Date, Sellers shall make the following deliveries to or for the benefit of Purchaser:

(a)    one or more Assignments and Assumptions of Restaurant Leases, substantially in the form attached as <u>Exhibit A</u> hereto, duly executed by Sellers, with respect to the Restaurant Leases (the **"Assignments of Restaurant Leases"**);

(b)    an Assignment and Assumption of Contracts, substantially in the form attached as <u>Exhibit B</u> hereto, duly executed by Sellers, pursuant to which Sellers' interest in all Purchased Contracts (other than any Restaurant Leases) shall be assigned to Purchaser (the **"Assignment of Other Contracts"**);

(c)    an Assignment of Intangible Property Assets, duly executed by Sellers, substantially in the form attached as <u>Exhibit C</u> hereto, pursuant to which Sellers' interest in all the Intangible Property Assets shall be assigned to Purchaser (the **"Assignment of Intangible Property Assets"**);

(d)    a Bill of Sale and Assignment, substantially in the form attached as <u>Exhibit D</u> hereto, duly executed by Sellers, pursuant to which Sellers' interest in any Purchased Assets not otherwise assigned at the Closing shall be assigned to Purchaser (the **"Bill of Sale"**);

(e)    the duly executed Management Agreement, which shall address any interim arrangements necessary pending the transfer of liquor licenses and permits to buyer and interim arrangements for the transition of computerized books and records, the form and substance of which shall be agreed to by the Parties, in good faith, and attached as Exhibit E no later than the first hearing set to consider entry of the Procedures Order;

(f)    certificates of title, duly executed by Sellers, required to convey ownership of any motor vehicles or similar equipment included within the Purchased Assets;

(g)    the certificate contemplated by Section 4.1(a), duly-executed by Sellers;

(h)    appropriate evidence of all necessary Entity action by Sellers in connection with the Contemplated Transactions, including, without limitation:    (i) certified copies of resolutions duly adopted by Sellers' Board of Directors (or other governing body, as appropriate) approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Sellers of this Agreement; and (ii) a certificate as to the incumbency of those officers of Sellers executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions; and

(i)    any such other documents, funds or other things reasonably requested by Purchaser or contemplated by this Agreement to be delivered by Sellers to Purchaser at the Closing.

3.3    Purchaser's Deliveries to Sellers at Closing. On    the    Closing    Date, Purchaser shall undertake the following to or for the benefit of Sellers:

(a)    pay, by wire transfer of Good Funds, and in addition to the Purchase Price, all Cure Costs to the parties to whom and pursuant to the terms by which the Bankruptcy Court directs such payments to be made under the Sale Order;

(b)    instruct the Escrow Holder in writing to release to Sellers, by wire transfer of Good Funds, the Deposit as a credit against the Purchase Price;

(c)    pay to Sellers, by wire transfer of Good Funds, an amount equal to the Purchase Price, less the funds to be released pursuant to Section 3.3(b) above (the **"Cash Purchase Price"**);

(d)    deliver the certificate contemplated by Section 4.1(a), duly executed by Purchaser;

(e)    deliver a counterpart of the Assignments of Restaurant Leases, duly executed by Purchaser;

(f)    deliver a counterpart of the Assignment of Other Contracts, duly executed by Purchaser;

(g)     deliver a counterpart of the Assignment of Intangible Property Assets;

(h)     deliver a counterpart of the Management Agreement;

(i)     deliver an Assumption of Liabilities with respect to the Assumed Liabilities, substantially in the form attached as <u>Exhibit F</u> hereto, duly executed by Purchaser (the "***Assumption of Liabilities***");

(j)     deliver any certificates of title required to convey ownership of any motor vehicles or similar equipment owned by Sellers to Purchaser, if acknowledgement or endorsement thereof is required by Purchaser;

(k)     deliver appropriate evidence of all necessary Entity action by Purchaser in connection with the Contemplated Transactions, including, without limitation: (i) certified copies of resolutions duly adopted by Purchaser's Board of Directors approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Purchaser of this Agreement; and (ii) a certificate as to the incumbency of those officers of Purchaser executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions; and

(l)     deliver any such other documents, funds or other things reasonably requested by Sellers or contemplated by this Agreement to be delivered by Purchaser to Sellers at the Closing.

3.4    <u>Sales, Use and Other Taxes</u>. Any and all sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or the Contemplated Transactions (collectively, the "***Transfer Taxes***") shall be in addition to the Purchase Price and borne and paid by Purchaser.

3.5    <u>Possession and Risk of Loss</u>. Right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date. Sellers shall transfer and deliver to Purchaser on the Closing Date such keys, locks and safe combinations and other similar items as Purchaser may reasonably require to obtain occupation and control of the Purchased Assets, and shall also make available to Purchaser at their then-existing locations the originals of all documents in Sellers' possession that are required to be transferred to Purchaser by this Agreement. The risk of loss of, or damage or destruction to, any of the Acquired Restaurants to be conveyed to Purchaser under this Agreement shall be borne by Sellers until Closing.

3.6    <u>Closing Date</u>. All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected. Unless provided otherwise herein or agreed otherwise in writing by the Parties, documents delivered at the Closing shall be dated as of the Closing Date.

4.    <u>Conditions Precedent to Closing.</u>

    4.1    <u>Conditions to Sellers' Obligations.</u>    Sellers' obligation to make the deliveries required of Sellers at the Closing Date and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction of each of the following conditions (unless such condition is waived by Sellers):

    (a)    All of the representations and warranties of Purchaser contained herein shall continue to be true and correct at the Closing in all material respects, and Purchaser shall have substantially performed or tendered performance of each material covenant on Purchaser's part to be performed which, by its terms, is required to be performed at or before the Closing, and Sellers shall have received a certificate by an officer of Purchaser, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in <u>Section 4.2</u> either have been satisfied or have been waived by Purchaser.

    (b)    Purchaser shall have tendered delivery of all items required to be delivered by Purchaser under <u>Section 3.3</u>.

    (c)    No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a Claim that consummation thereof would result in the violation of any Legal Requirement of any Governmental Body having appropriate jurisdiction.

    (d)    The Bankruptcy Court shall have entered the Procedures Order and the Sale Order, both in accordance with <u>Section 9</u> below, and the Sale Order shall not have been reversed or stayed as of the Closing Date.

    4.2    <u>Conditions to Purchaser's Obligations.</u>    Purchaser's obligation to make the deliveries required of Purchaser at the Closing and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction of each of the following conditions (unless such condition is waived by Purchaser):

    (a)    All of the representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects, and Sellers shall have substantially performed or tendered performance of each and every covenant on Sellers' part to be performed which, by its terms, is required to be performed at or before the Closing (*provided, however*, that Sellers shall have performed in all respects its covenants hereunder to sell, assign, transfer, convey and deliver to Purchaser all of Sellers' right, title and interest in and to all Purchased Assets, free and clear of all Encumbrances), and Purchaser shall have received a certificate by officers of Sellers, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in <u>Section 4.1</u> either have been satisfied or have been waived by Sellers.

(b)     Sellers shall have tendered delivery of all items required to be delivered by Sellers under Sections 3.2 and 3.5.

(c)     No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Legal Requirement of any Governmental Body having appropriate jurisdiction.

(d)     The Bankruptcy Court shall have entered the Procedures Order and the Sale Order, both in accordance with Section 9 below, and the Sale Order shall not have been reversed or stayed as of the Closing Date.

5.     Sellers' Representations and Warranties.

Each of Sellers (as to itself) hereby makes the following representations and warranties to Purchaser:

5.1     Organization.  Each of Sellers is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or other formation.  Each of Sellers is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where qualification is required.  Each of Sellers has all requisite Entity power and authority to own, lease and, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, to operate its properties, carry on the Business as now being conducted, and to enter into this Agreement and to consummate the Contemplated Transactions.

5.2     Validity and Enforceability.  The execution, delivery and performance of this Agreement by each of Sellers, and the consummation by each of Sellers of the Contemplated Transactions, have been duly authorized by all requisite corporate action.  Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by each of Sellers and (assuming this Agreement constitutes a valid and binding agreement of Purchaser) constitutes a valid and binding agreement of each of Sellers, enforceable against each of Sellers in accordance with its terms, except as to the effect, if any, of the Standard Exceptions to Enforceability.

5.3     No Conflict.  Subject to the entry of the Sale Order, neither the execution, delivery or performance of this Agreement by any of Sellers, nor the consummation by any of Sellers of the Contemplated Transactions, nor compliance by any Sellers with any of the provisions hereof, (a) conflict with or result in any breach of the articles of incorporation or bylaws of Sellers, (b) conflict with, result in a violation or breach of, or constitute (with or without notice or lapse of time) a default (or give rise to any right of termination, modification, cancellation, vesting, payment, exercise, acceleration, suspension or revocation) under, any of the terms, conditions or provisions of, any note, bond, mortgage, deed of trust, security interest, or Contract to which any of Sellers is a party or by which any of Sellers' properties or assets may be bound or affected, (c) violate any Legal Requirement applicable to Sellers or to Sellers'

13

properties or assets, (d) result in the creation or imposition of any Encumbrance on any asset of Sellers, or (e) cause the suspension or revocation of any Business Permits.

5.4    Litigation.    Except for the contemplated Chapter 11 Cases to be filed pursuant to this Agreement, there is no material legal proceeding of any type or kind (whether governmental, quasi-governmental, judicial or in an alternative dispute resolution forum) pending that, once the Sale Order is given effect, will result in any Liability on Purchaser or, to Sellers' Knowledge, threatened against or affecting any of Sellers that would likely result in the imposition of any Liability on Purchaser or in respect of the Purchased Assets, nor is there any material judgment or Order of any Governmental Body outstanding against Sellers.

5.5    Broker's or Finder's Fees.    No agent, broker or Person acting on behalf of any of Sellers is, or will be, entitled to any commission or broker's or finder's fees from Purchaser in connection with the Contemplated Transactions; *provided*, *however*, the Seller's investment banker, [Piper Jaffray], shall seek the Bankruptcy Court's approval to receive a transaction fee in accordance with the terms of its retention application.

5.6    Title to Assets; Sufficiency of Assets.    To Sellers' Knowledge, Sellers have good and marketable title to, a valid license to or a valid leasehold interest in the Purchased Assets. To Sellers' Knowledge, except for the Excluded Assets, the Purchased Assets and all Contracts identified by Seller (whether or not Purchased Contracts) constitute all of the assets used or necessary for the operation of the Acquired Restaurants as presently conducted.

6.    Purchaser's Warranties and Representations.

In addition to the representations and warranties contained elsewhere in this Agreement, Purchaser hereby makes the following representations and warranties to Sellers as of the Closing Date:

6.1    Organization.    Purchaser is a corporation duly formed, validly existing and in good standing under the laws of Nevada. Purchaser has all requisite corporate power and authority to own, lease and operate its properties, execute and deliver this Agreement, and to perform its obligations hereunder and consummate the Contemplated Transactions.

6.2    Validity and Enforceability.    This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser enforceable against it in accordance with its terms, except as may be limited by the Standard Exceptions to Enforceability.

6.3    No Conflict.    The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the Contemplated Transactions, have been duly and validly authorized. The execution and delivery of this Agreement, the consummation of the Contemplated Transactions, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Purchaser, do not and will not (a) conflict with or result in a breach of the articles of incorporation or bylaws of Purchaser, (b) violate any Legal Requirement, or (c) violate or conflict with or constitute a default under any agreement,

14

instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

6.4    <u>Financial Resources</u>.  The Purchaser has the financial resources necessary to consummate the Contemplated Transactions upon the terms and conditions set forth in this Agreement, and such financial resources are not subject to any constraints, conditions or contingencies that could in any way materially affect the Purchaser's ability to consummate the Contemplated Transactions or perform hereunder.

6.5    <u>Broker's or Finder's Fees</u>.    No agent, broker or Person acting on behalf of Purchaser is, or will be, entitled to any commission or broker's or finder's fees from Sellers in connection with the Contemplated Transactions.

7.    <u>"AS IS" Transaction</u>.

Purchaser hereby acknowledges and agrees that, except only as provided in <u>Section 5</u> above, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including, without limitation, income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any tangible Purchased Assets, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any Restaurant Lease, the zoning of any real property or improvements which are the subject of any Restaurant Lease, the value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets or any portion thereof, the terms, amount, validity, collectability or enforceability of the Receivables or any Assumed Liabilities or Sellers' Contract, the merchantability or fitness of the Furniture and Equipment, the Inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets or any portion thereof).  Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.  Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as Purchaser deemed necessary or appropriate and that in proceeding with the Contemplated Transactions, Purchaser is doing so based solely upon such independent inspections and investigations.  Accordingly, Purchaser will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

8.    <u>Covenants</u>

8.1    <u>Liquor License Approvals</u>.  Sellers shall reasonably cooperate with Purchaser in connection with Purchaser's filings with any Governmental Body or third party with respect to any of the Liquor Licenses and obtaining the necessary consents and approvals pertaining to transfer and/or issuance of the Liquor Licenses to Purchaser ("***Liquor License Approvals***"), including by entering into the Management Agreement.

8.2    <u>Adequate Assurance Regarding Purchased Contracts</u>. With respect to each Purchased Contract set forth on <u>Schedule 1.1(f)</u>, Purchaser shall provide adequate

assurance of the future performance of such Purchased Contract by Purchaser as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable, and Purchaser shall bear all risk associated with any failure by Purchaser to make such showing to the Bankruptcy Court's satisfaction.

8.3     Personally Identifiable Information. Purchaser shall honor and observe any and all written policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

9.     Bankruptcy Court Approvals.

9.1     Promptly following the Effective Date (and in no event later than five (5) days thereafter), Sellers shall make a motion (the "*Sale Motion*") for an order by the Bankruptcy Court, substantially in the form attached hereto as Exhibit G, approving the sale of the Purchased Assets to Purchaser and the assumption and assignment of the Purchased Contracts to Purchaser on the terms and conditions set forth in this Agreement (the "*Sale Order*") and shall use commercially reasonable efforts to obtain the Sale Order.  Any material changes to the form of the Sale Order must be approved by Purchaser and Sellers in their respective sole discretion.  If requested by Sellers or the Bankruptcy Court, Purchaser shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to Sellers' Contracts.

9.2     As part of the Sale Motion (or pursuant to a separate motion in Sellers' sole discretion), Sellers shall also request and use commercially reasonable efforts to obtain from the Bankruptcy Court an order (the "*Procedures Order*") in the form and content attached as Exhibit H.

10.     Commercially Reasonable Efforts.     Subject to the terms and conditions of this Agreement:

10.1     During the period between the Effective Date and Closing, Sellers and Purchaser shall (a) use their commercially reasonable efforts (i) to cause the conditions in Section 4 to be satisfied, (ii) to deliver or cause to be delivered at the Closing the items to be delivered by Sellers and Purchaser pursuant to Section 3.2 and Section 3.3, respectively, and (iii) to take all other actions to consummate the Contemplated Transactions, and (b) not take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any authorizations, Consents, or Orders to be sought pursuant to this Agreement.

10.2     From and after the Closing, Sellers and Purchaser shall use commercially reasonable efforts to deliver or cause to be delivered such additional documents and other papers and to take or cause to be taken such further actions as may be necessary, proper or advisable to make effective the Contemplated Transactions and to carry out the provisions hereof; provided that nothing herein shall require Sellers to execute any document or take any action that would (i) impose or involve obligations or Liabilities on Sellers over and above those imposed on Sellers by the other provisions of this

16

Agreement, (ii) involve any cost or expense (individually or in the aggregate) that is material in amount, or (iii) include joining or otherwise becoming a party to any action or proceeding of any kind.

10.3   From and after the Closing, Purchaser and Sellers shall reasonably cooperate in the transition of the Purchased Assets from Sellers to Purchaser, provided that neither Party shall be required to expend other than nominal unreimbursed costs in providing such cooperation.

10.4   Within fifteen (15) days after the Closing Date, Sellers shall use commercially reasonable efforts to take such corporate and other actions necessary to change their company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by the law of the state of their respective organization, and shall promptly thereafter provide Purchaser with written evidence of such name changes.  Sellers shall also file a motion with the Bankruptcy Court to change the captions of the Chapter 11 Cases to reflect such name changes.

11.   Conduct Pending Closing.

11.1   Except with the prior written consent of Purchaser, as otherwise contemplated or permitted by this Agreement or as required by the Bankruptcy Code, from the Effective Date until the Closing Date, Sellers shall operate the Acquired Restaurants in the ordinary course of business (i.e., as such Acquired Restaurants have been operated during the immediately preceding 6-month period), comply with all Legal Requirements applicable to the operation of the Acquired Restaurants and preserve its present business organization intact (in each of the foregoing cases, taking into account Sellers' status as debtors-in-possession).

11.2   Sellers shall promptly inform Purchaser in writing of the occurrence or non-occurrence of any event that, to Sellers' Knowledge, would cause any condition set forth in Section 4.2 not to be satisfied or the breach of any covenant hereunder by Sellers.

11.3   Each Party agrees that it will not make any public announcement or issue any press release or respond to any press inquiry with respect to this Agreement or the Contemplated Transactions without the prior approval of the other Party (which approval will not be unreasonably withheld), except as may be required (i) by any applicable Legal Requirement, or (ii) to administer the Chapter 11 Cases.

12.   Break Up Fee.

12.1   Sellers agree and acknowledge that Purchaser's negotiation and execution of this Agreement has required a substantial investment of management time and a significant commitment of resources by Purchaser, and that the negotiation and execution of this Agreement have provided value to Sellers.  Therefore, on the terms and expressly subject to the conditions precedent set forth in this Section 12 and the Procedures Order, and as Purchaser's sole and exclusive remedy, Sellers shall pay or cause Purchaser to be paid cash in an amount equal to One Million and 00/100 Dollars as a break-up fee (the "**_Break-Up Fee_**").  This provision shall not be construed as a penalty, but as a bona fide

17

attempt to establish an agreed upon measure of damages which Purchasers will suffer as a result of such termination of this Agreement

12.2    Sellers' payment obligations under Section 12.1 with respect to the Break-Up Fee shall be payable to Purchaser as and when provided in the Procedures Order and expressly subject to the conditions precedent set forth in the Procedures Order. As provided in the Procedures Order, the Break-Up Fee shall be paid from and out of (and only from and out of) the proceeds of an Alternative Transaction occurring within 180 days following the termination of the Contemplated Transactions.

12.4    Sellers' obligation to pay and Purchaser's right to receive the Break-Up Fee in accordance with the terms and conditions of the Procedures Order shall survive the termination of this Agreement.

12.5    As used in this Agreement, the term *"Alternative Transaction"* means any agreement or transaction involving the sale (in a single transaction or a series of transactions) of all or substantially all of the Purchased Assets, or the issuance or sale (in a single transaction or a series of transactions) of all or substantially all of the equity interests of Sellers or any of their successors to any Person other than Purchaser or a designee of Purchaser.

13.    Employee Matters.

13.1    As of the Closing Date, Purchaser shall have the right, but not the obligation, to employ or engage as contractors any or all of the employees of Sellers whose job function primarily relates to the Business ("*Business Employees*") as Purchaser determines. Any Business Employees actually employed by Purchaser are referred to herein as "*Transferred Employees.*" The terms of employment offered to any Business Employees shall be determined by Purchaser in its sole discretion and shall be contingent upon the issuance of the Sale Order by the Bankruptcy Court. Purchaser shall deliver a list of the Business Employees it intends to hire no later than 10 days prior to the Closing Date. As of the Closing, the employment of all of the Transferred Employees shall be terminated by Sellers; *provided, however,* Sellers shall be permitted to retain such employees as they deem reasonably necessary to administer or otherwise wind-down the Chapter 11 Cases.

13.2    Subject to Buyer's obligations under Section 2.3(g), Sellers will pay, in the ordinary course of business payroll practices, all obligations owed to the Transferred Employees through the day prior to the Closing Date for salary, wage, bonus, paid time off, benefits, overtime, Taxes, and other compensation or other amounts payable to or with respect to Transferred Employees. Sellers will be solely liable for all workers' compensation claims made by any of the Transferred Employees based on events or circumstances first occurring before the Closing Date.

13.3    Beginning at 12:01 a.m. on the Closing Date, Purchaser will provide employee benefit coverage for all Transferred Employees under new or existing plans sponsored by Purchaser. Purchaser will provide credit under its new or existing plans for all Transferred Employees' compensated time-off that is due from Sellers as of the Closing Date. Sellers will

pay all other restaurant level Business Employees that are not Transferred Employees the amount of their compensated time-off that is due from Sellers as of the Closing Date, and Purchaser will reimburse Sellers for such amounts on the Closing Date. Except for such compensated time-off, Sellers will remain solely liable, and Purchaser will not assume or otherwise have any Liabilities for, any contributions or benefits due with respect to any period prior to the Closing Date under any of Sellers' employee benefit plans.

13.4    Sellers shall retain the Liability for vacation time, sick leave, personal leave and other compensated time off accrued as of the Closing by Business Employees who are neither Transferred Employees nor restaurant level Business Employees ( the obligations to whom are being expressly assumed by Buyer pursuant to Section 2.3(g)).

13.5    INTENTIONALLY OMITTED

13.6    Sellers shall be solely liable for complying with the WARN Act and any and all comparable state law obligations (and for any failures to so comply); *provided, however,* that Purchaser shall be solely responsible for all Liabilities relating to or arising in connection with any actual, constructive or deemed termination of employment by Purchaser of any Transferred Employee after the Closing Date.

14.    Termination.

14.1    Termination by Mutual Consent.    This Agreement may be terminated at any time prior to the Closing Date by mutual written agreement of the Parties.

14.2    Termination by Either Purchaser or Sellers. This Agreement may be terminated at any time prior to the Closing Date by either Purchaser or Sellers if any Governmental Body shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions and either (i) thirty (30) days shall have elapsed from the issuance of such Order and such Order has not been removed or vacated, or (ii) such Order shall have become final and non-appealable.

14.3    Termination by Sellers. This Agreement may be terminated at any time prior to the Closing Date by Sellers as follows:

(a)    if there has been a material breach by Purchaser, which breach Purchaser has failed to cure within ten (10) days following its receipt of written notice thereof from Sellers;

(b)    if any condition precedent of Sellers specified in Section 4.1 shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Sellers;

(c)    if the Procedures Order is not entered by the Bankruptcy Court by May 31, 2019;

19

(d)     if the Sale Order is not entered by the Bankruptcy Court by July 26, 2019; or

(e)     if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Sellers' failure to meet its obligations hereunder, including without limitation using all diligent and commercially reasonable efforts to obtain approval of the Sale Order by the dates set forth herein.

14.4     <u>Termination by Purchaser</u>. This Agreement may be terminated at any time prior to the Closing Date by Purchaser as follows:

(a)     [Intentionally omitted];

(b)     if the Procedures Order is not entered by the Bankruptcy Court by May 31, 2018;

(c)     if the Sale Order is not entered by the Bankruptcy Court by July 26, 2019;

(d)     if there has been a material breach by a Seller, which breach such Seller has failed to cure within ten (10) days following its receipt of written notice thereof from Purchaser;

(e)     if any condition precedent of Purchaser specified in <u>Section 4.2</u> shall not have been satisfied or waived or, in the reasonable judgment of Purchaser, shall have become reasonably unlikely to be satisfied, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Purchaser;

(f)     if the Bankruptcy Court enters any Order approving any Alternative Transaction or confirming any Chapter 11 Plan involving any Alternative Transaction;

(g)     if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Purchaser's failure to meet its obligations hereunder;

(h)     if the Chapter 11 Case shall be dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if any trustee is appointed in the Chapter 11 Case; or

(i)     if for any reason (other than Purchaser's failure to provide adequate assurance of future performance sufficient to satisfy the relevant requirements of Section 365 of the Bankruptcy Code or applicable nonbankruptcy law and Section 365(c)(1) prohibits assignment without the counterparty's consent) Sellers are unable, or fail, to assume and assign to Purchaser at the Closing all Purchased Contracts.

14.5    <u>Effect of Termination</u>. In the event of termination by either Sellers or Purchaser of this Agreement pursuant to this <u>Section 14</u>, written notice thereof shall as promptly as practicable be given to the other Parties and thereupon this Agreement shall terminate and the Contemplated Transactions shall be abandoned without further action by the Parties hereto. Upon termination of this Agreement, (a) except as otherwise provided in this Agreement, this Agreement shall cease to have any force or effect, (b) the Parties shall not have any liability to each other, except for fraud occurring on or before the date of such termination; *provided, however*, that if this Agreement is terminated by reason of (i) any material breach hereof by the non-terminating Party or (ii) any material non-compliance by the non-terminating Party with its obligations under this Agreement, which non-compliance shall have been the cause of the failure of one or more of the conditions to the terminating Party's obligations to effect the Contemplated Transactions to have been satisfied, the terminating Party's right to pursue any available remedies at law will survive such termination unimpaired, and (c) the Parties under this Agreement shall cease to have any further obligations under this Agreement except pursuant to <u>Sections 2.2</u>, <u>12</u>, <u>14.5</u>, <u>16.1</u> through <u>16.9</u>, and <u>16.11</u> through <u>16.19</u> (as such obligations are affected by any defined terms contained herein relating thereto), and (d) all filings, applications and other submissions made pursuant to the Contemplated Transactions shall, to the extent practicable, be withdrawn from the Governmental Body or Person to which made.

14.6    <u>Notification of Certain Events</u>. Sellers shall give written notice to Purchaser promptly upon becoming aware of any occurrence, or failure to occur, of any event, which occurrence or failure to occur has caused or could reasonably be expected to cause any condition to the obligations of Purchaser to effect the Contemplated Transactions not to be satisfied. If Sellers give Purchaser a written notice pursuant to this <u>Section 14.6</u> then Purchaser shall be permitted to terminate this Agreement pursuant to <u>Section 14.4</u>.

15.    <u>Post-Closing Matters</u>.

15.1    <u>Further Conveyances and Assumptions</u>.

(a)    From time to time following the Closing, Sellers shall make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each of Sellers and its successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Contemplated Transactions. For the avoidance of all doubt, nothing herein shall require Sellers to execute any document or take any action that would (i) impose or involve obligations or Liabilities on Sellers over and above those imposed on Sellers by the other provisions of this Agreement, (ii) involve any cost or expense (individually or in the

21

aggregate) that is material in amount, or (iii) include joining or otherwise becoming a party to any action or proceeding of any kind.

15.2    <u>Reasonable Access to Records and Certain Personnel</u>. For a period of one (1) year following the Closing, (i) the Purchaser shall permit Sellers' counsel and other professionals and counsel for any successor to Sellers and their respective professionals (collectively, "**_Permitted Access Parties_**") reasonable access to the financial and other books and records relating to the Purchased Assets or the Business, which access shall include the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (ii) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access during regular business hours to complete their post-Closing activities (including, without limitation, preparation of Tax Returns), provided that such access does not unreasonably interfere with the Purchaser's business operations.

16.    <u>Miscellaneous.</u>

16.1    <u>Attorneys' Fees</u>. In the event that any Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, each Party in that action or proceeding shall bear its own attorneys' fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees).

16.2    <u>Notices</u>. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the others shall be deemed effected upon personal delivery in writing, one Business Day after being dispatched by reputable overnight courier (_e.g._, FedEx), postage prepaid, or in the case of delivery by facsimile, as of the date of facsimile transmission (with answer back confirmation of such transmission), or in the case of delivery by email, as of the date of the email transmission (with read-receipt enabled).  Notices shall be addressed as set forth below, but each Party may change its address by written notice in accordance with this <u>Section 16.2</u>.

To Seller(s):    Kona Grill, Inc.
15059 North Scottsdale Road, Suite 300
Scottsdale
AZ 85254
Facsimile: (844) 272 6842
Attn:  Christopher Wells, CRO
Email: CWells@alvarezandmarsal.com

With a copy to (which shall not constitute notice):

Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA  94111
Attn:   Jeremy V. Richards and John W. Lucas
Email: jlucas@pszjlaw.com
jrichards@pszjlaw.com

22

Facsimile:  (302) 652-4400

To Purchaser:    Williston Holding Company, Inc.
12000 Aerospace Avenue, Suite 400
Houston, TX  77034
Attn:  Marcus E. Jundt, CEO
Email: jundt@willistonholdingcompany.com

With a copy to (which shall not constitute notice):

> Gray, Plant, Mooty, Mooty & Bennett, P.A.
> 500 IDS Center
> 80 South Eighth Street
> Minneapolis, MN  55402
> Attn: Phillip W. Bohl
> Email: Phillip.Bohl@gpmlaw.com

16.3    <u>Entire Agreement</u>.    This Agreement and the documents to be executed pursuant hereto contain the entire agreement among the Parties relating to the sale of the Acquired Restaurants.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

16.4    <u>Modification</u>.  This  Agreement  may  be  modified,  amended  or supplemented only by a written instrument duly executed by all the Parties hereto which expressly indicates the intention to modify, amend or supplement this Agreement.

16.5    <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

16.6    <u>Captions</u>. All captions, Section titles and headings contained in this Agreement are for convenience of reference only and shall be without substantive meaning or context of any kind whatsoever and shall not be construed to limit or extend the terms or conditions of this Agreement.

16.7    <u>Waiver</u>. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver; *provided, however*, that the Consent of a Party to the Closing shall constitute a waiver by such Party of any condition precedent to Closing not satisfied as of the Closing Date.

16.8    <u>Payment of Fees and Expenses</u>. Except as provided in <u>Sections 12</u> and <u>16.1</u> above, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the Contemplated Transactions.

16.9    <u>Survival</u>. The respective representations and warranties of Purchaser and Sellers under this Agreement shall lapse and cease to be of any further force or effect effective upon the Closing.  Except as provided in the immediately preceding sentence, the covenants and agreements of Sellers and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

16.10    <u>Assignments</u>. This Agreement shall not be assigned by Sellers or Purchaser without the prior written consent of the other(s), which consent Purchaser or Sellers

may grant or withhold in their respective sole and absolute discretion; *provided, however,* that Purchaser may assign or otherwise transfer any or all of its rights and interests hereunder to one or more affiliates, wholly owned subsidiaries, successors by consolidation, merger or operation of law, purchasers of all or substantially all of the Purchaser's assets or business or lenders of Purchaser as collateral (subject, in all instances to Purchaser's obligations under <u>Section 8.2</u> hereof)  No assignment by any Party hereunder shall be deemed to in any way limit the assignor's liability or obligations hereunder.

16.11  <u>Binding Effect</u>. This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and permitted assigns of the Parties hereto.

16.12  <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the law of the State of Delaware applicable to contracts made and performed in such State.

16.13  <u>Construction</u>. In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

16.14  <u>CONSENT TO JURISDICTION</u>. THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL BE THE EXCLUSIVE FORUM FOR ENFORCEMENT OF THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS AND (ONLY FOR THE LIMITED PURPOSE OF SUCH ENFORCEMENT) SUBMIT TO THE JURISDICTION THEREOF; PROVIDED THAT IF THE BANKRUPTCY COURT DETERMINES THAT IT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THEN EACH PARTY (A) AGREES THAT ALL SUCH ACTIONS OR PROCEEDINGS SHALL BE HEARD AND DETERMINED IN A FEDERAL COURT OF THE UNITED STATES SITTING IN THE CITY OF PHOENIX, ARIZONA, (B) IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, (C) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT, AND (D) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN <u>SECTION 16.2</u> (PROVIDED THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY ARIZONA LAW).

16.15  <u>Counterparts</u>. This Agreement may be signed in counterparts.  The Parties further agree that this Agreement may be executed by the exchange of facsimile or electronic pdf signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

16.16  <u>Non-Recourse</u>. No past, present or future stockholder, director, officer, employee, or incorporator of Sellers or Purchaser shall have any liability for any obligation or Liability of Sellers or Purchaser, as the case may be, under this Agreement or for any claim, counter-claim, cause of action or demand based on, in respect of, or by reason of, the Contemplated Transactions, except for any claim against any Person based on the fraud or gross negligence of such Person in connection with any representations of Sellers or Purchaser hereunder, as the case may be.

16.17  <u>Time is of the Essence</u>. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

16.18  <u>Interpretation and Rules of Construction</u>. In this Agreement, except to the extent that the context otherwise requires:

(a)  when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

(b)  the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)  whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)  the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)  all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)  the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)  any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

(h)  references to a person are also to its permitted successors and assigns; and

(i)  the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

DOCS_LA:321810.6 50045/002

16.19  _Third Party Beneficiaries_. This Agreement is intended to be solely for the benefit of the Parties hereto and is not intended to confer, and shall not be deemed to confer, any benefits upon, or create any rights in or in favor of, any Person other than the Parties hereto, and their respective permitted assigns.

17.    _Definitions_. In addition to the other terms defined elsewhere in this Agreement, for the purposes of same, the following words and terms shall have the meaning set forth below (such meanings being equally applicable to both the singular and plural form of the terms defined).    The exhibits and schedules referenced in this _Section 17_ and throughout the Agreement are deemed to be part of the Agreement and are incorporated herein by reference.

"**_Acquired Restaurant_**" means those restaurants which are operated at the premises leased pursuant to a Restaurant Lease.

"**_Affiliate_**" of a Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first-mentioned Person.  For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or by contract or otherwise, and the terms "controlling" and "controlled by" have meanings correlative to the foregoing.

"**_Agreement_**" shall have the meaning provided for in the preamble.

"**_Allocation Schedule_**" shall have the meaning provided for under _Section 2.7_.

"**_Alternative Transaction_**" shall have the meaning ascribed to such term in _Section 12.4_ above.

"**_Assignment of Restaurant Leases_**" shall have the meaning provided for under _Section 3.2(b)_.

"**_Assignment of Intangible Property Assets_**" shall have the meaning provided for under _Section 3.2(d)_.

"**_Assignment of Other Contracts_**" shall have the meaning provided for under _Section 3.2(c)_.

"**_Assumed Liabilities_**" shall have the meaning provided for under _Section 2.3_.

"**_Assumption of Liabilities_**" shall have the meaning provided for under _Section 3.3(i)_.

"**_Avoidance Action_**" means all preference or avoidance claims and actions of Sellers, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any other affirmative Claim of Sellers against third parties, including, without limitation, any Claims arising under non-bankruptcy law.

"**_Bankruptcy Code_**" shall have the meaning provided for under _Recital B_.

"**_Bankruptcy Court_**" shall have the meaning provided for under _Recital B_.

"**_Bill of Sale_**" shall have the meaning provided for under _Section 3.2(d)_.

"**_Break-Up Fee_**" shall have the meaning provided for under _Section 12.1_.

"*Business*" shall have the meaning provided for under <u>Recital A</u>.

"*Business Day*" means any day other than a Saturday or Sunday or a legal holiday on which banks in California are closed.

"*Business Employees*" shall have the meaning provided for under <u>Section 13.1</u>.

"*Business Permit*" means any business permit, license, certificate of occupancy, registration, certificate of public convenience and necessity, approval, easement, authorization or operating right issued or granted by any Governmental Body having jurisdiction over the Business.

"*Cash Purchase Price*" shall have the meaning provided for under <u>Section 3.3(c)</u>.

"*Chapter 11 Cases*" shall have the meaning provided for under <u>Recital B</u>.

"*Claim*" means any claim, cause of action, right of recovery, right of set-off, and right of recoupment of every kind and nature including but not limited to prepayments, warranties, guarantees, refunds, reimbursements.

"*Closing*" shall have the meaning provided for under <u>Section 3.1</u>.

"*Closing Date*" shall have the meaning provided for under <u>Section 3.1</u>.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Consent*" means any consent, approval, authorization, affirmative vote, waiver, agreement or license by, or report or notice to, any Person.

"*Contemplated Transactions*" shall have the meaning provided for under <u>Recital C</u>.

"*Contract*" means any executory contract or unexpired lease within the meaning of the Bankruptcy Code.

"*Copyright*" means all copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals therefor, and any past, present or future claims or causes of actions arising out of or related to any infringement or misappropriation of any of the foregoing.

"*Cure Costs*" means the amounts required to be paid as cure amounts under Section 365 of the Bankruptcy Code so that Sellers may sell, assume and assign the Purchased Contracts to Purchaser, as set forth on <u>Schedule 1.3(b)</u> hereto.

"*Deposit*" shall have the meaning provided for under <u>Section 2.1(a)</u>.

"*Documents*" shall have the meaning provided for under <u>Section 1.1(i)</u>.

"*Domain Name*" means the internet domain names owned by Sellers, and all registrations, applications and renewals related to the foregoing.

"*Effective Date*" shall have the meaning provided for in the preamble.

"*Encumbrance*" means any claim, lien, pledge, option, charge, easement, Tax assessment, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties of any sort whatsoever, whether voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title

retention agreement or lease in the nature thereof.

"*Entity*" means any corporation (including any nonprofit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

"*Escrow*" shall have the meaning provided for under Section 2.1(a).

"*Escrow Holder*" shall have the meaning provided for under Section 2.1(a).

"*Excluded Assets*" shall have the meaning provided for under Section 1.2.

"*Excluded Contract*" means any Sellers' Contract that is not a Purchased Contract.

"*Excluded Liability*" shall have the meaning provided for under Section 2.4.

"*Excluded Petty Cash*" means, collectively, any petty cash of Sellers (i) on the premises of any of the Acquired Restaurants in excess of $4,000, and (ii) on any premises or at any location that is not an Acquired Restaurant.

"*Furniture and Equipment*" means, to the extent located at, forming part of, or used primarily in connection with an Acquired Restaurant, all fixtures and other Leasehold Improvements, counters, POS systems, hoods, washers, disposal systems, ovens, grills, friers, refrigeration units, artwork, racks, stands, displays, counters, desks, chairs, tables, dispensers, and other furniture and furnishings, hardware, vehicles, tools, small ware, and other equipment (copiers, fax machines, telephone lines and numbers, computers, printers, and other telecommunication equipment), and miscellaneous office and store supplies and other items of tangible personal property owned or used by Sellers in the conduct of the Business. As used herein, the "Furniture and Equipment" does not include any tangible property held by Sellers pursuant to a Contract where Purchaser does not assume at the Closing the underlying Contract relating to such property but, notwithstanding the foregoing, shall include those tangible assets located at Sellers' Headquarters Premises which are described on Schedule 17 (FFE) attached hereto..

"*Gift Certificates*" means any gift certificates, gift cards, or food/beverage credits that are issued by Seller and required to be honored by Sellers in the ordinary course of business prior to the Closing Date.

"*Good Funds*" shall have the meaning provided for under Section 2.1(a).

"*Governmental Body*" means any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal); (d) multinational organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

"*Headquarters Premises*" means and refers to the premises commonly known as 15059 North Scottsdale Road, Suite 300, Scottsdale, Arizona.

29

*"Indebtedness"* shall mean and include (i) all obligations for borrowed money, (ii) al obligations evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations to pay the deferred purchase price of property or services (other than accounts payable and accrued expenses), (iv) all obligations with respect to capital leases, (v) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (vi) all non-contingent reimbursement and other payment obligations in respect of letters of credit and similar surety instruments (including construction performance bonds, but not contingent obligations in respect of letters of credit and similar surety instruments (including construction performance bonds)), and (vii) all guaranty obligations with respect to the types of obligations listed in clauses (i) through (vi) above.

*"Intangible Property Assets"* means any Intellectual Property Assets or Other Intangible Property Assets owned or held by Sellers. As used in this Agreement, "Intangible Property Assets" shall in all events exclude: (i) any materials containing information about employees (other than Transferred Employees), to the extent disclosure of which is prohibited under applicable law, and (ii) any software or other item of intangible property held by Sellers pursuant to a license or other Contract where Purchaser does not assume the underlying Contract relating to such software or item of intangible personal property at the Closing.

*"Intellectual Property Assets"* means intellectual property or other proprietary rights of Sellers of every kind throughout the world, both domestic and foreign, which, in each case, are related to the Business, including all inventions and improvements thereon, Patents, Trademarks, Trademark Rights, Copyrights, Domain Names, Technology, Recipes and trade secrets.

*"Inventory"* means all food, all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory and stock in trade owned by any Seller, whether or not prepaid, and wherever located, held or owned, including all fresh and frozen foodstuffs, alcoholic beverages, non-alcoholic beverages, disposable paper goods (such as napkins and paper towels), soaps and detergents, condiments, retail merchandise, replacement and spare parts and fuels and other similar items owned and held by Sellers or used in connection with the Acquired Restaurants, wherever located.

*"Keen-Summit Agreement"* means that certain Retention Agreement dated as of April 23, 2019, by and among Keen-Summit Capital Partners LLC and Kona Grill Inc.

*"Large Party Deposit"* means any cash deposit, prepayment, down-payment, or reservation fee made to Sellers in connection with a Large Party Reservation.

*"Large Party Reservation"* means a reservation for space, food, beverage, and associated service for any party larger than 12 people at any Acquired Restaurant made with the payment of a Large Party Deposit for a date and time after the Closing Date including, for example, a large family party or gathering, a corporate party or function, or a similar group function planned in advance.

*"Leasehold Improvements"* means any leasehold improvements or appurtenances to such improvements (including, without limitation, buildings, structures, storage areas, driveways, walkways, planters, landscaping and parking areas).

*"Legal Requirement"* means any applicable federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, proclamation, treaty, convention, rule, regulation, directive, pronouncement, requirement,

notice requirement, guideline, Order, specification, determination, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"*Liability*" means any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type whatsoever, whether accrued or unaccrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or unasserted, due or to become due.

"*Liquor License*" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by a Seller in the operation of the Business.

"*Liquor License Approval*" shall have the meaning provided for under Section 8.1.

"*Management Agreement*" means the agreement substantially in the form attached as Exhibit E.

"*Order*" means any judgment, decision, consent decree, injunction, ruling or order of any Governmental Body that is binding on any Person or its property under applicable law.

"*Other Contract*" means any Sellers' Contract other than the Restaurant Leases.

"*Other Intangible Property Assets*" means all intangible personal property (other than the Intellectual Property Assets) owned or held by Sellers, including, without limitation, (A) the books and records pertaining to the Business; (B) proprietary information relating to the Business, including but not limited to catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone numbers identified with the Business; and (C) all goodwill of the Business.

"*Other Lease*" means any Sellers' Contract that is a lease other than a Restaurant Lease.

"*Outside Date*" means July 31, 2019.

"*Parties*" shall have the meaning provided for in the preamble.

"*Patent*" means the United States and foreign patents and patent applications owned by Sellers, including any continuations, divisionals, continuations in part, or reissues of patent applications and patents issuing thereon and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"*Permitted Access Parties*" shall have the meaning provided for under Section 15.2.

"*Person*" means an individual, Entity or Governmental Body.

"*Petition*" means the petition that commenced the Chapter 11 Cases.

"*Petition Date*" means the date of the filing of the Petition with the Bankruptcy Court.

"*Previously Omitted Contract*" shall have the meaning provided for under Section 2.6(b)(i).

"*Previously Omitted Contract Designation*" shall have the meaning provided for under Section 2.6(b)(i).

"*Previously Omitted Contract Notice*" shall have the meaning provided for under Section

2.6(b)(ii).

"*Procedures Order*" shall have the meaning provided for under Section 9.2.

"*Purchase Price*" shall have the meaning provided for under Section 2.1.

"*Purchased Assets*" shall have the meaning provided for under Section 1.1.

"*Purchased Contract*" is defined in Section 1.1(f) hereof.

"*Purchaser*" shall have the meaning provided for in the preamble.

"*Receivables*" means all accounts receivable (whether current or non-current) of the Business attributable to the operation of the Acquired Restaurants as of the Closing, even if such accounts receivable become due and payable after the Closing, and all causes of action specifically pertaining to the collection of the foregoing.

"*Recipes*" means all of Sellers' recipes, methods, procedures, cooking/ preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages (whether alcoholic or non-alcoholic), or otherwise (in each case, written or oral or in any other form whatsoever).

"*Restaurant Lease*" means any real property lease set forth on Schedule 1.1(f) by any of Sellers under which a Restaurant is the leased premises, together with all rights and interests of Sellers relating thereto, whether held directly by Sellers or indirectly through an agent or nominee (including but not limited to all security deposits, purchase options, renewal options, rights of first refusal, reconveyance rights and expansion rights, if any, fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto, all Leasehold Improvements thereon or forming a part thereof and all easements, licenses, rights and appurtenances thereto and associated with such Restaurant Lease).

"*Restaurant Petty Cash*" shall mean petty cash of Sellers on the premises of any Acquired Restaurant, other than Excluded Petty Cash.

"*Sale Hearing*" means the hearing conducted by the Bankruptcy Court to approve the Contemplated Transactions.

"*Sale Motion*" shall have the meaning provided for under Section 9.1.

"*Sale Order*" shall have the meaning provided for under Section 9.1.

"*Sellers*" shall have the meaning provided for in the preamble.

"*Sellers' Contract*" means any Contract (a) to which any of Sellers is a party or by which any of Sellers is bound and (b) that is related to the Business.

"*Sellers' Knowledge*" means the actual knowledge of any of the Chief Executive Officer and Chief Restructuring Officer, and such knowledge as would be obtained following the exercise of reasonable inquiry by such Persons.

"*Standard Exceptions to Enforceability*" means any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

32

"**Subsidiary**" means, with respect to any Person, (a) any corporation of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation, is held, directly or indirectly by such Person and (b) any partnership or limited liability company of which (i) such Person is a general partner or managing member or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership or limited liability company.

"**Tax**" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, transfer pricing report or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Technology**" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, know how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"**Trademarks**" means all trademark registrations and applications for trademark registration owned by Sellers, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"**Trademark Rights**" means all common law rights in the United States and any foreign jurisdiction in any trade names, corporate names, logos, slogans, designs, trade dress, and unregistered trademarks and service marks owned by Sellers, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated with any of the foregoing.

"**Transfer Taxes**" shall have the meaning provided for under Section 3.4.

"**Transferred Employee**" shall have the meaning provided for under Section 13.1.

"**Utilities**" shall have the meaning provided for under Section 2.88.

"**WARN Act**" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder, or any formulation of similar rights arising under applicable state law.

*[SIGNATURE PAGES FOLLOW;*
*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

33

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement as of the day and year first above written.

**PURCHASER:**

Williston Holding Company, Inc., a Nevada corporation

By: _____
Name:  Marcus E. Jundt
Its:      CEO

**SELLERS:**

Kona Grill, Inc., a Delaware corporation

By:      _____
Name:  _____
Its:      _____

Kona Restaurant Holdings, Inc., a Delaware corporation

By:      _____
Name:  _____
Its:      _____

Kona Sushi, Inc., an Arizona corporation

By:      _____
Name:  _____
Its:      _____

Kona Macadamia, Inc., a Delaware corporation

By:      _____
Name:  _____
Its:      _____

*[SIGNATURES CONTINUED ON NEXT PAGE]*

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement as of the day and year first above written.

**PURCHASER:**

Williston Holding Company, Inc., a Nevada corporation

By: _____

Name:  Marcus E. Jundt

Its:  CEO

**SELLERS:**

Kona Grill, Inc., a Delaware corporation

By: _____

Name:  Christopher Wells

Its:  Chief Restructuring Officer

Kona Restaurant Holdings, Inc., a Delaware corporation

By: _____

Name:  Christopher Wells

Its:  Chief Restructuring Officer

Kona Sushi, Inc., an Arizona corporation

By: _____

Name:  Christopher Wells

Its:  Chief Restructuring Officer

Kona Macadamia, Inc., a Delaware corporation

By: _____

Name:  Christopher Wells

Its:  Chief Restructuring Officer

*[SIGNATURES CONTINUED ON NEXT PAGE]*

DOCS_LA:321810.6 50045/002

Kona Texas Restaurants, Inc., a Texas corporation

By: _____

Name: Christopher Wells

Its: Chief Restructuring Officer

Kona Baltimore, Inc., a Delaware corporation

By: _____

Name: Christopher Wells

Its: Chief Restructruing Officer

Kona Grill International Holdings, Inc., a Delaware corporation

By: _____

Name: Christopher Wells

Its: Chief Restructuring Officer

Kona Grill International, Inc., an Arizona corporation

By: _____

Name: Christiopher Wells

Its: Chief Restructuring Officer

Kona Grill Puerto Rico, Inc., an Arizona corporation

By: _____

Name: Christopher Wells

Its: Chief Restructuring Officer

## SCHEDULES

### [Drafts Attached]

### Schedule 1.1(e)

### Intangible Property Assets

#### *Trademarks*

United States:

| Mark | Appl./Reg. No. | Country | Owner |
|------|----------------|---------|-------|
| EAT MORE BEER DRINK MORE BEER | 87937061 | United States | Kona Grill, Inc. |
| XXI BREW CO | 87937065 | United States | Kona Grill, Inc. |
| XXI BREW CO LAS VEGAS, NV | 87937067 | United States | Kona Grill, Inc. |
| KONAVORE | 4061001 | United States | Kona Grill, Inc. |
| EAST MEETS WEST. THEY PARTY. | 3729306 | United States | Kona Grill, Inc. |
| KONA GRILL | 2414461 | United States | Kona Grill, Inc. |
| KONA GRILL | 4155598 | Hawaii | Kona Macadamia, Inc. |

Foreign:

| Mark | Appl./Reg. No. | Country | Owner |
|------|----------------|---------|-------|
| KONA GRILL | TMA988431 | Canada | Kona Grill International Holdings, Inc. |
| KONA GRILL | 1663833 | Mexico | Kona Grill International Holdings, Inc. |
| KONA GRILL | 1618889 | Mexico | Kona Grill International Holdings, Inc. |
| KONA GRILL | 2015-0000493 | Costa Rica | Kona Grill International Holdings, Inc. |
| KONA GRILL | 2015140898 | El Salvador | Kona Grill International Holdings, Inc. |
| KONA GRILL | 210147 | Guatemala | Kona Grill International Holdings, Inc. |
| KONA GRILL | 15004132 | Honduras | Kona Grill International Holdings, Inc. |
| KONA GRILL | 238622 | Panama | Kona Grill International Holdings, Inc. |
| KONA GRILL | 908902352 | Brazil | Kona Grill International Holdings, Inc. |
| KONA GRILL | 1215442 | Chile | Kona Grill International Holdings, Inc. |
| KONA GRILL | 545336 | Colombia | Kona Grill International Holdings, Inc. |
| KONA GRILL | 2015-3805 | Ecuador | Kona Grill International Holdings, Inc. |
| KONA GRILL | 447697 | Paraguay | Kona Grill International Holdings, Inc. |
| KONA GRILL | S00088747 | Peru | Kona Grill International Holdings, Inc. |
| KONA GRILL | 461742 | Uruguay | Kona Grill International Holdings, Inc. |
| KONA GRILL | 15/2349 | Dominican Republic | Kona Grill International Holdings, Inc. |
| KONA GRILL | 066303 | Jamaica | Kona Grill International Holdings, Inc. |
| KONA GRILL | 49280 | Trinidad and Tobago | Kona Grill International Holdings, Inc. |

| KONA GRILL | 2015 14525 | Turkey | Kona Grill International Holdings, Inc. |
| KONA GRILL | 3187661 | United Kingdom | Kona Grill International Holdings, Inc. |
| KONA GRILL | 107444 | Bahrain | Kona Grill International Holdings, Inc. |
| KONA GRILL | 137786 | Jordan | Kona Grill International Holdings, Inc. |
| KONA GRILL | 162316 | Kuwait | Kona Grill International Holdings, Inc. |
| KONA GRILL | 92778 | Oman | Kona Grill International Holdings, Inc. |
| KONA GRILL | 96194 | Qatar | Kona Grill International Holdings, Inc. |
| KONA GRILL | 1436013197 | Saudi Arabia | Kona Grill International Holdings, Inc. |
| KONA GRILL | 278291 | United Arab Emirates | Unknown applicant |
| KONA GRILL | 229782 | United Arab Emirates | Kona Grill International Holdings, Inc. |

### *Domain Names*

- konagrill.com

### *Other*

- "Kona Grill" logo
- Sellers' Facebook account (including all associated login credentials and content)
- Sellers' Twitter account (including all associated login credentials and content)
- Sellers' Instagram account (including all associated login credentials and content)
- Sellers' LinkedIn account (including all associated login credentials and content)

2

### Schedule 1.1(f)

### Purchased Contracts

*__Restaurant Leases__*

- **Unit No. 101**. Lease Agreement effective October 9, 2013, by and between Scottsdale Fashion Square, LLC, a Delaware limited liability company, and Kona Sushi, Inc., an Arizona corporation d/b/a Kona Grill, for the premises commonly known as Space #0559 in the Scottsdale Fashion Square shopping center located at 7014 East Camelback Road, Scottsdale, Arizona 85251.

- **Unit No. 103**. Lease dated March 14, 2017, by and between Country Club Plaza JV, LLC, a Delaware limited liability company, and Kona Macadamia, Inc., a Delaware corporation d/b/a Kona Grill, for the premises commonly known as Store Number Q-440 in the Country Club Plaza shopping center located at 444 Ward Parkway, Kansas City, Missouri 64112.

- **Unit No. 105**. Lease dated December 6, 2002, by and between The Shops at Boca Park – Phase II, LLC, a Nevada limited liability company, and Kona Grill Las Vegas, Inc., a Delaware corporation d/b/a Kona Grill, for the premises commonly known as Retail Building 6, Suite 100, in The Shops at Boca Park shopping center located at 750 South Rampart Boulevard, Las Vegas, Nevada 89145 (as amended by (i) that certain First Amendment to Lease dated [●], by and between [●] and [●]; (ii) that certain Second Amendment to Lease dated May 4, 2011, by and between Charleston Associates, LLC, a Delaware limited liability company and successor-in-interest to The Shops at Boca Park – Phase II, LLC, and Kona Grill Las Vegas, Inc.; and (iii) that certain Third Amendment to Lease dated May 6, 2013, by and between Charleston Associates, LLC, and Kona Macadamia, Inc., a Delaware corporation and successor-in-interest to Kona Grill Las Vegas, Inc.).

- **Unit No. 106**. Lease dated December 29, 2014, by and between Taubman Cherry Creek Shopping Center, L.L.C., a Delaware limited liability company, and Kona Macadamia, Inc., for the premises commonly known as Store Number 184 and Store Number 281-A in the Cherry Creek Shopping Center located at 3000 East 1st Avenue, Denver, Colorado 80206.

- **Unit No. 107**. Ground Lease dated March 16, 2004, by and between 168th and Dodge, L.P., a Nebraska limited partnership, and Kona Grill Omaha, Inc., a Delaware corporation d/b/a Kona Grill, for the premises commonly known as Building J in the Village Pointe Shopping Center located at 295 North 170th Street, Omaha, Nebraska 68118 (as amended by (i) that certain First Amendment to Lease dated April 26, 2006, by and between 168th and Dodge, L.P., and Kona Sushi, Inc., as successor-in-interest to

3

Kona Grill Omaha, Inc.; and (ii) that certain Second Amendment to Lease dated August 6, 2018, by and between 168th and Dodge, L.P., and Kona Sushi, Inc.).

- **Unit No. 108**. Lease dated October 7, 2004, by and between Clay Terrace Partners, LLC, an Indiana limited liability company, and Kona Grill Indiana, Inc., a Delaware corporation d/b/a Kona Grill, for the premises commonly known as Room C37 in the Clay Terrace shopping mall located at 14395 Clay Terrace Drive, Carmel, Indiana 46032 (as amended by (i) that certain Lease Amendment dated April 15, 2008, by and between Clay Terrace Partners, LLC, and Kona Grill Indiana, Inc.; (ii) that certain Second Lease Amendment dated October 25, 2011, by and between Clay Terrace Partners, LLC, and Kona Macadamia, Inc., as successor-in-interest to Kona Grill Indiana, Inc.; and (iii) that certain Third Lease Amendment dated August 21, 2012, by and between Clay Terrace Partners, LLC, and Kona Macadamia, Inc.).

- **Unit No. 110**. Lease Agreement dated November 12, 2004, by and between La Cantera Retail Limited Partnership, a Texas limited partnership, and Kona Grill Cantera, Inc., a Delaware corporation d/b/a Kona Grill, for the premises commonly known as Building 7, Suite 7300, in The Shops at La Cantera located at 15900 La Cantera Parkway, San Antonio, Texas 78256 (as amended by (i) that certain Assignment and Consent to Assignment of Lease dated September 6, 2005, by and among La Cantera Retail Limited Partnership, Kona Grill Cantera, Inc., and KG Texas Kona Grill, Inc., a Texas corporation d/b/a Kona Grill; and (ii) that certain First Amendment of Lease effective October 3, 2012, by and between La Cantera Retail Limited Partnership and KG Texas Kona Grill, Inc., as successor-in-interest to Kona Grill Cantera, Inc.).

- **Unit No. 111**. Shopping Center Lease dated March 25, 2005, by and between NorthPark Partners, LP, a Delaware limited partnership, and Kona Grill Dallas, Inc., a Delaware corporation d/b/a Kona Grill, for the premises commonly known as Space N-1142 in Building N of the NorthPark Center shopping mall located at 8687 North Central Expressway, Dallas, Texas 75225 (as amended by (i) that certain Amendment of Lease dated November 6, 2008, by and among NorthPark Partners, LP, Kona Grill Dallas, Inc., and Kona Grill, Inc.; (ii) that certain 2012 Amendment of Lease dated July 16, 2012, by and among NorthPark Partners, LP, Kona Texas Restaurants, Inc., a Texas corporation and successor-by-merger to Kona Grill Dallas, Inc., and Kona Grill, Inc.; (iii) that certain 2016 Amendment of Lease dated January 10, 2017, by and among NorthPark Partners, LP, Kona Texas Restaurants, Inc., and Kona Grill, Inc.; and (iv) that certain 2017 Amendment of Lease dated September 15, 2017, by and among NorthPark Partners, LP, Kona Texas Restaurants, Inc., and Kona Grill, Inc.).

- **Unit No. 114**. Shopping Center Lease dated October 5, 2005, by and between Oak Brook Promenade L.L.C., a Delaware limited liability company, and Kona Sushi, Inc., for the premises commonly known as Space K in the Oak Brook Promenade shopping center located at 3051 Butterfield Road, Oak Brook, Illinois 60523 (as amended by: (i) that certain Lease Term Agreement dated November 6, 2006, by and between Oak Brook

4

Promenade, L.L.C., and Kona Sushi, Inc.; and (ii) that certain First Amendment to Lease dated July 27, 2011, by and between Oak Brook Promenade, L.L.C., and Kona Sushi, Inc.).

- **Unit No. 117**. Ground Lease dated August 4, 2006, by and between 100 East Big Beaver, LLC, a Michigan limited liability company, and Kona Macadamia, Inc., for the premises commonly known as 30 East Big Beaver Road, Troy, Michigan 48083.

- **Unit No. 120**. Lease Agreement dated August 30, 2007, by and between WestCor SanTan Village LLC, an Arizona limited liability company, and Kona Sushi, Inc., for the premises commonly known as Space #200 in the SanTan Village shopping center located at 2224 East Williams Field Road, Gilbert, Arizona 85295.

- **Unit No. 122**. Lease dated November 5, 2007, by and between Windsor Plaza, LLC, a Minnesota limited liability company, and Kona Sushi, Inc., for the Building and the Outdoor Patio (as such terms are defined in the Lease) at the south end of the premises commonly known as the Windsor Plaza Shopping Center located at 11997 Singletree Lane, Eden Prairie, Minnesota 55344 (as amended by that certain First Amendment to Lease dated December 23, 2008, by and between Windsor Plaza, LLC, and Kona Sushi, Inc.).

- **Unit No. 126**. Net Lease Agreement dated March 31, 2008, by and between Woodbridge Restaurant Urban Renewal, L.L.C., a New Jersey limited liability company, and Kona Macadamia, Inc., for the premises commonly known as 515 Route 1 South, Woodbridge, New Jersey 08830.

- **Unit No. 127**. Lease Agreement dated May 19, 2008, by and between GF One East Pratt Street, LLC, a Maryland limited liability company, and Kona Macadamia, Inc., for that portion of the Restaurant/Retail Complex (as that term is defined in the Lease Agreement) commonly known as One East Pratt Street, #103, Baltimore, Maryland 21202 (as amended by (i) that certain First Amendment to Lease dated June 2, 2009, by and between GF One East Pratt Street, LLC, and Kona Macadamia, Inc.; (ii) that certain Assignment of Lease dated January 27, 2010, by and between Kona Macadamia, Inc., and Kona Baltimore, Inc., a Delaware corporation; and (iii) that certain Second Amendment of Lease dated March 25, 2010, by and between GF One East Pratt Street, LLC, and Kona Macadamia, Inc.).

- **Unit No. 128**. Retail Restaurant Lease dated September 19, 2008, by and between Metropolitan Life Insurance Company, a New York corporation, and Kona Macadamia, Inc., for the space identified as 4134 Boy Scout Boulevard, Building B-1, Tampa, Florida 33607 (as amended by that certain First Amendment to Retail Restaurant Lease dated October 9, 2009, by and between Metropolitan Life Insurance Company and Kona Macadamia, Inc.).

5

- **Unit No. 129**. Shopping Center Lease dated December 27, 2012, by and between Meridian CenterCal, L.L.C., a Delaware limited liability company, and Kona Sushi, Inc., for the premises commonly known as Space B-140 in The Village at Meridian shopping center located at 3573 East Longwing Lane, Meridian, Idaho 83646 (as amended by that certain First Amendment to Shopping Center Lease dated June 25, 2015, by and between Meridian CenterCal, L.L.C., and Kona Sushi, Inc.).

- **Unit No. 132**. In-Line Space Lease dated October 15, 2013, by and between The Fountains at Farah, LP, a Texas limited partnership, and Kona Texas Restaurants, Inc., for the Premises (as that term is defined in the In-Line Space Lease) in The Fountains at Farah Shopping Center located at 8889 Gateway Boulevard West, Suite 1740, El Paso, Texas 79925.

- **Unit No. 133**. Standard Commercial Shopping Center Lease dated December 30, 2013, by and between Easton Town Center II, LLC, a Delaware limited liability company, and Kona Macadamia, Inc., for the premises commonly known as Space 502 in Building 5 at the Easton Town Center shopping mall located at 4087 New Bond Street, Columbus, Ohio 43219.

- **Unit No. 134**. Shopping Center Lease dated May 9, 2013, by and between Avalon North, LLC, a Delaware limited liability company, and Kona Macadamia, Inc., for the premises commonly known as Suite 5000, plus the Patio Area (as that term is defined in the Shopping Center Lease), in the Avalon shopping center located at 5100 Avalon Boulevard, Alpharetta, Georgia 30009 (as amended by that certain First Amendment to Lease dated August 5, 2013, by and between Avalon North, LLC, and Kona Macadamia, Inc.).

- **Unit No. 135**. Lease dated November 7, 2013, by and between Taubman Benderson UTC LLC, a Delaware limited liability company, and Kona Macadamia, Inc., for the premises commonly known as Store Number 173 in The Mall at University Town Center located at 150 University Town Center Drive, Sarasota, Florida 34243 (as amended by (i) that certain Assignment and Assumption of Lease dated November 7, 2013, by and between Taubman Benderson UTC LLC, and TB Mall at UTC LLC, a Delaware limited liability company; and (ii) that certain First Modification of Lease Agreement dated August 5, 2014, by and between TB Mall at UTC LLC, and Kona Macadamia, Inc.).

- **Unit No. 136**. Lease dated November 7, 2013, by and between Plaza Internacional Puerto Rico, LLC, a Puerto Rico limited liability company, and Kona Macadamia, Inc., for the premises commonly known as Store Number 135 in The Mall of San Juan shopping center located at 1000 The Mall of San Juan Boulevard, San Juan, 00924, Puerto Rico (as amended by (i) that certain First Amendment of Lease Agreement dated April 11, 2014, by and between Plaza Internacional Puerto Rico, LLC, and Kona Macadamia, Inc.; (ii) that certain Assignment and Assumption of Lease dated September 17, 2014, by and between Kona Macadamia, Inc., and Kona Grill Puerto Rico, Inc., an Arizona

corporation; (iii) that certain Second Modification of Lease Agreement dated March 12, 2015, by and between Plaza Internacional Puerto Rico, LLC, and Kona Grill Puerto Rico, Inc.; (iv) that certain Third Modification of Lease Agreement dated June 30, 2016, by and between Plaza Internacional Puerto Rico, LLC, and Kona Grill Puerto Rico, Inc.; (v) that certain Fourth Modification of Lease Agreement dated May 31, 2017, by and between Plaza Internacional Puerto Rico, LLC, and Kona Grill Puerto Rico, Inc.; (vi) that certain Fifth Modification of Lease Agreement dated February 22, 2018, by and between Plaza Internacional Puerto Rico, LLC, and Kona Grill Puerto Rico, Inc.; and (vii) that certain Sixth Modification of Lease Agreement dated December 27, 2018, by and between Plaza Internacional Puerto Rico, LLC, and Kona Grill Puerto Rico, Inc.).

- **Unit No. 138**. Lease Agreement dated March 11, 2014, by and between West Plano Village, LTD, a Texas limited partnership, and Kona Texas Restaurants, Inc., for the Demised Premises (as that term is defined in the Lease Agreement) in the West Plano Village shopping center located at 5973 West Parker Road, Plano, Texas 75093.

- **Unit No. 141**. Lease dated August 6, 2014, by and between Liberty Center Holdings LLC, a Delaware limited liability company, and Kona Macadamia, Inc., for the premises commonly known as Space E-100 in the Liberty Center shopping center located at 7524 Gibson Street, Liberty Township, Ohio 45069.

- **Unit No. 143**. Lease dated October 14, 2014, by and between North Star Mall, LLC, a Delaware limited liability company, and Kona Texas Restaurants, Inc., for the premises commonly known as Space 1255 in the North Star Mall shopping center located at 7400 San Pedro Avenue, San Antonio, Texas 78216 (as amended by (i) that certain First Amendment of Lease dated October 27, 2015, by and between North Star Mall, LLC, and Kona Texas Restaurants, Inc.; and (ii) that certain Letter Agreement dated July 15, 2016, by and between North Star Mall, LLC, and Kona Texas Restaurants, Inc.).

- **Unit No. 145**. Lease dated October 14, 2014, by and between Ridgedale Center, LLC, a Delaware limited liability company, and Kona Sushi, Inc., for the premises commonly known as Space 1068 in the Ridgedale Center shopping mall located at 12235 Wayzata Boulevard, Minnetonka, Minnesota 55305.

- **Unit No. 148**. Lease dated October 30, 2015, by and between IMI Huntsville LLC, a Delaware limited liability company, and Kona Macadamia, Inc., for the premises commonly known as Space 150 in Building 435 in the Bridge Street Town Centre shopping mall located at 435 The Bridge Street Northwest, Huntsville, Alabama 35806.

- **Unit No. 154**. Lease Agreement dated April 15, 2016, by and between SDQ III RETAIL, LLC, a Delaware limited liability company, and Kona Sushi, Inc., for the premises commonly known as Space K-100 in the Scottsdale Quarter shopping mall located at 15345 North Scottsdale Road, Scottsdale, Arizona 85254.

7

- **Headquarters**. Lease Agreement dated April 15, 2016, by and between SDQ III FEE, LLC, a Delaware limited liability company, and Kona Grill, Inc., for the premises known as Suite M2-230 on the second (2nd) floor and Suite M3-300 on the (3rd) floor in the "M" building located on land with an address of 15257 North Scottsdale Road, Scottsdale, Arizona 85260.

DOCS_SF:101091.2 50045/002

### *Other Contracts*

- Eighth Amendment to Master Services Agreement between ADP and Kona Grill, Inc. dated July 1, 2016.

- Preventive Maintenance Agreement on all HVAC Equipment Located at 4087 New bond St. Colombus, OH between Airecom Inc. and Kona Macadamia, Inc. dated March 13, 2018

- Product Sale Agreement between Kona Grill, In. and Airgas USA, LLC dated October 3, 2018.

- Uniform Rental Service Agreement between Alsco Inc. and Kona Grill Inc. dated August 24, 2015

- Uniform Rental Service Agreement between Ameripride and Kona Grill Inc. dated April 21, 2011

- Amendment to Service Agreement between Aramark Uniform Services and Kona Grill, Inc. dated February 7, 2019.

- Software Licenses and Service Agreement between Bigart-Ecosystems LLC DBA Wisetail Kona Grill, Inc. dated April 29, 2016.

- [Uniform Rental Service between Cadillac Uniform & Linen Supply LLC and Kona Grill Puerto Rico, Inc. dated [●]]

- Marketing Agreement between China Mist and Kona Grill Inc. dated February 19, 2014

- Kona Grill, Inc. Employment Agreement between Christi Hing and Kona Grill, Inc. dated September 4, 2018.

- Beverage Marketing Agreement between COCA COLA USA and Kona Grill Inc. dated April 17, 2015

- [Coca-Cola Puerto Rico Bottling]

- Compeat Services Agreement between Compeat, Inc., d/b/a Compeat Restaurant Management Systems, and Kona Grill, Inc. dated September 16, 2016.

- Agreement for Commercial National Accounts between Kona Grill, Inc. and Direct TV, LLC effective as of April 29, 2016.

- Delivery and Promotion Agreement between DoorDash, Inc. and Kona Grill dated February 28, 2017.

9

- Foodservice Distribution Agreement between Distribution Market Advantage, Inc. and Kona Grill, Inc. and Subsidiaries dated June 20, 2017

- Agreement for Multi Territory Account service between Muzak LLC DBA MoodMedia and Kona Grill Inc. effective as of September 14, 2017

- Product and Services Supply Agreement between Ecolab Inc. and Kona Grill effective as of October 1, 2015.

- [Ecolab Mfg Inc Puerto Rico]

- Energy and Sustainability Management Services Agreement between ECOVA Inc. and Kona Grill, Inc. dated March 3, 2016

- Amendment to the Distribution Agreement between Edward Don & Company and Kona Grill Inc. dated October 2, 2013.

- [Planned Maintenance Agreement for Refrigeration, HVAC and Cooking Equipment between Encore One LLC and Kona Grill Inc.]

- F&B Annual Help Desk Support Agreement between F&B Management and Kona Grill, Inc. dated April 9, 2019.

- International Franchise Agreement Canada between Ontario Limited and Kona Grill, Inc. dated April 11, 2017.

- First Amendment to International Development Agreement between Hakaya Collection Development FZE and Kona Grill International, Inc. dated September 5, 2018.

- Planned Maintenance Agreement on all HVAC equipment located at 295 N 170th St. Omaha, NE between Fred's Heating and Air and Kona Grill, Inc. dated June 5, 2018]

- Armored Car Service Agreement between Garda CL West Inc. and Kona Grill, Inc dated July 11, 2018

- [Great Plains Software]

- Restaurant Delivery Agreement - Fairfax between Grubhub Holdings Inc. and Kona Grill Inc. September 27, 2017.

- Restaurant Delivery Agreement - Huntsville between GrubSouth LLC. and Kona Grill Inc. December 8, 2017.

- Restaurant Delivery Agreement – Kansas City between Grubhub Holdings Inc. and Kona Grill Inc. dated July 12, 2017.

10

- Restaurant Delivery Agreement – Richmond between Grubhub Holdings Inc. and Kona Grill Inc. dated August 3, 2017.

- Service Agreement between Harford Refrigeration Co., Inc. and Kona Grill, Inc dated June 11, 2018

- Service Agreement between Red Book Connect, LLC DBA HotSchedules and Kona Grill Inc effective as of October 1, 2017

- Natural Gas Purchase Contract between Interstate Gas Supply, Inc. and Kona Macadamia, Inc. dated February 7, 2019.

- Retention Agreement between Kona Grill Inc. and Keen-Summit Capital Partners LLC dated April 23, 2019.

- Distributor Service Agreement between Maines Conklin and Kona Grill dated September 1, 2017.

- Antivirus Base Plan Subscription between NCR Corporation and Kona Grill, Inc effective as of December 3, 2018

- Mailing Solution Agreement between Neopost and Kona Grill, Inc dated January 23, 2015

- OpenTable Client Intake Form between OpenTable and Kona Grill, Inc. dated March 1, 2017.

- Image Management Contract between Kona Grill, Inc. and Pacific Office Automation, Inc. dated September 27, 2017.

- Total Image Management Master Agreement between Kona Grill, Inc. and Pacific Office Automation, Inc. dated May 8, 2018.

- Equipment Rental Terms and Conditions Schedule Amendment #3 between Paetec and Kona Grill Inc. dated November 30, 2016.

- Payroll and Human Capital Management Services Agreements between Paycom Payroll, LLC and each of Kona Restaurant Holdings, Kona Sushi Inc., Kona Macadamia, Inc., Kona Texas Restaurants, Inc., and Kona Grill Puerto Rico, Inc., each effective as of August 31, 2018.

- Scope of Work Agreement between Paytronix Systems Inc. and Kona Grill, Inc. dated March 26, 2018

- Preventive Maintenance Agreement on all HVAC Equipment Located at 230 Tresser Blvd Stamford CT between R. A. Levine Company and Kona Grill, Inc. dated June 11, 2018

- Service Agreement between Reputation.com and Kona Grill dated January 30, 2018

- Service Agreement between Research Data Group and Kona Grill, Inc. dated May 29, 2015

- Order Management Agreement between Restaurant Revolution Technologies, Inc. and Kona Grill, Inc. dated December 22, 2015

- Cybersecurity Service Agreement between Tevora Business Solutions Inc. and Kona Grill, Inc. dated December 28, 2018

- Scheduled Service Agreement on all HVAC Equipment Located at 7524 Gibson Street Liberty Township, OH between Trane U.S. Inc. and Kona Grill effective as of June 1, 2018

- [Uniform and Garment Rental Service Agreement between Valley City Linen and Kona Grill dated April 6, 2017]

- Service agreement between Vuria LLC and Kona Grill, Inc. dated April 18, 2018

- Service agreement between Thomson Reuters DBA West and Kona Grill dated June 24, 2011

- Master Framework Letter Agreement between Kona Grill Inc. and Portier, LLC (wholly-owned subsidiary of Uber Technologies, Inc.) dated May 30, 2017.

- [Worldwide Express]

12

## Schedule 1.1(g)

## Business Permits and Liquor Licenses

| Store # | State | Location | License Number | License Type | Next Expiration Date | Issued By |
|---|---|---|---|---|---|---|
| 148 | AL | Huntsville | 243027 | City Privilege License | 12/31/19 | City of Huntsville |
| 148 | AL | Huntsville | 47-5575 | Food Permit | 10/31/19 | AL Dept of Health |
| 148 | AL | Huntsville | 10764845 | Liquor | 09/30/19 | Alabama ABC |
| 148 | AL | Huntsville | 56109 | Alarm Permit | 2019 | City of Huntsville PD |
| 148 | AL | Huntsville | 19105 | Occupational License (Account 164684) | 09/30/19 | Madison County |
| 120 | AZ | Gilbert | 120077591 | State Liquor | 03/31/20 | AZ Dept Liquor Control (violations) |
| 120 | AZ | Gilbert | 34793 | Alarm Permit - (renews with Biz License) | 01/31/20 | Gilbert Police Dept (renews w Biz lic) |
| 120 | AZ | Gilbert | FD-12865 | Health Permit | 05/31/19 | Maricopa County |
| 120 | AZ | Gilbert | 07541004 | Gilbert TPT | 12/31/19 | AZ Dept of Revenue |
| 120 | AZ | Gilbert | BUSLIC002786-12-2017 | Business License (alarm permit renews) | 01/31/20 | City of Gilbert |
| 120 | AZ | Gilbert | 17891 | City Liquor | 12/31/19 | Gilbert - Development Services |
| 101 | AZ | Scottsdale | 12073979 | State Liquor | 03/31/20 | AZ Dept Liquor Control (violations) |
| 101 | AZ | Scottsdale | FD-12659 | Health Permit | 4/30/20 | Maricopa County |
| 101 | AZ | Scottsdale | 07541004 | City of Scottsdale - TPT | 12/31/19 | AZ Dept of Revenue |
| 101 | AZ | Scottsdale | 1105215 | City of Scottsdale - Alarm # 1105215 | 07/09/19 | City of Scottsdale |
| 101 | AZ | Scottsdale | 0850193 | City of Scottsdale - City Liquor # 0850193 | 12/31/19 | City of Scottsdale |

13

| Store # | State | Location | License Number | License Type | Next Expiration Date | Issued By |
|---------|-------|----------|----------------|--------------|----------------------|-----------|
| 154 | AZ | Scottsdale – SQ | 1130018 | Transaction Privilege Tax License | 12/31/19 | AZ Dept of Revenue |
| 154 | AZ | Scottsdale – SQ | 1207A776 | State Liquor | 03/31/20 | AZ Dept of Liquor Control (violations) |
| 154 | AZ | Scottsdale – SQ | 1130019 | Spirituous Liquor Tax Permit | 12/31/19 | City of Scottsdale |
| 154 | AZ | Scottsdale – SQ | 1134272 | Business Registration | | City of Scottsdale |
| 154 | AZ | Scottsdale – SQ | 2003865 | Alarm Permit | 12/07/19 | City of Scottsdale |
| 154 | AZ | Scottsdale – SQ | FD-51278 | Health Permit | 07/31/19 | Maricopa County |
| 106 | CO | Denver | 35-09423-0000 | State Liquor  (H&R) (send w city & County renewal) | 09/10/19 | CO DOR - |
| 106 | CO | Denver | 35-09423-0000 | City - Liquor & Food Business Professional License | 09/10/19 | City of Denver - |
| 106 | CO | Denver | 430431 | Alarm User Permit | 07/22/19 | City and County of Denver |
| 106 | CO | Denver | 214335-070075 | City and County of Denver | 12/31/19 | Manager of Finance C&C of Denver |
| 106 | CO | Denver | 03509423-0000 | Sales Tax License | 12/31/19 | CO Dept of Revenue |
| 106 | CO | Denver | CO104415 & CO104416 | Boiler Certificate | 09/30/19 | CO Dept of Labor and Employment |
| 128 | FL | Tampa | BEV3910573 | State Liquor | 09/30/19 | State of Florida ABT |
| 128 | FL | Tampa | SEA 3916624 | State Food | 02/01/20 | DBPR - Hotels&Rest |
| 128 | FL | Tampa | none | Annual Report & Commercial Ins Audit | 01/31/20 | City of Tampa |
| 128 | FL | Tampa | none | Business Tax Receipt | 09/30/19 | City of Tampa |
| 128 | FL | Tampa | 39-8015.191657-3 | Resale Cert for Sales Tax | 12/31/19 | FL Dept of Revenue |
| 128 | FL | Tampa | SEA 3916624 | Business Tax Receipt | 09/30/19 | Hillsborough County |

14

| Store # | State | Location | License Number | License Type | Next Expiration Date | Issued By |
|---|---|---|---|---|---|---|
| 135 | FL | Sarasota | SEA6805488 | State Food | 12/01/19 | State of Florida ABT |
| 135 | FL | Sarasota | BEV6804857 | State Liquor | 03/31/20 | DBPR - Hotels&Rest |
| 135 | FL | Sarasota | 990010114467 | Business Tax | 09/30/19 | Sarasota Tax Collector |
| 115 | FL | Sarasota | 68-8016517897-4 | Resale Cert for Sales Tax | 12/31/19 | FL Dept of Revenue |
| 135 | FL | Sarasota | 58-DD-1655191 | Doggie Dining Permit | 06/30/19 | FL Dept of Health |
| 134 | GA | Alpharetta | 5958 | Alcohol Beverage License | 12/31/19 | City of Alpharetta |
| 134 | GA | Alpharetta | 72247 | License to Sell No notice | 12/31/19 | State of GA Dept. of Revenue |
| 134 | GA | Alpharetta | 3330 | Commercial Waste Water Permit | 03/31/20 | Fulton County |
| 134 | GA | Alpharetta | 5935 | Business/Occupational License | 12/31/19 | City of Alpharetta |
| 134 | GA | Alpharetta | FSP-060-002391 | Food Service Permit | 10/01/19 | Fulton County |
| 129 | ID | Boise | 41855 | Health Permit | 12/31/19 | Central District Health |
| 129 | ID | Boise | 11318 | State Liquor License | 04/30/20 | Idaho State Police |
| 129 | ID | Boise | ALC20150107 | City of Meridian Alcohol | 04/30/20 | Meridain City Clerk |
| 129 | ID | Boise | 2016601 | Ada County Alcohol license | 04/30/20 | Ada County |
| 114 | IL | Oak Brook | 1A-0074228 | State Liquor License | 09/30/19 | State Liquor Control Commission |
| 114 | IL | Oak Brook | 20 | Village of Oak Brook Class A-1  On-Sale liquor w/ 2am Sat | 06/30/19 | Village of Oak Brook |
| 114 | IL | Oak Brook | 1001757 | Food | 04/30/20 | DuPage County |
| 114 | IL | Oak Brook | 102080 | Water Permit | 04/30/20 | Flagg Creek Water Reclamation Dist |

15

DOCS_SF:101091.2 50045/002

| Store # | State | Location | License Number | License Type | Next Expiration Date | Issued By |
|---------|-------|----------|----------------|--------------|---------------------|-----------|
| 108 | IN | Carmel | RR29201024 | Retailer - LBW Type 210 | 02/19/20 | IN Alcohol & Tobacco Commission |
| 108 | IN | Carmel | 1227101026 | Retail Merchant Certificate | 12/31/19 | IN Dept of Revenue |
| 108 | IN | Carmel | 0968 | Food | 12/31/19 | Hamilton Cnty HD |
| 117 | MI | Troy | # 156177 & SDM # 156178 | Class C w/ss | 04/30/20 | MI Liquor Control Commission |
| 117 | MI | Troy | | Boiler Certificate | 11/27/19 | MI Dept of Licensing & Reg. Affairs |
| 117 | MI | Troy | 164797 | Alarm Registration | 01/31/20 | City of Troy |
| 117 | MI | Troy | n/a | Sales Tax Registration | 12/31/19 | MI Dept of Treasury |
| 117 | MI | Troy | SFE3963055661 | Food | 04/30/20 | Oakland County Health |
| 127 | MD | Baltimore | LB219 | Class B  #LB 224 | 04/30/20 | Baltimore City Liquor Bd |
| 127 | MD | Baltimore | LB003 | Liquor License | 04/30/20 | Board of Liquor License Commissioners |
| 127 | MD | Baltimore | 21061 | Food/Restaurant | 09/25/19 | Baltimore City Health |
| 127 | MD | Baltimore | 30994867 | Business - Traders License | 04/30/20 | Baltimore City Circuit Court |
| 127 | MD | Baltimore | 141628 | Fire Prevention - public assembly | 09/30/19 | Director of Finance - |
| 127 | MD | Baltimore | 3-1C760 | Waste /water Discharge Permit | 05/31/19 | City of Balt - Public Works |
| 127 | MD | Baltimore | | Frank Jarowski - FEE | Q2 & Q4 | Frank Jarowski - Inhouse invoice |
| 122 | MN | Eden Prairie | 18-639 & CH17/41295 | Liquor On Sale & Sunday | 12/31/19 | City of Eden Prairie |
| 122 | MN | Eden Prairie | 4720, 4721, 4722 | Food | 01/31/20 | Hennepin County |
| 122 | MN | Eden Prairie | 520582 | Vehicle Food Permit | 01/31/20 | Hennepin County |
| 122 | MN | Eden Prairie | 28115 | Retailer's Card | 12/31/19 | State - AGED |
| 122 | MN | Eden Prairie | 4720 | Hospitality Fee - Annual | 06/30/19 | MN Dept of Health |
| 145 | MN | Minnetonka | No # | Liquor License on Sale & On Sunday | 12/31/19 | City of Minnetonka |

16

DOCS_SF:101091.2 50045/002

| Store # | State | Location | License Number | License Type | Next Expiration Date | Issued By |
|---------|-------|----------|----------------|--------------|----------------------|-----------|
| 145 | MN | Minnetonka | 821 | Food Permit | 12/31/19 | City of Minnetonka |
| 145 | MN | Minnetonka | 59530 | Retailer's ID Card | 12/31/19 | Dept of Public Safety |
| 103 | MO | Kansas City | 144990 | State - Retail Liquor Drink | 06/30/19 | MO Division of Alcohol |
| 103 | MO | Kansas City | 144991 | State - Sunday Drink | 06/30/19 | MO Division of Alcohol |
| 103 | MO | Kansas City | LIC-4-16-10059598 | City & County - full drink & Sunday & Sidewalk | 07/31/19 | City of Kansas City |
| 103 | MO | Kansas City | L0835230208 | City - Conv & Tourism | 12/31/19 | City of Kansas City  Due |
| 103 | MO | Kansas City | 100252 | Food | 12/31/19 | Kansas City Health Dept |
| 103 | MO | Kansas City | 19814 | Place of Assembly | 05/01/19 | Kansas City Fire Prevention |
| 103 | MO | Kansas City | No # | Parks & Rec's Lease | 01/31/20 | Parks and Rec |
| 103 | MO | Kansas City | n/a | Managing Officer Fee | 06/30/19 | BSE Services |
| 103 | MO | Kansas City | 107821 | Alarm # 107821 | 11/25/19 | Board of Police Commissions |
| 107 | NE | Omaha | 65173 | State Class I Liquor | 04/30/20 | NE Liquor Control Commission |
| 107 | NE | Omaha | 229577 | City Class I Liquor | 04/30/20 | City of Omaha |
| 107 | NE | Omaha | 75162 | Food & Drink | 12/31/19 | Douglas Cnty Health |
| 107 | NE | Omaha | 36379 | Cert of Assembly | 09/30/19 | ME DP: / Office of safety |
| 107 | NE | Omaha | 36235 | Sign Permit | 12/31/19 | City of Omaha |
| 107 | NE | Omaha | 9725490 | Sales Tax Permit | 07/19/19 | NE Dept of Revenue |
| 107 | NE | Omaha | 208092 | Alarm Permit | 09/21/19 | City of Omaha |
| 105 | NV | Boca Park | L64-00033 | City Liquor - Restaurant with Alcohol | 09/30/19 | City of Las Vegas+K169 |
| 105 | NV | Boca Park | R09-01218-3-001096 | City Restaurant - Business License | 3/1 & 9/1 | City of Las Vegas |
| 105 | NV | Boca Park | PR00013178 | Food | 06/30/19 | Southern NV Health District |

17

DOCS_SF:101091.2 50045/002

| Store # | State | Location | License Number | License Type | Next Expiration Date | Issued By |
|---------|-------|----------|----------------|--------------|---------------------|-----------|
| 105 | NV | Boca Park | PR0013179 | Sushi | 06/30/19 | Southern NV Health District |
| 105 | NV | Boca Park | PR0013180 | Service Bar | 06/30/19 | Southern NV Health District |
| 105 | NV | Boca Park | PR0013181 | Bar | 06/30/19 | Southern NV Health District |
| 105 | NV | Boca Park | FAN-2883 | Fire Permit - renew on line | 10/01/19 | City of Las Vegas Fire |
| 105 | NV | Boca Park | PR0117076 | Drinking Establishment Roof Bar | 06/30/19 | Southern NV Health District |
| 126 | NJ | Woodbridge | 1225-33-021-007 | State Liquor | 06/30/19 | Twp of Woodbridge & ABC |
| 126 | NJ | Woodbridge | 412 | Food | 12/31/19 | TWP of Woodbridge |
| 126 | NJ | Woodbridge | | Woodbridge Township | 05/31/20 | TWP of Woodbridge |
| 126 | NJ | Woodbridge | BG05 #1225-71954 | Life Hazard Use | 05/05/20 | Iselin Fire Dist #9 |
| 133 | OH | Columbus | 4779540 | Liquor License | 2/1/2020 | State of OH Division of Liquor Control |
| 133 | OH | Columbus | C22624 | Alarm | 11/08/19 | City of Columbus |
| 133 | OH | Columbus | PR0033350-PT0031081 | Food Service License | 03/01/19 | Columbus Public Health |
| 141 | OH | Cincinnati | 523 | Food Service Operation License | 03/01/20 | Butler County Dept of Health |
| 141 | OH | Cincinnati | 4779540-0005 | Division of Liquor Control | 06/01/19 | State of OH |
| 136 | PR | San Juan | 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 | Business License | 6/30/19 | Officina de Finanzas Municipales |
| 136 | PR | San Juan | 192927 | Fire | 2/1/19 | Estado Libre Asociado De PR |
| 136 | PR | San Juan | 2015S063720 | Liquor | 12/31/19 | Secretario De Hacienda |
| 136 | PR | San Juan | 0605357-0012 | Merchant's Certificate | 12/31/21 | Dept of Tax |
| 136 | PR | San Juan | 436083 | Sanitary License | 02/25/20 | |

18

DOCS_SF:101091.2 50045/002

| Store # | State | Location | License Number | License Type | Next Expiration Date | Issued By |
|---|---|---|---|---|---|---|
| 136 | PR | San Juan | none | Service Contract | Qtrly | Miguel Bonilla |
| 136 | PR | San Juan | 2015-PUS-00134 | Use Permit | None | Estado Libre Asociado De PR |
| 111 | TX | Dallas | MB 624398 | State liquor # - MB, F&B, LH | 04/05/21 | TX ABC |
| 111 | TX | Dallas | 1137023 | City Liquor-MB, LH, Cartage | 4/5/19 | City of Dallas |
| 111 | TX | Dallas | MB624398 | County Liquor-MB, LH, Cartage | 04/15/19 | Dallas County |
| 111 | TX | Dallas | CC: 12329 | Food Permit- | 12/31/19 | City of Dallas |
| 110 | TX | San Antonio | MB 607354 | State Liquor - MB, F&B, LH | 09/07/19 | TX ABC |
| 110 | TX | San Antonio | 263326 | City Liquor - Mixed Beverage & LB | 09/07/19 | City of San Antonio |
| 110 | TX | San Antonio | 607354 | County Liquor - MB, LH | 09/07/19 | Albert Urestin Bexar County Tax Office |
| 110 | TX | San Antonio | 9919899 | Alarm Permit - Fire | 11/30/19 | City of San Antonio |
| 110 | TX | San Antonio | 9955123 | Alarm Permit - Police Commercial | 10/31/19 | City of San Antonio |
| 110 | TX | San Antonio | 181202 | Food | 08/30/19 | City of San Antonio |
| 132 | TX | El Paso | LFOD 16-02594 | Food License | 08/22/19 | City of El Paso Planning & Inspection |
| 132 | TX | El Paso | PE873346 | Beverage Cartage Permit | 05/26/19 | Office of the Cnty Tax Assessor |
| 132 | TX | El Paso | MB873346 | Mixed Beverage Permit w.FB | 05/26/20 | TX ABC |
| 132 | TX | El Paso | LSAL 14-01481 | City Security Alarm License | 07/26/20 | City of El Paso Dev Department |
| 132 | TX | El Paso | LFIR18-00531 | Places of Assembly | 02/15/20 | El Paso Fire Prevention Division |
| 132 | TX | El Paso | LFIR18-00531 | Comprssed Gas Permit | 02/15/20 | El Paso Fire Prevention Division |
| 132 | TX | El Paso | PSB 17754 | FOG Certificate | 01/29/20 | El Paso Water Utilities |
| 138 | TX | Plano | RM904027 | Mixed Beverage Permit & late Hours | 04/06/21 | City of Plano |

19

DOCS_SF:101091.2 50045/002

| Store # | State | Location | License Number | License Type | Next Expiration Date | Issued By |
|---|---|---|---|---|---|---|
| 138 | TX | Plano | RM904027 | Mixed Beverage Restaurant & Food Permit w FB | 4/6/21 | TX ABC |
| 138 | TX | Plano | 70778 | Alarm Permit | 06/19/19 | Plano Police Dept |
| 138 | TX | Plano | RM904027 | Mixed Beverage Restaurant & Food Permit w FB | 04/06/19 | Collin County |
| 138 | TX | Plano | | | | City of Plano Fire Inspection |
| 138 | TX | Plano | BEV | Bev Cartage Permit | 04/30/19 | Colin County |
| 138 | TX | Plano | | Food Service Full Service Restaurant | 04/30/20 | City of Plano Env Health |
| 143 | TX | San Antonio (NS) | MB958577 | Beverage Cartage Permit | 09/21/20 | TX ABC |
| 143 | TX | San Antonio (NS) | 9980728 | Burglar Alarm | 06/30/19 | City of San Antonio PD |
| 143 | TX | San Antonio (NS) | MB895877 | Beverage Cartage | 09/21/20 | City of San Antonio Revenue Collections |
| 143 | TX | San Antonio (NS) | PE 953577 | PE Permit | 09/21/19 | Albert Uresti |
| 143 | TX | San Antonio (NS) | 401220 | Health Permit | 12/31/19 | City of San Antonio |

20

DOCS_SF:101091.2 50045/002

## Schedule 1.3(b)

## Cure Costs

### *Restaurant Leases*

| Unit No. | Location | Cure Costs |
|---|---|---|
| 101 | Fashion Square, 7014 E. Camelback Rd., #559, Scottsdale, AZ 85251 | $0.00 |
| 103 | Country Club Plaza, 444 Ward Parkway, Kansas City, MO 64112 | $136,679.61 |
| 105 | Fashion Village @ Boca Park, 750 S. Rampart Blvd., Las Vegas, NV 89145 | $132,729.57 |
| 106 | Cherry Creek Mall, 3000 East 1st Avenue #184, Denver, CO 80206 | $178,894.96 |
| 107 | Village Pointe, 295 N. 170th Street, Omaha, NE 68118 | $36,990.17 |
| 108 | Clay Terrace, 14395 Clay Terrace Dr. #180, Carmel, IN 46032 | $37,733.88 |
| 110 | The Shops at La Cantera, 15900 LaCantera Parkway, Bldg #7, Ste. #7300, San Antonio, TX 78256 | $0.00 |
| 111 | North Park Center, 8687 North Central Expressway, Suite #1722, Dallas, TX 75225 | $0.00 |
| 114 | Oak Brook Promenade, 3051 Butterfield Road, Oak Brook, IL 60523 | $0.00 |
| 117 | 30 E. Big Beaver Rd., Troy, MI 48083 | $0.00 |
| 120 | Santan Village, 2224 E. Williams Field Rd., #101, Gilbert, AZ 85295 | $0.00 |
| 122 | Windsor Plaza, 11997 Singletree Lane, Eden Prairie, MN 55344 | $0.00 |
| 126 | Renaissance Hotel, 511 US Highway 1 South, Iselin, NJ 08830 | $20,250.00 |
| 127 | One East Pratt Street Building, One East Pratt Street #103, Baltimore, MD 21202 | $92,107.86 |
| 128 | Met West International, 4134 W. Boy Scout Blvd. #B-1, Tampa, FL 33607 | $53,312.88 |
| 129 | Village at Meridian, 3573 E. Longwing Lane #140, Meridian, ID 83646 | $33,225.61 |
| 132 | The Fountains at Farah, 8889 Gateway Blvd. West, Suite 1740, El Paso, TX 79925 | $27,150.31 |
| 133 | Easton Town Center, 4087 New Bond Street, Space 502, Columbus, Ohio 43219 | $0.00 |
| 134 | Avalon, 5100 Avalon Blvd., Alpharetta, GA 30009 | $33,722.19 |
| 135 | University Town Center, 150 University Town Center Dr., Suite #150, Sarasota, FL 34243 | $121,392.50 |
| 136 | The Mall of San Juan, 1000 The Mall of San Juan Boulevard, #135, San Juan, 00924, Puerto Rico | $70,489.64 |
| 138 | West Plano Village, 5973 W. Parker Rd., Plano, TX 75093 | $0.00 |
| 141 | 7524 Gibson St., Liberty Township, OH 45069 | $46,595.78 |
| 143 | North Star Mall, 7400 San Pedro Ave. #1255, San Antonio, TX 78216 | $0.00 |
| 145 | Ridgedale Center, 12235 Wayzata Blvd. #1068, Minnetonka, MN 55305 | $55,652.46 |
| 148 | Bridge Street Town Centre, 435 The Bridge Street NW, Ste. 150, Huntsville, AL 35806 | $62,544.36 |
| 154 | Scottsdale Quarter, 15345 North Scottsdale Road, K-100, Scottsdale, Arizona 85254 | $131,192.20 |
| HQ | Scottsdale Quarter – Office, 15059 North Scottsdale Road, Suite 300, Scottsdale, AZ, 85254 | $195,046.60 |
| Storage | Scottsdale Quarter – Storage | $417.92 |

## Other Contracts

| | Counterparty | Contract | Cure Costs |
|---|---|---|---|
| A-1 | ADP | Eighth Amendment to Master Services Agreement dated July 1, 2016 | $15,205.08 |
| B-2 | Airecom, Inc. | Service Agreement dated March 13, 2018 | $4,628.76 |
| B-3 | Airgas, Inc. | Product Sale Agreement dated October 3, 2018 | $21,007.07 |
| B-4 | ALSCO | Service Agreement dated August 24, 2015 | $25,941.03 |
| B-5 | AMERIPRIDE | Service Agreement dated April 21, 2011 | $2,356.96 |
| B-6 | Aramark Uniform Services | Amendment to Service Agreement dated April 4, 2019 | $124,399.00 |
| B-45 | Bigart-Ecosystems LLC DBA Wisetail | Software Service Agreement dated April 29, 2016 | $3,160.00 |
| B-48 | Cadillac Uniform & Linen Supply LLC | Contract Proposal dated [●] | $4,794.32 |
| B-22 | China Mist | Marketing Agreement dated February 19, 2014 | $3,099.48 |
| B-9 | COCA COLA USA | Beverage Marketing Agreement dated April 17, 2015 | $3,139.25 |
| [●] | Coca-Cola Puerto Rico Bottling | [●] | $5,889.37 |
| B-52 | Compeat | Compeat Services Agreement dated September 16, 2016 | $13,292.22 |
| B-10 | Direct TV | Direct TV Services Agreement dated April 28, 2011 | $25,694.84 |
| B-41 | Distribution Market Advantage Inc. | Foodservice Distribution Agreement dated June 20, 2017 | $198,900.43 |
| B-11 | Muzak LLC DBA MOOD DMX | Agreement for Multi Territory Account Service effective as of September 14, 2017 | $4,727.17 |
| B-12 | EcoLab – CA | Products and Services Supply Agreement effective as October 1, 2015 | $105,123.23 |
| [●] | Ecolab Mfg Inc Puerto Rico | [●] | $8,235.83 |
| B-13 | ECOVA Inc. | Services Agreement dated March 3, 2016 | $1,185.08 |
| B-21 | Edward Don & Company | Amendment to the Distribution Agreement dated October 2, 2013 | $193,534.19 |
| B-55 | Encore One LLC | Planned Maintenance Agreement for Refrigeration, HVAC and Cooking Equipment | $25,133.68 |
| B-23 | F&B Management | F&B Annual Help Desk Support Agreement dated April 9, 2019 | $9,642.49 |
| B-15 | Fred's HVAC Services | Maintenance Agreement dated June 5, 2018 | $854.93 |
| B-16 | Garda CL West Inc. | Armored Car Service Agreement dated July 11, 2018 | $33,389.45 |
| [●] | Great Plains | [●] | $0 |
| B-17 | Harford Refrigeration Co., Inc. | Service Agreement dated June 11, 2018 | $9,339.95 |
| B-18 | RedBook Connect DBA HotSchedules | Service Agreement dated October 1, 2017 | $5,363.90 |
| B-30 | Keen-Summit Capital Partners LLC | Retention Agreement dated April 23, 2019 | $0 |
| B-47 | Maines Conklin | Distributor Service Agreement dated September 1, 2017 | $21,241.01 |
| B-26 | NCR Corporation | Subscription effective as of December 3, 2018 | $9,708.50 |
| B-27 | Neopost | Service Agreement dated January 23, 2015 | $1,562.89 |
| B-51 | Pacific Office Automation, Inc. | Image Management Contract dated September 27, 2017 | $0 |
| B-51 | Pacific Office Automation, Inc. | Total Image Management Master Agreement dated May 8, 2018 | $0 |
| [●] | Paetec | Equipment Rental Terms and Conditions Schedule Amendment #3 dated November 30, 2016 | $55,424.44 |
| B-28 | Paycom Payroll, LLC | Payroll and Human Capital Management Services Agreement dated August 31, 2018 (Kona Restaurant Holdings) | [●] |
| B-28 | Paycom Payroll, LLC | Payroll and Human Capital Management Services Agreement dated August 31, 2018 (Kona Sushi) | [●] |
| B-28 | Paycom Payroll, LLC | Payroll and Human Capital Management Services Agreement dated August 31, 2018 (Kona Macadamia) | [●] |
| B-28 | Paycom Payroll, LLC | Payroll and Human Capital Management Services Agreement dated August 31, 2018 (Kona Texas Restaurants) | [●] |
| B-28 | Paycom Payroll, LLC | Payroll and Human Capital Management Services Agreement dated August 31, | [●] |

DOCS_SF:101091.2 50045/002

|       |                                        | 2018 (Kona Grill Puerto Rico)                                  |             |
|-------|----------------------------------------|----------------------------------------------------------------|-------------|
| B-29  | Paytronix Systems Inc.                 | Scope of Work dated March 26, 2018                             | $250.00     |
| B-30  | R. A. Levine Company                   | Maintenance Agreement dated June 11, 2018                      | $1,053.56   |
| B-31  | Reputation.com                         | Proposal for Services dated April 1, 2018                      | $1,288.00   |
| B-33  | Research Data Group                    | Service Agreement dated May 29, 2015                           | $968.67     |
| B-32  | Restaurant Revolution Technologies, Inc. | Order Management Agreement dated December 22, 2015           | $11,700.00  |
| B-36  | Tevora Business Solutions Inc.         | Service Agreement dated December 28, 2018                      | $19,814.95  |
| B-37  | Trane U.S. Inc.                        | Maintenance Agreement effective June 1, 2018                   | $8,487.91   |
| B-53  | Valley City Linen                      | Uniform and Garment Rental Service Agreement [•]               | $7,239.37   |
| B-40  | Vuria LLC                              | Service Agreement dated April 18, 2018                         | $299.75     |
| B-25  | Thomson Reuter DBA West                | Service Agreement dated June 24, 2011                          | $5,812.63   |
| [•]   | Worldwide Express                      | [•]                                                            | $2,834.72   |

DOCS_SF:101091.2 50045/002

Schedule 2.3(a)

**Historical Summary of Sellers' Liabilities Relating to Gift Certificates**

**Sum of Stored Value Balance**

| as of March 31, 2019 |
| --- |

| Year | Total |
| --- | --- |
| 2003 | 7,902.92 |
| 2004 | 27,650.45 |
| 2005 | 43,734.64 |
| 2006 | 41,672.55 |
| 2007 | 60,381.73 |
| 2008 | 61,544.41 |
| 2009 | 69,332.73 |
| 2010 | 100,174.40 |
| 2011 | 82,544.33 |
| 2012 | 92,243.08 |
| 2013 | 112,255.03 |
| 2014 | 162,766.65 |
| 2015 | 172,403.06 |
| 2016 | 750,228.70 |
| 2017 | 994,253.60 |
| 2018 | 709,374.01 |
| 2019 | 76,531.14 |
| **Grand Total** | **3,564,993.43** |

DOCS_SF:101091.2 50045/002

## Schedule 2.4

### Other Excluded Liabilities

Any Claim or Liability of Kona Grill, Inc. ("**Company**") or any of its Affiliates or Subsidiaries arising out of or in connection with the following:

- **Kuhn v. Kona Grill, Inc. (Case No. 1:19-CV-00266)**. On January 28, 2019, James Kuhn, the Company's former Chief Executive Officer, commenced a civil action in the United States District Court for the District of Maryland, related to the termination of his employment by the Company. The lawsuit alleges that, among other things, the Company breached Mr. Kuhn's executive employment agreement and seeks certain payments to which Mr. Kuhn alleges he was entitled upon termination of employment. The Company filed its response denying Mr. Kuhn's claims on February 22, 2019.

- **Kona Grill, Inc. v. Kuhn (Case No. 2:19-CV-01420)**. On February 28, 2019, the Company commenced a separate action against Mr. Kuhn in the United States District Court for the District of Arizona for Mr. Kuhn's breach of his fiduciary duties owed to the Company under Arizona law.

- **Phillip Griggs v. Kona Texas Restaurants, Inc. (Case No. CC-19-00914-D)**. On February 12, 2019, Phillip Griggs commenced a civil action in the County Court of Dallas County for the State of Texas, alleging, among other things, that the Company unlawfully interfered with Mr. Griggs' personal property (an envelope full of cash that Mr. Griggs left on a table at the Company's Dallas location). This case is set for dismissal on June 24, 2019.

- **Fashion Show Mall, LLC v. Kona Macadamia, Inc. (Case No. A-19-789179-C)**. On February 11, 2019, Fashion Show Mall, LLC, commenced a civil action in the District Court of Clark County for the State of Nevada, alleging, among other things, that the Company breached its lease by closing its restaurant in Las Vegas, Nevada.

- Guizar Azhieva v. Kona Texas Restaurants, Inc. (Case No. 2018CI22736).

- **The Irvine Company LLC v. Kona Sushi, Inc. (Case No. 30-2018-01011011-CU-BC-CJC)**. On August 9, 2018, The Irvine Company LLC filed a complaint for damages in the Superior Court for the State of California for the County of Orange alleging, among other things, that the Company breached its written contract relating to the Company's decision to close its restaurant in Irvine, California. A mandatory settlement conference was scheduled for April 19, 2019.

- **Teresa Shaw v. Kona Macadamia, Inc. (Case No. 1816-CV07888)**.

- **Kona Texas Restaurants, Inc., v. NorthPark Partners, LP (Case No. DC-18-02458)**.

25

- **Boots v. Kona Sushi, Inc. (Case No. 0:17-CV-03401).** On July 27, 2017, a class action complaint was filed against Kona Sushi, Inc., wholly-owned subsidiary of the Company, by Mitchell Boots, individually and on behalf of a Proposed Rule 23 Class, in the United States District Court for Minnesota claiming, among other things, that the Company violated Minnesota gratuity/tip pooling laws with respect to certain classes of restaurant employees. The plaintiff brought claims on behalf of a putative Minnesota class and a putative national class of employees. On October 25, 2017, the plaintiff amended the complaint to withdraw the national class claims and other common law claims, leaving one claim on behalf of a putative Minnesota class, and added a second named Plaintiff, Tracy Fortman. The parties participated in mediation on August 3, 2018, which concluded without resolution. The matter is proceeding in accordance with the court-scheduled dates.

## Schedule 17

### Headquarters Premises Furniture and Equipment

as of March 31, 2019

| Asset | Count |
|---|---|
| **A/V** | |
| 2 60" Samsung TVs | 1 |
| 4 Samsung TVs & Wall Mounts | 1 |
| Corp Office Cabling & TV Installation | 1 |
| Imagine | 1 |
| Imagine-HDTV acctg conf rm | 1 |
| Phone System | 1 |
| Projector | 1 |
| Televisions | 1 |
| White Noise System over Cubicles | 1 |
| **COMPUTERS** | |
| 1 ABBYY Verification License | 1 |
| 20 Office 2013 Licenses | 1 |
| 710 Computer Equipment | 1 |
| ABBYY LICENSE | 1 |
| ACA Management Platform | 1 |
| AirTight WiFi | 1 |
| ALOHA LICENSE - UPGRADE | 1 |
| AutoCAD for Monica | 1 |
| AutoCAD License | 1 |
| AutoCAD Software | 1 |
| Brd Rm & Cnf Rm Computers | 1 |
| Cabling for New Office | 1 |
| Compeat - Allware Services | 1 |
| Compeat Software | 1 |
| Computers | 8 |
| Corp Office Cabling | 1 |
| Database license | 1 |
| Dell Powercommect Switches | 1 |
| Dell-Sharepoint Server | 1 |
| Email Archiver - GHA Technologies | 1 |
| Fusion IO Card | 1 |
| HotSchedules | 1 |
| HP 2920-48G Switch | 1 |
| HP2920-48G Switch | 1 |
| INTERNET UPGRADE | 1 |

27

| | |
|---|---|
| iSynergy - Toshiba | 1 |
| Microsoft SQL Server Licenses - 2 | 1 |
| Netapp DS14MK4 FC Disk Shelf 1/2/4 GB | 1 |
| Phone System for New Office | 1 |
| POS TERMINALS | 1 |
| Research database | 1 |
| SAN for IT virtualization | 1 |
| Sherwood | 1 |
| Software 711 | 1 |
| Tango | 1 |
| USE TAX - ALOHA LICENSE UPGRADE | 1 |
| Verisae | 1 |
| Verisae Asset Tagging | 1 |
| **FIXTURES** | |
| DŽcor | 1 |
| Wallcoverings | 1 |
| Window Shades | 1 |
| World Map in Office | 1 |
| Z Gallerie New Office Decor | 1 |
| **FLOORING** | |
| 7'6" X 10'5" Rug - Versailles Rug | 1 |
| **FURNITURE** | |
| 8 New Chairs for Conference Room | 1 |
| Office Cabinet | 1 |
| Boardroom Sideboard | 1 |
| Office Furniture | 1 |
| Cabinet for Small Conference Room | 1 |
| Corp Office Furniture | 1 |
| Cubicles | 1 |
| Freight | 1 |
| Lounge Sofa | 1 |
| New Cubicle Reconfiguration | 1 |
| New Office Desk | 1 |
| New Office Furniture | 1 |
| Office Furniture | 2 |
| PolArt Bookcase | 1 |
| Printer Stand for Office | 1 |
| **FURNITURE CHAIR** | |
| Corp Office Furniture | 1 |
| New Office Chairs | 1 |
| Office Chairs Corp Office | 1 |
| **FURNITURE PATIO** | |
| Patio Umbrella | 1 |

28

| | |
|---|---|
| Patio Umbrella Stand | 1 |
| **FURNITURE TABLE** | |
| 2 Z Gallerie Tables | 1 |
| Office Work Table | 1 |
| New Office Boardroom Table | 1 |
| New Office Chair | 1 |
| **KITCHEN EQUIPMENT** | |
| Kitchen Equipment | 1 |
| Kitchen Package-Conveyor Oven | 1 |
| Kitchen Package-Countertop Steamer | 1 |
| Kitchen Package-Rice Cooker | 1 |
| New Office Kitchen Equipment | 1 |
| Refrigerator in New Office | 1 |
| **LIGHTING** | 1 |
| Boardroom Light Fixtures | 1 |
| **RESTAURANT EQ** | |
| Frozen Cocktail/Beverage Freezer | 1 |
| Security System | 1 |
| **SIGNAGE** | |
| Corp Office Signage | 1 |
| Sign for Lobby | 1 |
| Signage- Outside | 1 |

DOCS_SF:101091.2 50045/002

**Exhibit "A"**

**ASSIGNMENT AND ASSUMPTION OF RESTAURANT LEASE**

This Assignment and Assumption of Restaurant Lease (this "*Assignment*") made and entered into as of _____, 2019 by and between [*Insert name of applicable Seller*], each of the foregoing being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (the "*Assignor*") and _____, a _____ (the "*Assignee*").

Assignors and Assignee acknowledge that:

A.    Assignor is the tenant(s) of certain real property premises located at _____ (the "*Restaurant*") under that certain real property lease dated _____ between such Assignor, as lessee, and _____, as lessor (the "*Landlord*"), as amended _____ (as so amended, the "*Lease*").

C.    Assignor and various Affiliates of Assignor, as Sellers, and Assignee, as Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated _____, 2019 (the "*Purchase Agreement*"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

D.    Concurrently with the mutual execution and delivery of this Assignment, Assignors and Assignee are consummating the Contemplated Transactions. Assignor and Assignee are executing and delivering this Assignment in satisfaction of certain obligations of Assignor and Purchaser pursuant to Sections 3.2(a) and 3.3(e) of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, and intending to be legally bound hereby, Assignors and Assignee hereby agree as follows:

1.    Assignment. Assignor hereby sells, assigns and transfers to Assignee, all interest of Assignors, as tenant(s), in and to the Restaurant and the Lease, a copy of which Lease is attached hereto as *Exhibit "A."* Assignor makes no representations and warranties of any kind whatsoever with respect to the Lease.

**2.    Assumption**. Assignee hereby accepts the foregoing assignment of the Lease, and does hereby assume the duties and obligations of tenant under the Lease, thereunder accruing from and after the Effective Date, and does hereby agree to be bound by and to perform or cause to be performed, as a direct obligation to Landlord, each and all of the terms, conditions, covenants and provisions to be done, kept and performed under such Lease accruing from and after the Effective Date, to the same extent as if Assignee had been an original party thereto.

**3.    Assignee's Indemnification**. Assignee shall indemnify, defend (with counsel reasonably satisfactory to Assignors) and hold Assignors free, clear and harmless from and against any and all claims, demands, suits, causes of actions, penalties, liabilities, costs, fees and

expenses of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees and costs for the performance or nonperformance of Assignee's obligations under the Lease, which accrued from and after the Effective Date.

**4.      Attorneys' Fees.**  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

**5.      Amendments.**  This Assignment may only be amended by a writing signed by both Assignor and Assignee.

**6.      Delivery Pursuant to Purchase Agreement.**  Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Purchase Agreement, and the acknowledgement and disclaimer set forth in Section 7 thereof).

**7.      Governing Law.**  This Assignment shall be governed by and construed and enforced in accordance with the laws of [Delaware], without giving effect to the conflicts of laws provisions thereof.

**8.      Counterparts**.  This Assignment may be executed in separate counterparts, each of which shall be deemed to be an original, but both of which, taken together, shall be deemed one original document.

**9.      Execution in Counterparts.**  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

2

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date first written above.

<div style="margin-left: 40%;">

**ASSIGNOR:**

_____, a
_____,
Chapter 11 Debtor and Debtor in Possession


By:      _____
Name:  _____
Its:      _____

**ASSIGNEE:**

_____,
a _____


By:      _____
Name:  _____
Its:      _____

</div>

*[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION OF RESTAURANT LEASE]*

**Exhibit "B"**

## ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS

This Assignment and Assumption of Leases and Contracts (this "*Assignment*") is entered into as of _____, 2019, by and among _____, a _____ and _____, a _____, each of the foregoing being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (collectively, the "*Assignors*"), and _____, a _____ (the "*Assignee*").

Assignors and Assignee acknowledge that:

A.    Assignors, as Sellers, and Assignee, as Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated as of [_____], 2019 (the "*Purchase Agreement*"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the mutual execution and delivery of this Assignment, Assignors and Assignee are consummating the Contemplated Transactions. Assignors and Assignee are executing and delivering this Assignment in satisfaction of certain obligations pursuant to Sections 3.2(b) and 3.3(f) of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Assignors and Assignee hereby acknowledge, Assignors and Assignee hereby agree as follows:

1.    Assignment.    Effective as of the Closing Date, each of the Assignors hereby assigns to Assignee all of its respective right, title and interest in and to the those of the Purchased Contracts described on **Schedule 1** attached hereto and incorporated herein by this reference (collectively, the "*Assigned Contracts*").

2.    Assumption.    Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to perform all of Assignors' obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting party thereunder.

3.    Amendments.    This Assignment may only be amended by a writing signed by both Assignors and Assignee.

4.    Execution in Counterparts.    This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; *provided, however*, that if the Parties exchange facsimile or electronic pdf signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly thereafter.

5.    Delivery Pursuant to Purchase Agreement.    Notwithstanding anything to the contrary herein, Assignors and Assignee are executing and delivering this Assignment in

accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

6. <u>Governing Law</u>. This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of [Delaware].

DOCS_LA:321810.6 50045/002

IN WITNESS WHEREOF, Assignors and Assignee have executed this Assignment as of the day and year first set forth above.

**ASSIGNORS:**

_____, a
_____ and
Debtor and Debtor in Possession


By: _____
Name: _____
Its: _____


_____, a
_____ and
Debtor and Debtor in Possession


By: _____
Name: _____
Its: _____


**[INSERT SIGNATURE BLOCKS FOR ALL APPLICABLE ASSIGNORS]**

**ASSIGNEE:**

_____,
a _____


By: _____
Name: _____
Its: _____


*[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS]*

Exhibit "C"

## ASSIGNMENT OF INTANGIBLE PROPERTY

_____, a _____ and
_____ _____, a _____, each of the foregoing
being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the
Bankruptcy Court (collectively, the "**_Assignors_**") are executing this Assignment of Intangible
Property Assets (this "**_Assignment_**") in favor of _____ (the "**_Assignee_**"),
with respect to the following facts and circumstances:

(A)     Assignors and Assignee have heretofore entered into that certain Asset Purchase
Agreement dated as of [_____], 2019 (the "**_Purchase Agreement_**").  Except for terms
specifically defined in this Assignment, the capitalized terms used in this Assignment shall have
the same meanings as such terms when used in the Purchase Agreement.

(B)     Concurrently with the execution and delivery of this Assignment, Assignors and
Assignee are consummating the transactions contemplated by the Purchase Agreement.  Pursuant
to the Purchase Agreement, Assignors are required to execute and deliver this Assignment at the
Closing.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt
and sufficiency of which Assignors hereby expressly acknowledge, each of the Assignors hereby
assigns, conveys, transfers and sets over unto Assignee, all of its respective right, title and
interest, if any, in and to all Intangible Property Assets.

This Assignment shall inure to the benefit of, and be binding upon, the successors,
executors, administrators, legal representatives and assigns of Assignors and Assignee.

Notwithstanding anything to the contrary herein, Assignors are executing and delivering
this Assignment in accordance with and subject to all of the terms and provisions of the Purchase
Agreement (including, without limitation, the acknowledgement and disclaimer set forth in
Section 7 of the Purchase Agreement).

This Assignment shall be governed by and construed and enforced in accordance with the
laws of the State of [Delaware].

_[Balance of Page Intentionally Left Blank]_

IN WITNESS WHEREOF, Assignors and Assignee have executed this Assignment as of the ___ day of _____, 2019.

**ASSIGNORS:**

_____, a
_____ and
Debtor and Debtor in Possession

By:     _____
Name: _____
Its:     _____

_____, a
_____ and
Debtor and Debtor in Possession

By:     _____
Name: _____
Its:     _____

[INSERT SIGNATURE BLOCKS FOR ALL APPLICABLE ASSIGNORS]

**ASSIGNEE:**

_____,
a _____

By:     _____
Name: _____
Its:     _____

*[SIGNATURE PAGE TO ASSIGNMENT OF INTANGIBLE PROPERTY]*

### Exhibit "D"

### BILL OF SALE AND ASSIGNMENT

Reference is hereby made to that certain Asset Purchase Agreement, dated _____, 2019 (the "*Purchase Agreement*"), by and among _____, a _____ and _____, a _____, each of the foregoing being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (collectively, the "*Sellers*") and _____, a _____ (the "*Purchaser*").  Except for terms specifically defined in this Bill of Sale and Assignment, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Purchase Agreement.

For good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledge, each of Sellers hereby sells, transfers, assigns and delivers to Purchaser all of its respective right, title and interest in and to the Purchased Assets.

Notwithstanding anything to the contrary herein, Sellers are executing and delivering this Bill of Sale and Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

**IN WITNESS WHEREOF**, Sellers have caused this Bill of Sale and Assignment to be executed as of the _____ day of _____, 2019.

<div align="center">

**SELLERS:**

</div>

_____, a
_____ and
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

_____, a
_____ and
Debtor and Debtor in Possession


By: _____
Name: _____
Its: _____

**[INSERT SIGNATURE BLOCKS FOR ALL APPLICABLE ASSIGNORS]**

<div align="center">

*[SIGNATURE PAGE TO BILL OF SALE AND ASSIGNMENT]*

</div>

**EXHIBIT "E"**

**Form of Management Agreement**

**[To Be Attached]**

**Exhibit "F"**

**ASSUMPTION AGREEMENT**

This Assumption Agreement (this "***Assumption***") is entered into as of this _____ day of [_____], 2019, by _____, a _____ (the "***Purchaser***") in favor of _____, a _____ and _____, a _____, each of the foregoing (other than Purchaser) being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (the "***Sellers***"). This Assumption is entered into with respect to the following facts and circumstances:

A.    Sellers and Purchaser have heretofore entered into that certain Asset Purchase Agreement dated [_____], 2019 (the "***Purchase Agreement***"). Except for terms specifically defined herein, the capitalized terms used in this Assumption shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the execution and delivery of this Assumption, Purchaser and Sellers are consummating the transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Purchaser hereby acknowledges, Purchaser hereby agrees as follows:

1.    Assumption. Effective as of the Closing Date, Purchaser hereby assumes and agrees to perform all of the Assumed Liabilities in accordance with their terms as expressed in the Purchase Agreement.

2.    Amendments. This Assumption may only be amended by a writing signed by both Purchaser and Sellers.

3.    Governing Law. This Assumption shall be governed by and construed and enforced in accordance with the laws of the State of [Delaware].

4.    Execution in Counterparts. This Assumption may be executed in counterparts and delivered by the delivery of facsimile signatures; *provided, however*, that if the Parties exchange facsimile or electronic pdf signatures, each of them agrees to provide the other with a copy of this Assumption bearing their original signature promptly thereafter.

IN WITNESS WHEREOF, Purchaser has executed this Assumption Agreement as of the day and year first set forth above.

**PURCHASER:**

_____,
a _____

By:  _____
Name:  _____
Its:  _____

*[SIGNATURE PAGE TO ASSUMPTION AGREEMENT]*

**Exhibit "G"**

**Form of Sale Order**

**[Attached]**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KONA GRILL, INC., et al.,[1] | ) | Case No.: 19-10953 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS PURSUANT TO ASSET PURCHASE AGREEMENT(S) FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, AND OTHER INTERESTS, AND OTHER INTERESTS; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

This matter coming before the Court on the motion (the "Motion")[2] of the above-captioned affiliated debtors and debtors in possession (the "Debtors") for the entry of an order pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "Local Rules") (a) authorizing the sale of the Assets free and clear of Liens, Claims and Encumbrances, and other interests, except as provided in the asset purchase agreement by and between the Debtors and Williston Holding Company, Inc. (the "Successful Bidder") and (b)

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include:  Kona Grill, Inc. (6690); Kona Restaurant Holdings, Inc. (6703); Kona Sushi, Inc. (4253); Kona Macadamia, Inc. (2438); Kona Texas Restaurants, Inc. (4089); Kona Grill International Holdings, Inc. (1841); Kona Baltimore, Inc. (9163); Kona Grill International, Inc. (7911); and Kona Grill Puerto Rico, Inc. (7641).  The headquarters and service address for the above-captioned Debtors is 15059 North Scottsdale Road, Suite 300, Scottsdale, Arizona 85254.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto to the Successful Bidder; and (c) granting related relief; and the Court having reviewed the Motion and the Court having found that (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iv) notice of the Motion was sufficient under the circumstances; and after due deliberation the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; and good and sufficient cause having been shown;

**AND IT IS FURTHER FOUND AND DETERMINED THAT:**

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    The Debtors' notice of the Bid Procedures, the Cure Amounts, the Auction and the hearing to approve any sale of the Assets (the "Sale Hearing") was appropriate and reasonably calculated to provide all interested parties with timely and proper notice, and no other or further notice is required.

C.    The Successful Bidder is not a successor to Debtors or this bankruptcy estate by any reason or theory of law or equity, and that Successful Bidder shall not be subject to successor liability for any products sold prior to Closing.

DOCS_SF:100991.3 50045/001

D.    The Purchase Price was negotiated at arms' length and constitutes fair consideration for the Assets.  The Successful Bidder is a good faith purchaser of the Assets pursuant to section 363(m) of the Bankruptcy Code and the provisions of Section 363(n) of the Bankruptcy Code have not been violated.

E.    Notice of the hearing on the Motion of the Sale and any related Auction was proper under the Bankruptcy Code, Bankruptcy Rules and Local Rules.

F.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

**IT IS HEREBY ORDERED THAT**:

1.    The Motion is **GRANTED** as set forth herein.  The sale of the Assets to the Successful Bidder on the terms and conditions set forth in the Successful Bidder's APA (defined below) is approved.  The Debtors are authorized to consummate the transactions under the Successful Bidder APA in accordance with this Order.

2.    All objections and responses to the Motion that have not been overruled, withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied.

3.    The Successful Bidder's offer for the Assets, as embodied in the Successful Bidder's asset purchase agreement (the "Successful Bidder's APA"), is the highest and best offer for the correlative portion of the Assets and is hereby approved.

4.    The Successful Bidder's APA annexed hereto as **Exhibit 1** is hereby approved pursuant to section 363(b) of the Bankruptcy Code, and the Debtors are authorized to

3

consummate and perform all of their obligations under the Successful Bidder's APA and to execute

such other documents and take such other actions as are necessary or appropriate to effectuate the

Successful Bidder's APA.

5.     Pursuant to section 363(f) of the Bankruptcy Code, the Assets may be sold

and transferred free and clear of all Liens, Claims and Encumbrances, and other interests, except

as otherwise provided in the Successful Bidder's APA, with any and all such Liens, Claims and

Encumbrances, and other interests to attach to the proceeds of such sale with the same validity (or

invalidity), priority, force, and effect such Liens, Claims and Encumbrances, and other interests

had on the Assets immediately prior to the Sale and subject to the rights, claims, defenses, and

objections, if any, of the Debtors and all interested parties with respect to any such asserted Liens,

Claims and Encumbrances, and other interests.

6.     The Successful Bidder is not a successor to the Debtors or these bankruptcy

estates by any reason or theory of law or equity, and the Successful Bidder shall not be subject to

successor liability for any products sold prior to Closing.  All creditors or other persons are hereby

barred from bringing any claim or asserting any Liens, Claims and Encumbrances, and other

interests against the Successful Bidder or the Assets, except as relates to Assumed Liabilities.

7.     Pursuant to section 365 of the Bankruptcy Code, the assignment and

assumption of the Assumed Executory Contracts of the Debtors, as identified in the Successful

Bidder's APA, by the Successful Bidder, is hereby authorized and approved in all respects.

8.     The Successful Bidder shall pay, concurrently with the Closing and as a

condition to the Debtors' assumption and assignment thereof, all cure amounts owing to the

4

counterparties to the Assumed Executory Contracts that are assumed at the Closing. Any provision in an Assumed Executory Contract that purports to prohibit the assignment of such Assumed Executory Contract, or that purports to allow the counterparty to terminate, recapture, or impose penalties upon assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect. Upon closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Successful Bidder shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Executory Contracts and the Assumed Executory Contracts shall remain in full force and effect for the benefit of the Successful Bidder. The Successful Bidder has provided adequate assurance of future performance under the Assumed Executory Contracts within the meaning of Section 365 of the Bankruptcy Code.

9.     Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, the Sale by the Debtors to the Successful Bidder of the Assets and transactions related thereto, upon the closing under the Successful Bidder's APA, are authorized and approved in all respects.

10.     The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Order shall be effective immediately upon its entry.

11.     The terms of this Order shall be binding on the Successful Bidder and its successors, the Debtors, creditors of the Debtors, and all other parties in interest in these bankruptcy cases, and any successors of the Debtors, including any trustee or examiner appointed in any of these cases or upon a conversion of any of these cases to Chapter 7 of the Bankruptcy Code.

12.    The Successful Bidder is a good faith purchaser entitled to the benefits, protections and immunities afforded by section 363(m) of the Bankruptcy Code and the provisions of section 363(n) of the Bankruptcy Code have not been violated.  No reversal or modification of this Order on appeal will affect the validity of the Successful Bidder's APA or the transaction contemplated thereby.  As set forth in Exhibit D of the Motion, the Successful Bidder might be an "insider" as defined by Section 101 of the Bankruptcy Code.   Neither the Debtors nor the Successful Bidder is or will be entering into the Successful Bidder's APA fraudulently, or for the purposes of hindering, delaying or defrauding any of the Debtors' creditors, and the Purchase Price constitutes reasonably equivalent and fair value (as those terms or their equivalents are defined by the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of the Bankruptcy Code) for the purchased Assets.

13.    With respect to the transactions consummated pursuant to this Order, this Order shall be sole and sufficient evidence of the transfer of title to any particular purchaser, and the sale transaction consummated pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the property sold pursuant to this Order, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state, and local officials, and each of such persons and entities is hereby directed to accept this Order as sole and sufficient evidence of

6

such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

14.    In connection with the closing, KeyBank shall deliver to the Successful Bidder termination of its financing statements filed in the applicable jurisdictions under Article 9 of the Uniform Commercial Code and release of any lien, security interest, mortgage, or other encumbrance against any of the Purchased Assets acquired by the Successful Bidder.

15.    This Court retains jurisdiction to interpret, implement and enforce the provisions of, and resolve any disputes arising under or related to, this Order and the Successful Bidder's APA, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith.

16.    The failure specifically to include any particular provision of the Successful Bidder's APA or any of the documents, agreements, or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement, or instrument, it being the intent of the Court that the Successful Bidder's APA and each document, agreement, or instrument be authorized and approved in its entirety.

17.    The Successful Bidder's APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

Dated: _____, 2019

_____
UNITED STATES BANKRUPTCY JUDGE

DOCS_SF:100991.3 50045/001

**Exhibit "H"**

**Form of Procedures Order**

**[Attached]**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KONA GRILL, INC., et al.,[1] | ) | Case No.: 19-10953 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER (A) AUTHORIZING ENTRY INTO THE ASSET PURCHASE AGREEMENT WITH RESPECT TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF DEBTORS; (C) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO; (D) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (E) APPROVING CERTAIN BREAK-UP FEE PROVISIONS; AND (F) GRANTING OTHER RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (the "Debtors") for, in part, entry of an order (a) authorizing Debtors to enter into the Purchase Agreement in the form attached as Exhibit C to the Motion (the "Purchase Agreement") with Williston Holding Company, Inc. (the "Stalking Horse Purchaser") or with the Successful Bidder at an Auction held by the Debtors; (b) approving certain bid procedures for the sale of substantially all of the Debtors' Assets; (c) scheduling an auction and hearing to consider the sale and approve the form and manner of notice related thereto; (d) establishing procedures relating to

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: Kona Grill, Inc. (6690); Kona Restaurant Holdings, Inc. (6703); Kona Sushi, Inc. (4253); Kona Macadamia, Inc. (2438); Kona Texas Restaurants, Inc. (4089); Kona Grill International Holdings, Inc. (1841); Kona Baltimore, Inc. (9163); Kona Grill International, Inc. (7911); and Kona Grill Puerto Rico, Inc. (7641). The headquarters and service address for the above-captioned Debtors is 15059 North Scottsdale Road, Suite 300, Scottsdale, Arizona 85254.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion.

the assumption and assignment of certain contracts, including notice of proposed cure amounts; (e) approving Break-up fee; and (f) granting other related relief, and it appearing that the Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(a); the Court having considered the Motion; and it appearing that the relief requested in the Motion, is in the best interests of the Debtors' bankruptcy estates, their creditors and other parties-in-interest; and after due deliberation and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

     A.     This Court has jurisdiction over this Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

     B.     Notice of the Motion was adequate and sufficient under the circumstances of this chapter 11 case, and such notice complied with all applicable requirements of title 11 of the United States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules.

     C.     All objections to the relief requested in the Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled except as otherwise set forth herein. A reasonable opportunity to object or otherwise be heard was afforded to all parties in interest entitled to notice.

D.      The bid procedures attached hereto as **Exhibit 1** (the "Bid Procedures") are reasonable and appropriate under the circumstances of these chapter 11 cases.  The Debtors have articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the Bid Procedures.  The Bid Procedures represent a fair and appropriate method for maximizing the realizable value of substantially all of the Debtors' Assets.  Therefore, the Debtors are authorized to take any and all actions necessary or appropriate to implement the Bid Procedures.

E.      The Debtors' selection of the Stalking Horse Purchaser and entry into the Purchase Agreement with the Stalking Horse Purchaser are in the best interests of the Debtors and the Debtors' estates and creditors.  The Purchase Agreement with the Stalking Horse Bidder will enable the Debtors to secure an adequate floor for the Auction and will provide a clear benefit to the Debtors' estates.

F.      The Stalking Horse Purchaser has expended considerable time, money and energy pursuing the proposed sale of the Assets, and the Debtors have engaged in arms' length good faith negotiations with such Stalking Horse Purchaser.  The Break-up Fee and other bidding protections, as set forth in the Purchase Agreement and Bid Procedures, in favor of a Stalking Horse Purchaser are (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) commensurate to the real and substantial benefit that will be conferred upon the Debtors' estates by the Stalking Horse Purchaser, and (iii) are reasonable and appropriate, in light of the size and nature of the contemplated sale transaction and comparable transactions, the commitments that will be made under the Purchase Agreement and the efforts that have been expended by the Stalking Horse

3

Purchaser. The Break-up Fee is a material inducement for the Stalking Horse Purchaser's entry into its stalking horse bid. The Stalking Horse Purchaser will be unwilling to commit to purchase the Assets under the terms of the Purchase Agreement unless the Stalking Horse Purchaser is assured the protection provided by the Break-up Fee. The payment of such amount to the Stalking Horse Purchaser is fair and reasonable in view of the fact that, if the Break-up Fee is triggered, then the Stalking Horse Purchaser's efforts will have increased the prospects that the Debtors will receive the highest or otherwise best offer for the Assets.

G.    The form of the Purchase Agreement is fair and reasonable and provides flexibility in the process to sell the Assets in a manner designed to maximize the value of the Assets. The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-up Fee to the Stalking Horse Purchaser in the amount and under the circumstances set forth in the Purchase Agreement.

H.    The Notice of Bid Procedures, Auction date and Sale Hearing, substantially in the form attached hereto as **Exhibit 2** (the "Sale and Bid Procedures Notice"), the Notice of Auction and Sale Hearing, substantially in the form attached hereto as Exhibit 3 (the "Creditor Notice"), and the notice substantially in the form attached hereto as **Exhibit 4** to be served on counterparties to the Assumed Executory Contracts ("Cure Notice") each is calculated to provide adequate notice concerning the proposed sale of the Assets and the proposed assumption and assignment of the Assumed Executory Contracts that are the property of the Debtors, and is intended to provide due and adequate notice of the relief that will be sought by the Motion.

I.      The procedures for the assumption and assignment of the Assumed Executory Contracts provided for herein and the Cure Notice are reasonable and appropriate and consistent with the provisions of Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The procedures for the assumption and assignment of the Assumed Executory Contracts have been narrowly tailored to provide an adequate opportunity for all non-debtor counterparties to the Assumed Executory Contracts to assert any objection.

J.      The entry of this Bid Procedures Order is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.      The relief requested in the Motion is granted as set forth in this Bid Procedures Order.

2.      The Bid Procedures attached hereto as **Exhibit 1** are approved in their entirety, and are incorporated into this Bid Procedures Order and shall apply to the proposed sale of the Assets.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bid Procedures, provided such action is not inconsistent with the Stalking Horse Purchase Agreement.

3.      The proposed sale of the Assets, the proposed assumption and assignment of the Assumed Executory Contracts, and the Auction shall be conducted in accordance with the provisions of this Bid Procedures Order and the Bid Procedures.

4.      The Break-up Fee as set forth in the Bid Procedures is hereby approved.  The Debtors are authorized without further Court action to pay the Break-up Fee solely to the extent

such amount becomes due and payable to the Stalking Horse Purchaser, pursuant to the Purchase Agreement and this Bid Procedures Order.

5.      The Sale and Bid Procedures Notice attached hereto as **Exhibit 2**, the Creditor Notice attached hereto as **Exhibit 3**, and the Cure Notice attached hereto as **Exhibit 4** provide proper notice to all parties in interest and are approved.

6.      Within three (3) business days following entry of this Bid Procedures Order, the Debtor shall serve by first class mail the Sale and Bid Procedures Notice on the following parties: (a) the U.S. Trustee; (b) the Committee, if any, or the Debtors' top 30 unsecured creditors; (c) all parties known to assert a lien, encumbrance or claim on any of the Assets; (d) all known counterparties to the Debtor's unexpired leases and executory contracts; (e) all entities known to have expressed an interest in bidding on the Assets; (f) the United States Attorney's office; (g) all state attorney generals in states in which the Debtor' assets are located; (h) state taxing authorities in the states in which the Debtors' assets are located and the Internal Revenue Service; (i) environmental authorities and other regulatory authorities in the states or applicable jurisdictions in which the Debtors' assets are located; (j) the Stalking Horse Purchaser and its counsel; and (k) all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of this Bid Procedures Order.

7.      Within three (3) business days following entry of this Bid Procedures Order, the Debtors shall serve the Creditor Notice on all known creditors of the Debtors and publish such Creditor Notice in the national edition of the New York Times.  Except as set forth in this and the

6

foregoing paragraph of this Bid Procedures Order, no other or further notice of the sale shall be required to be provided by the Debtors.

8.     Within three (3) business days following the entry of this Bid Procedures Order, the Debtors shall file and serve the Cure Notice to the counterparties to the Assumed Executory Contracts. Counterparties to the Assumed Executory Contracts[3] (each a "Counterparty," and together, the "Counterparties") must file and serve on the applicable notice parties any objection to the assumption and assignment of any Assumed Executory Contract, including objections to any Cure Amount, by **July 15, 2019, at 4:00 p.m. (Eastern Time)**.  However, the Stalking Horse Purchaser may choose to add or delete certain Assumed Executory Contracts.  If the Stalking Horse Purchaser chooses to add or delete an Assumed Executory Contract, then notice of that addition or deletion shall be provided to the affected counterparty by the Debtors approximately five (5) days prior to the Auction or, if no Auction is required, five (5) days prior to the Sale Hearing.  Only those Assumed Executory Contracts assumed as of the closing of the Sale will be required to be cured.

9.     Any Counterparty failing to timely file an objection to the Cure Amount set forth in the Cure Notice shall be deemed to consent to the assumption and assignment of the Assumed Executory Contract and be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts against the Debtors, their estates, and the Successful Bidder with respect to the Assumed Executory Contracts to which it is a Counterparty.

---

[3] The inclusion of any agreement as an Assumed Executory Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included as an Assumed Executory Contract.

7

Notwithstanding anything herein to the contrary, no executory contract or unexpired lease will be assumed unless and until the occurrence of the closing of the Sale to the Successful Bidder.

      10.    Any other objection to any of the relief to be requested at the Sale Hearing must be in writing, state the basis of such objections with specificity and shall be filed with the Court (with a courtesy copy to Chambers) on or before **July 15, 2019, at 4:00 p.m. (Eastern Time)** (the "Objection Deadline"), and such objection must be served and otherwise undertaken in accordance with the Sale and Bid Procedures Notice so as to be received by such date and time by: (i) counsel to the Debtors and Debtors in Possession, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801), Attn: John W. Lucas and James E. O'Neill; (ii) counsel to the Official Committee of Unsecured Creditors: [#]; (iii) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 N. King Street, Suite 2207, Lock Box 35, Wilmington, DE 19801, Attn: Jaclyn Weissgerber; and (iv) counsel to the Stalking Horse Purchaser, Gray Plant Mooty, 500 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402 (Attn: Phillip Bohl) and Austria Legal, LLC, 1007 North Orange Street, 4th Floor, Wilmington, DE 19801 (Attn: Matthew Austria). The failure of any objecting person or entity to file its objections by the Objection Deadline and in accordance with the Sale and Bid Procedures Notice will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection (including the sale of Assets and assumption and assignment of Assumed Executory Contracts free and clear of all Liens, Claims and Encumbrances, and other interests).

      11.    Compliance with the foregoing notice provisions shall constitute sufficient notice of the Debtors' proposed Sale of the Assets free and clear of all Liens, Claims and

Encumbrances, and other interests, the contemplated assumption and assignment of each Assumed

Executory Contract and the proposed amount of Cure Amounts with respect to each such Assumed

Executory Contract, and no additional notice of such contemplated transactions need be given.

12.     The Bid Deadline shall be **July 18, 2019, at 4:00 p.m. (Eastern Time)**.

13.     The Debtors, after consultation with the Committee and KeyBank, shall have

the exclusive right to determine whether a bid is a Qualified Bid and shall notify Qualified Bidders

whether their bids have been recognized as such as promptly as practicable after a Qualified Bidder

delivers all of the materials required by the Bid Procedures.  The Debtors shall provide the Qualified

Bids to counsel for the Stalking Horse Purchaser in the manner provided in the Purchase

Agreement.

14.     If the Debtors receive more than one Qualified Bid (as defined in the Bid

Procedures), an auction (the "Auction") will be held no later than **July 23, 2019, at 10:00 a.m.**

**(Eastern Time)**, at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street,

17th Floor, Wilmington, Delaware 19801, or at any such other location as the Debtors may hereafter

designate.  The Stalking Horse Purchaser is deemed a Qualified Bidder for all purposes, including

for purposes of participating in the Auction, should it wish to do so.

15.     Counsel to the Debtors is authorized to hold and conduct the Auction in

accordance with the Bid Procedures.  At such Auction, each Qualified Bidder shall be required to

confirm that it has not engaged in any collusion with respect to the bidding or the sale, and the

Auction shall be conducted openly and transcribed.  Within twenty-four (24) hours following the

conclusion of the Auction, the Debtors shall file a notice identifying the Successful Bidder with the

Court and shall serve such notice by fax, email, or if neither is available, by overnight mail to all counterparties whose contracts are to be assumed and assigned.

16.     The Sale Hearing shall be conducted on **July 25, 2019, at 2:00 p.m. (Eastern Time)**, and may be adjourned from time to time without further notice other than an announcement in open court at the Sale Hearing.

17.     Notwithstanding anything herein or in the Bid Procedures to the contrary, no sale free and clear of Liens, Claims and Encumbrances, and other interests shall be approved unless it complies with section 363(f) of the Bankruptcy Code.

18.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) and 7062 or otherwise, the terms and conditions of this Bid Procedures Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Bid Procedures Order.

19.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Bid Procedures Order.

Dated: _____, 2019

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

DOCS_SF:100991.3 50045/001

## EXHIBIT 1

**Bid Procedures**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KONA GRILL, INC., et al.,[1] | ) | Case No.: 19-10953 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## BID PROCEDURES FOR SALE OF
## SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

The above-captioned debtors and debtors in possession (the "Debtors") filed a motion dated May 14, 2019 (the "Motion"),[2] seeking, among other things, approval of the process and procedures set forth below (the "Bid Procedures") through which they will determine the highest and best offer for the sale of substantially all of the business assets of the Debtors (the "Assets"). On May [#], 2019, the Bankruptcy Court entered its order (the "Bid Procedures Order"), which, among other things, approved the Bid Procedures. Debtors will seek to enter into a Purchase Agreement with a stalking horse bidder (the "Stalking Horse Purchaser") for the sale of the Assets, subject to higher and better bids that may be submitted in accordance with these Bid Procedures.

On July 25, 2019, at 2:00 p.m. (Eastern time), as further described below and in the Bid Procedures Order, the Bankruptcy Court shall conduct the "Sale Hearing" at which the Debtors shall seek entry of the Sale Order authorizing and approving the sale of the Assets to the Stalking Horse Purchaser or to one or more other Qualified Bidders (defined below) that the Debtors, in their sole discretion (in consultation with the Committee and KeyBank), determine to have made the highest and best offer.

### Agreement

Prospective bidders should submit a proposed asset purchase agreement (a "Competing Agreement"), similar in form and substance, as modified, to the asset purchase agreement attached to the Motion as Exhibit C (the "Purchase Agreement"). Subject to the approval of the Court, the highest or best bidder at the auction will purchase the Assets, and assume certain executory contracts and unexpired leases of the Debtors, free and clear of any Liens, Claims and Encumbrances, and other interests. The transaction contemplated is subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to Bankruptcy Code §§ 363 and 365.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include:  Kona Grill, Inc. (6690); Kona Restaurant Holdings, Inc. (6703); Kona Sushi, Inc. (4253); Kona Macadamia, Inc. (2438); Kona Texas Restaurants, Inc. (4089); Kona Grill International Holdings, Inc. (1841); Kona Baltimore, Inc. (9163); Kona Grill International, Inc. (7911); and Kona Grill Puerto Rico, Inc. (7641).  The headquarters and service address for the above-captioned Debtors is 15059 North Scottsdale Road, Suite 300, Scottsdale, Arizona 85254.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion or Purchase Agreement, as applicable.

### *Assets for Sale*

The Debtors are offering for sale the Assets, which generally consist of the Debtors' right, title and interest in substantially all of the assets heretofore used exclusively in connection with or arising out of the operation of the Debtors' business as further set forth in section 1.1 of the Purchase Agreement and schedules thereto.  Except as otherwise provided in the Purchase Agreement, all of the Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of any Liens, Claims and Encumbrances, and other interests (other than Permitted Liens, Claims and Encumbrances and other interests, and/or except as otherwise provided in the Competing Agreement) to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Liens, Claims and Encumbrances to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Liens, Claims and Encumbrances applied against the Assets.

### *Participation Requirements*

In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "<u>Potential Bidder</u>") must first deliver (unless previously delivered) to the Debtors and their counsel, not later than five (5) business days before the Bid Deadline (defined below), unless otherwise modified by the Debtors in their reasonable discretion:

a)     <u>Confidentiality Agreement</u>.  An executed confidentiality agreement ("<u>Confidentiality Agreement</u>") in form and substance acceptable to the Debtors;

b)     <u>Identification of Potential Bidder</u>.  Concurrently with its Bid, identification of the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

c)     <u>Corporate Authority</u>.  Concurrently with its Bid, written evidence satisfactory to Debtors of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction;

d)     <u>Disclosure</u>.  Written disclosure of any connections or agreements with the Debtors, the Stalking Horse Purchaser, any other known Potential Bidder or Qualified Bidder (as defined below), and/or any officer, director or direct or indirect equity security holder of the Debtors; and

e)     <u>Proof of Financial Ability to Perform</u>.  Prior to or at the time of presentation of a Bid, written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction.  Such information should include, *inter alia*, the following:

(1)     the Potential Bidder's current financial statements (audited if they exist);

(2)     contact names and numbers for verification of financing sources;

<div align="center">2</div>

(3)     evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

(4)     any such other form of financial disclosure of credit-quality support information or enhancement acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction.

### Designation as Qualified Bidder

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the Assets of the Debtors do not overlap and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described above and otherwise satisfies the requirements of the Bid Procedures Order and the procedures set forth herein, and that the Debtors, in their discretion (in consultation with any Official Committee of Unsecured Creditors that may be appointed (the "Committee") and KeyBank National Association ("KeyBank")), determine is reasonably likely to submit a *bona fide* offer for the Assets and to be able to consummate a sale if selected as a Successful Bidder.

The Debtors, in their sole discretion and in consultation with the Committee and KeyBank, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

The Stalking Horse Purchaser is a Qualified Bidder and is deemed to satisfy all Bid requirements as set forth herein.

### *Access to Due Diligence Materials*

Only Potential Bidders that execute and deliver a confidentiality agreement satisfactory to the Debtors, in their sole discretion, are eligible to receive due diligence access or access to additional non-public information. The Debtors shall not be required to provide confidential or proprietary information to a Potential Bidder if the Debtors believe that such disclosure would be detrimental to the interests of the Debtors. If the Debtors determine that a Potential Bidder that has satisfied all requirements to become a Qualified Bidder and yet does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence access or access to additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders or others in connection with the sale of the Assets.

### *Due Diligence From Bidders*

Each Potential Bidder and Qualified Bidder (each, a "Bidder") (and, collectively, "Bidders") shall comply with all requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with such requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

3

**Bidding Process**

The Debtors and their advisors shall (in consultation with Committee and KeyBank): (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions hereof; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets. The Debtors (in consultation with the Committee and KeyBank) shall have the right to adopt such other rules for the bidding process that are not inconsistent with the Bid Procedures Order that will better promote the goals of such process.

*Bid Deadline*

On or before the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written and electronic copies of its Bid to the Debtors, 15059 North Scottsdale Road, Suite 300, Scottsdale, AZ, Attn: Christopher J. Wells, [**email**], with a copy to counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware 19801, Attn: John W. Lucas and James E. O'Neill, not later than 4:00 p.m. (prevailing Eastern time) on July 18, 2019 (the "Bid Deadline"). The Debtors shall promptly provide copies of all Bids to counsel for the Committee and KeyBank.

A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

*Bid Requirements*

To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtors (in consultation with the Committee and KeyBank) to satisfy each of the following conditions), unless otherwise modified by the Debtors in their reasonable discretion:

1.  Good Faith Deposit. Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of Kona Grill, Inc. in an amount to be determined by the Debtors, but in any event no less than 10% of the Bidder's offer.

2.  Purchase Price. The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtors (in consultation with the Committee and KeyBank) (the cash component must be no less than an amount necessary to satisfy the Break-up Fee, as defined below). The Bid must clearly set forth the purchase price and identify any non-cash components including, without limitation, which liabilities of the Debtors the bidder is agreeing to assume (the "Purchase Price").

3.  Irrevocable. The Bids of the Successful Bidder and the Back-up Bidder must be irrevocable until the earlier of (a) the closing of the transaction with the Successful Bidder, or (b) the date the Sale Order has become final and non-appealable (the earliest of the dates being the "Termination Date").

4.  Principal Terms. A Bid must include an executed agreement pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents") and a black-lined copy of the Competing Agreement marked to show all changes requested by the Qualified Bidder, including specification of the proposed Purchase Price and any changes to any exhibits or schedules to the Competing Agreement. The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome to the Debtors than the provisions contained in

4

the Stalking Horse Purchaser's Purchase Agreement.    A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Contemplated Transaction Documents. The Contemplated Transaction Documents must include a commitment to close by no later than the closing date set forth in section 3 of the Purchase Agreement.    A Bid should propose a contemplated transaction involving all or substantially all of the Assets, provided, however, that the Debtors in their sole discretion (in consultation with the Committee and KeyBank) may consider proposals for less than substantially all the Assets if such proposals or combination of proposals maximizes the value of the Debtors' estates.

5.    <u>Contingencies</u>.    A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions.    A Bid must disclose any governmental approvals identified by the Qualified Bidder other than as set forth in the Competing Agreement that may impact the evaluation of such Bid.

6.    <u>Authorization to Bid and Identity of Bidder</u>.    A Bid must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery and closing of the Contemplated Transaction Documents. A Bid must also fully disclose the identity of such entity that is submitting the Bid, including the identity of each equity holder or other financial backer of the bidder if such bidder is formed for the purpose of submitting the bid.

7.    <u>Financing Sources</u>.    A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors (in consultation with the Committee and KeyBank) with appropriate contact information for such financing sources.

8.    <u>No Fees Payable to Qualified Bidder</u>.    A Bid may not request or entitle the Qualified Bidder, other than the Stalking Horse Purchaser, to any Break-up fee, termination fee, expense reimbursement or similar type of payment.    Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bid Procedures.

9.    <u>Immediate Payment of the Break-up Fee</u>.    A Bid must allow for the immediate payment of the Break-up Fee to the Stalking Horse Purchaser from the first proceeds of the cash portion of the Purchase Price of such Bid.

10.    <u>Non-Reliance</u>.    A Bid must include an acknowledgement and representation of the Qualified Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets and Assumed Liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "Qualified Bid," if the Debtors believe, in their sole discretion (in consultation with the Committee and KeyBank), that such Bid would be consummated if selected as the Successful Bid. The Debtors shall have the right to reject any and all Bids that they believe, in their sole discretion (in consultation with the Committee and KeyBank), do not comply with the Bid Procedures. In the event that any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good Faith Deposit.

### Break-up Fee

Recognizing the Stalking Horse Purchaser will expend time, energy and resources, and that the Stalking Horse Purchaser provides a floor bid with respect to the Assets that it offers to purchase, the Debtors are authorized (pursuant to the Bid Procedures Order) to provide the following bidding protections to the Stalking Horse Purchaser.

1.    The Debtors have agreed to pay the Stalking Horse Purchaser, upon the terms set forth in Section 12 of the Purchase Agreement, the amount of One Million and 00/100 Dollars as a Break-up fee (the "Break-up Fee") pursuant to and in accordance with the terms of the Purchase Agreement and Bid Procedures Order.

2.    Any Bid submitted on the Bid Deadline by a party or parties other than the Stalking Horse Purchaser must be in an amount that is sufficient to pay the Break-up Fee and result in additional consideration to the Debtors' estates in the amount of at least $250,000 (as compared to the Purchase Price offered by such Stalking Horse Purchaser), after payment of the Break-up Fee, plus the assumption of liabilities.

### Auction

If the Debtors receive at least two (2) Qualified Bids from Qualified Bidders (inclusive of the Stalking Horse Purchaser Bid) prior to the Bid Deadline, then the Debtors shall notify the Stalking Horse Purchaser and each other Qualified Bidder that the Debtors intend to conduct an auction (the "Auction") to consider all Qualified Bids and to determine the highest or otherwise best bid with respect to the Assets. At least forty-eight (48) hours prior to the Auction, the Debtors shall provide the Stalking Horse Purchaser, all Qualified Bidders and the Committee and KeyBank with copies of all Qualified Bids in advance of the Auction, but may exclude any confidential financial information, as reasonably designated by the applicable Qualified Bidder. Unless otherwise designated by the Debtors, the Auction shall commence at **10:00 a.m. (Eastern time) on a date no later than July 23, 2019,** at the offices of Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, DE 19899, or at such other place designated by the Debtors.

In advance of the Auction, the Debtors will notify all Qualified Bidders in writing of (i) the highest or otherwise best Qualified Bid, as determined by the Debtors in their discretion (the "Baseline Bid") and (ii) the time and place of the Auction.

If the Debtors do not receive more than one (1) Qualified Bid from a Qualified Bidder (inclusive of the Stalking Horse Purchaser Bid), then no Auction shall be scheduled or conducted, and the Court at the Sale Hearing shall proceed to solely consider the approval of the proposed sale to the Stalking Horse Purchaser as set forth in the Purchase Agreement and shall not consider any competing or alternative offers or proposals to purchase the Assets.

6

If the Auction is necessary, such Auction shall be conducted according to the following procedures:

**20.**     **Participation at the Auction**

Only the Stalking Horse Purchaser and Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction. Only the authorized representatives and professional advisors of each of the Qualified Bidders, the Stalking Horse Purchaser, the Debtors, the Committee, KeyBank, and the U.S. Trustee shall be permitted to attend the Auction.

Except as otherwise set forth herein, the Debtors (in consultation with the Committee and KeyBank) may conduct the Auction in the manner they determine will result in the highest or best offer for the Assets in accordance with the Bid Procedures.

In the Debtors' sole discretion, after the conclusion of the Auction, the Debtors may resume an auction for the sale of discrete assets and/or discrete groups of assets, if any, which are not included in the Successful Bid, on such bidding procedures as may be implemented by the Debtors in their discretion (in consultation with the Committee and KeyBank).

**21.**     **The Debtors Shall Conduct the Auction**

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall be made by the Debtors in their discretion (in consultation with the Committee and KeyBank), and may take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates (the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors reserve the right to conduct the Auction in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received in accordance with the Bid Procedures. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid. Pursuant to Local Rule 6004-1, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the Bid Procedures, the Auction or the proposed transaction.

**22.**     **Terms of Overbids**

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

**(a)**     **Minimum Overbid Increment**

During the Auction, bidding shall begin initially with the Baseline Bid. Any Overbid after the Baseline Bid shall be made in increments of at least $250,000 in cash or other consideration acceptable to the Debtors; *provided, however*, that any Overbids by the Stalking Horse Purchaser thereafter shall only be required to be equal to the sum of (1) the then existing lead Bid plus (2) the $250,000 Overbid less (3) $1,000,000 (*i.e.*, the amount of the Break-up Fee).

Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtors (in consultation with the Committee and KeyBank) accept a higher Qualified Bid as an Overbid.

7

**(b)**     **Consideration of Overbids**

The Debtors reserve the right, in their reasonable business judgment (in consultation with the Committee and KeyBank), to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

## 23.     Additional Procedures

The Debtors may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion (in consultation with the Committee and KeyBank), will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order or the Bankruptcy Code. All such rules will provide that all Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

The Debtors (in consultation with the Committee and KeyBank) may (a) determine which Qualified Bid, if any, is the highest and best offer and (b) reject at any time before entry of an order of the Bankruptcy Court approving the sale of the Assets pursuant to a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code or these Bid Procedures; or (iii) contrary to the best interest of the Debtors, their estates and their creditors.

## 24.     Consent to Jurisdiction as Condition to Bidding

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

## 25.     Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Debtors (in consultation with the Committee and KeyBank) shall immediately identify the highest or best offer for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest or best offer will provide the greatest amount of net value to the Debtors, and the next highest or best offers after the Successful Bid (the "Back-up Bid") and the entity or entities submitting the Back-up Bid (the "Back-up Bidder"), and advise the Qualified Bidders of such determination. Upon three (3) days' prior notice by the Debtors, the Back-up Bidder selected by the Debtors must immediately proceed with the closing of the transaction contemplated under the Back-up Bid in the event that the transaction with the Successful Bidder is not consummated for any reason.

As stated above, the Bids of the Successful Bidder and the Back-up Bidder must be irrevocable until the Termination Date.

8

### Acceptance of Successful Bid

The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of such Qualified Bid. The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

### "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except to the extent set forth in the Purchase Agreement or the Competing Agreement of the Successful Bidder. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or the Purchase Agreement or the Competing Agreement of the Successful Bidder.

### Free of Any and All Interests

Except as otherwise provided in the Purchase Agreement or the Successful Bidder's Competing Agreement and subject to the approval of the Bankruptcy Court, all of Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of any Liens, Claims and Encumbrances, and other interests to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Liens, Claims and Encumbrances, and other interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such, Liens, Claims and Encumbrances, and other interests applied against the Assets.

### Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on **July 25, 2019, at 2:00 p.m. (Eastern time)**, or on such other date as may be established by the Bankruptcy Court.

If the Successful Bidder fails to consummate an approved sale in accordance with the applicable asset purchase agreement or such agreement is terminated, the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting the Back-up Bid without further order of the Bankruptcy Court.

### Return of Good Faith Deposit

The Good Faith Deposit of the Successful Bidder (or the Back-up Bidder that becomes a Successful Bidder) shall be applied to the Purchase Price of such transaction at Closing. The Debtors will hold the Good Faith Deposits of the Successful Bidder and the next highest Qualified Bidder in a segregated account until the closing of the sale with the Successful Bidder; Good Faith Deposits of all other Qualified Bidders shall be held in a segregated account, and thereafter returned to the respective bidders following the conclusion of the Auction. If a Successful Bidder (including any Back-up Bidder that has become the Successful Bidder) fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the

9

Debtors shall be entitled to retain the Successful Bidder's Good Faith Deposit as the Debtors' damages resulting from such Successful Bidder's breach or failure to perform.

DOCS_SF:100991.3 50045/001